**In the United States District Court**
**For the Northern District of Illinois**
**Eastern Division**

| | | |
|---|---|---|
| MELVIN JONES, on behalf of himself and all others similarly situated, and in the interest of the general public, | ) ) ) | **Class Action** |
| | ) | No. |
| Plaintiffs, | ) | |
| | ) | Judge |
| vs. | ) | |
| | ) | Magistrate |
| Former Chicago Police Department (CPD) Commander JON BURGE; former CPD Sergeant JOHN BYRNE; former CPD detectives MICHAEL BOSCO, ROBERT FLOOD, DENNIS McGUIRE, DANIEL McWEENY; former CPD Superintendent RICHARD BRZECZEK; former Mayor and former State's Attorney RICHARD M. DALEY; former State's Attorney RICHARD A. DEVINE; WILLIAM J. KUNKLE; the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; and the COOK COUNTY STATE'S ATTORNEY'S OFFICE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | **Jury Trial Demand** |

## CLASS ACTION COMPLAINT

Plaintiff MELVIN JONES, on behalf of himself and all others similarly situated, and in the interest of the general public, for his complaint against JON BURGE; JOHN BYRNE; MICHAEL BOSCO; ROBERT FLOOD; DENNIS McGUIRE; DANIEL McWEENY; RICHARD BRZECZEK; RICHARD M. DALEY; RICHARD A. DEVINE; WILLIAM J. KUNKLE; the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; and the COOK COUNTY STATE'S ATTORNEY'S OFFICE, alleges the following upon information and belief (except for those allegations pertaining to Mr. Jones, which are based on personal knowledge), after due investigation by undersigned counsel:

## V.    INTRODUCTION

1.      A thirty-seven-year period of the systematic torture of African American male arrestees, witnesses, and suspects and the conspiracy used to cover it up disintegrated on June 29, 2010, when former Chicago Police Department (CPD) Commander Jon Burge was convicted in this court of the crimes of perjury and obstruction of justice.

2.      Plaintiff Melvin Jones was only one of an estimated 135 victims of the systematic torture regime that the Defendants either participated in by torturing or otherwise abusing criminal suspects, or by condoning the torture program through a knowing refusal to acknowledge, prevent, or punish the illegality of the Defendants' interrogation tactics.

3.      Mr. Jones brings this action for himself and as a representative plaintiff acting for the interests of the general public.

4.      Mr. Jones also brings this action as a class action, on behalf of himself and all other persons who were victims (the Class) of the conspiracy to cover-up the systematic torture of African American male arrestees, witnesses, and suspects.

5.      Defendant Burge's conviction in 2010 marked the first time that Mr. Jones and the Class had an opportunity to obtain judicial relief for the abuses they suffered at the hands of Burge and the Defendant Officers.

6.      Before this conviction, the City of Chicago had proven to be a place where police brutality ran rampant and the "code of silence" provided immunity for its perpetrators.

7.      Before this conviction and because of the wrongful conduct of the Defendants, victims of police torture could not expect that their stories would be believed by prosecutors or taken seriously by the courts.

2

8.    This conviction, and this conviction alone, has cleared the path for justice for Mr. Jones and the Class.

9.    Mr. Jones and the Class seek damages for the injuries inflicted upon them as a result of the systematic deprivation of their constitutional rights.

## VI.    JURISDICTION AND VENUE

10.    This court has jurisdiction over this civil rights action, brought pursuant to 42 U.S.C. § 1983, et seq. and the United States Constitution and under 28 U.S.C. §§ 1331 and 1343(a).

11.    This court also has supplemental jurisdiction over the state law claims, under 28 U.S.C. § 1367(a).

12.    Venue is proper under 28 U.S.C. § 1391(b), as the parties reside, or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

## VII.    PARTIES

13.    **Plaintiff Melvin Jones** is a fifty-nine-year-old African American man, a homeless resident of the City of Chicago and Cook County, and a citizen of the United States.

14.    **Defendant Jon Burge** was a duly appointed and sworn Chicago Police Lieutenant and the commanding officer of CPD Area 2 Detective Violent Crime Unit (Area 2). As the commanding officer at Area 2, Burge was the commanding officer of Defendant John Byrne, and Defendants Michael Bosco, Robert Flood, Dennis McGuire, and Daniel McWeeny.

15.    In 1988, Burge was promoted to Commander of Area 3 detectives and held this assignment until 1991 when he was suspended and ultimately fired for the torture and abuse of Andrew Wilson.

3

16.    Burge was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

17.    **Defendant John Byrne** was a duly appointed and sworn Chicago Police Sergeant who was assigned to Area 2, under Burge's command, from 1982 to August 1986.

18.    From 1988 to 1991, Byrne was a sergeant at Area 3, also under Burge's command.

19.    Defendant Byrne was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

20.    **Defendants Michael Bosco, Robert Flood, Dennis McGuire,** and **Daniel McWeeny** (collectively, the **Defendant Officers**) were duly appointed and sworn Chicago Police officers who were assigned to the Detective Division at Area 2 under Defendant Burge's command, and who engaged in the conduct complained of in the course and scope of their employment.

21.    The Defendant Officers are sued in their individual and official capacities.

22.    **Defendant Richard Brzeczek** was the CPD Superintendent from 1981-1983.

23.    Defendant Brzeczek was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

24.    **Defendant Richard M. Daley** was the State's Attorney of Cook County from 1981 to 1989.  During that period, he was responsible for the policies, practices, and customs of that office.

25.    From 1989 to May 16, 2011, Defendant Daley was the Mayor of the City of Chicago and as such was the chief policy maker for the City of Chicago, its Police Department,

4

City Council, and Police Board and was therefore responsible for policies, practices, and customs complained of herein.

26.     Defendant Daley was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

27.     **Defendant Richard A. Devine** served as Defendant Daley's First Assistant at the State's Attorney's Office from 1981 to 1983.

28.     From 1988 to 1997 Devine was, together with Defendant William J. Kunkle, counsel for Defendants Burge, Byrne, and other Area 2 police officers, in several civil suits, defending them against claims of torture.

29.     As such, Devine was Special Assistant Corporation Counsel, paid by, and agents for, the City of Chicago, its Mayor, City Council, and Corporation Counsel's Office.

30.     Devine was the State's Attorney of Cook County from 1997 to 2008.  During that period, he was responsible for the policies, practices, and customs of that office.  Defendant Devine was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

31.     **Defendant William J. Kunkle** was the First Deputy State's Attorney of Cook County under Defendant Daley and answered directly to Defendant Devine during that period.

32.     In 1983, Kunkle became First Assistant State's Attorney and, as such, answered directly to Daley.

33.     In 1986 and 1987, Kunkle, then in private practice with Devine, was appointed Special Assistant State's Attorney of Cook County by Daley, and as such headed the re-prosecution of Andrew Wilson.

34.     From 1988 to 1997, Kunkle was, together with Devine, counsel for Defendants Burge, Byrne, and other Area 2 police officers in several civil suits, defending them against claims of torture.  As such, he and Devine were Special Assistant Corporation Counsel, paid by, and agents for, the City of Chicago, its Mayor, City Council, and Corporation Counsel's Office.

35.     Defendant Kunkle was acting in the scope of his employment at all times material to this complaint and is sued in his individual capacity.

36.     **Defendant City of Chicago** is an Illinois municipal corporation, and is and/or was the employer of Defendant Burge and each of the Defendant Officers.

37.     The City of Chicago is responsible for the acts of Defendant Burge and of the Defendant Officers while employed by the City of Chicago and while acting within the scope of their employment.

38.     **Defendant Cook County** is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (the State's Attorney's Office).

39.     At all times relevant to this action, Cook County and the State's Attorney's Office were responsible for the policies, practices, and customs of the State's Attorney's Office and the prosecutors working therein.

40.     At all times relevant to this action, each of the named Defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois.

41.     Each Defendant's actions constituted "state action" as defined under federal law.

6

## VIII.  CLASS ACTION ALLEGATIONS

42.     Mr. Jones brings this action as a class action under Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of himself and all other victims of the conspiracy to cover-up the systematic torture of African American male arrestees, witnesses, and suspects.

43.     Mr. Jones's claims are typical of the claims of the other members of the Class, as Mr. Jones and all other members were injured in the same way–by the torturous and otherwise abusive treatment by Burge and other CPD officers during questioning or interrogation; the failure of the Defendants to stop or prevent these abuses from recurring; and the conspiratorial cover-up of the systematic torture regime, in violation of federal and state law as complained of herein.

44.     Mr. Jones will fairly and adequately represent the interests of the Class and has retained or will retain counsel competent and experienced in class action litigation.

45.     Mr. Jones has no interests that are contrary to or in conflict with those of the Class.

46.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because of the Defendants' unlawful and tortious conspiracy to cover up the systematic torture regime, it is impossible for the class members individually to seek redress for the unlawful conduct alleged.

47.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy and substantial benefits will derive from proceeding as a class action.  For example:

       a.      Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

7

efficiently, and without the duplication of effort and expense that numerous individual actions would engender;

b.    Without the representation provided by Mr. Jones herein, few, if any, members of the Class will receive legal representation or redress for their injuries;

c.    Class treatment also will permit the adjudication of claims by many members of the Class who could not afford to individually litigate such claims against the Defendants;

d.    Class treatment is required for optimal deterrence;

e.    Mr. Jones and the members of the Class have all suffered irreparable harm and damages as a result of the Defendants' unlawful and wrongful conduct; and

f.    Absent a class action, the members of the class will not receive restitution, and will continue to suffer losses.

48.    Mr. Jones knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient group-wide adjudication of this controversy.

49.    Common questions of law and fact exist as to all members of the Class, including:

a.    Whether the Defendants' acts or omissions as alleged herein constitute racketeering activity, a fraudulent scheme, and/or a conspiracy to violate the constitutional rights of Mr. Jones and the members of the Class;

b.    Whether the Defendants participated in and pursued the concerted action or common course of conduct complained of;

c.    What state law(s) govern;

d.    Whether Mr. Jones and members of the Class have sustained compensable damages and, if so, the proper measure of such damages; and

e.    Whether Mr. Jones and the members of the Class are entitled to punitive damages and/or civil penalties.

## IX.    FACTUAL STATEMENTS

**The unlawful arrest, interrogation, and torture of Mr. Jones**

50.    On February 5, 1982, Defendants Flood and McGuire arrested Mr. Jones at his then-girlfriend's (Jacqueline Quinn's) home while he was babysitting her three-year-old child. Flood and McGuire ransacked the residence and produced an inoperable gun which they said they found in a drawer in the child's room.

51.    Thereafter, Flood and McGuire charged Mr. Jones with Unlawful Use of a Weapon (UUW) and then took him by police vehicle to Area 2 police headquarters at 9059 S. Cottage Grove Avenue on Chicago's South Side.

52.    Once at Area 2, Flood and McGuire placed Mr. Jones in an interrogation room and handcuffed him to the wall.

53.    Although Mr. Jones had been arrested for UUW, Flood and McGuire immediately began to question Mr. Jones about his alleged involvement in the murder of Geoffrey Mayfield. Mr. Jones denied any involvement in the murder.

54.    Defendant Burge later entered the room.  In the presence of Flood and McGuire, Burge threatened that Mr. Jones "was going to wish he had never set eyes on him."

55.    At this point, McGuire left the room.

56.    Thereafter, Burge and Flood resumed their interrogation of Mr. Jones.  Flood first repositioned Mr. Jones so that he was handcuffed to the wall with his hands behind his back, in a standing position.

57.    Burge sat in a chair facing Mr. Jones and told him that he "hoped he had fucked that night" because Mr. Jones "was going to need it after he was through with him."

58.     Thereafter, Burge pulled Mr. Jones's pants down to his ankles and attached a homemade electrocution device (the shock box) to his body and electrocuted him on his left foot, left thigh, and penis.

59.     Mr. Jones screamed in pain and protested, saying: "You ain't supposed to be doing this to me."

60.     Burge turned to Flood and asked him whether he had seen anything.

61.     Flood looked up at the ceiling and replied that he had not seen anything.

62.     Burge then turned back to Mr. Jones and said: "You see, it's just me and you. No Court and no State are going to take your word against a Lieutenant's word."

63.     During the interrogation, Burge also gagged Mr. Jones's mouth with a brown sock and struck Mr. Jones on the head with a stapler at least twice.

64.     The next day, Defendant McWeeny and another unidentified police officer continued the interrogation of Mr. Jones.

65.     Burge entered the room carrying a gun and asked McWeeny whether Mr. Jones had "started talking yet."

66.     When McWeeny said no, Burge put the gun to Mr. Jones's head and said he was going to "blow his black head off."

67.     At no point during Mr. Jones's four-day detention at the police station was he given his Miranda rights, nor was he allowed to speak to a lawyer although he requested one.

68.     Despite the torture, Mr. Jones did not confess to the UUW crime for which he was ostensibly being detained. Nor did Mr. Jones confess to participating in a homicide.

**Mr. Jones's motion to suppress hearings**

69.     On February 10, 1982, Cassandra Watson, the lawyer representing Mr. Jones in his UUW case, filed a motion to quash arrest and to suppress evidence based on Mr. Jones's description of his torturous interrogation at Area 2.

70.     A hearing on the motion to suppress was held on May 27, 1982.

71.     During this hearing, Flood and McGuire testified and denied Mr. Jones's allegations that he had been tortured.

72.     Flood further testified that he and McGuire were in the interrogation room with Mr. Jones, and denied that Defendant Burge was ever in the room.

73.     McGuire testified that he did not remember speaking to Mr. Jones at all.

74.     On August 5, 1982, Judge Roger J. Kiley of the Cook County Circuit Court presided over another hearing on the motion to suppress.  At this hearing, Burge and McGuire denied that they had abused Mr. Jones.

75.     Burge also testified–contrary to Flood's May 27, 1982 testimony–that he had been present in the interrogation room with Mr. Jones while Flood and McGuire were questioning him.

76.     Although Burge denied having questioned Mr. Jones himself, he admitted that he warned Mr. Jones that "the criminal justice system . . . do[es] not think highly of people that kill State's witnesses, and I also told him that if it took us a day, six months, a year, or ten years, we would get the parties that were responsible for murdering this witness."

77.     After hearing testimony from Burge and McGuire, and from Mr. Jones, Judge Kiley granted the motion to suppress on 5th Amendment grounds.

#10410943_v1

78.     Judge Kiley, however, rejected Mr. Jones's 4th and 14th Amendment arguments, based on his torture at Area 2, not finding that Mr. Jones's testimony on that "particular question to be particularly credible or corroborated."

79.     At Mr. Jones's subsequent UUW trial, on September 9, 1982, he was found not guilty and released from jail.

80.     Because he could not afford bond on the UUW charge, Mr. Jones had been held in police custody for a total of eight months.

81.     Upon his release, Watson warned Mr. Jones that "in [her] opinion it was obvious the police were going to get him and that they were going to put the [Mayfield] murder case on him any way they could.  [They] had an extended conversation about that [and she] warned him to be very careful."  Her warning would prove to be prescient.

**Mr. Jones's arrest, bench trial, and wrongful conviction for murder**

82.     Three months later, on December 10, 1982, Flood and McGuire arrested Mr. Jones again.

83.     Flood and McGuire arrested Mr. Jones as a suspect in a triple murder investigation, yet Mr. Jones was never charged with that crime.

84.     At a hearing on Mr. Jones's motion to quash his arrest, Flood testified that Deneen Murray told him that she and Mr. Jones were present at the scene of the triple murder.

85.     Flood also testified that Murray took a polygraph test to insure the truthfulness of her account and that she identified Mr. Jones in a police lineup.

86.     In a 1987 opinion reversing Mr. Jones's murder conviction, the Appellate Court of Illinois, First District, found that Murray never actually identified Mr. Jones as the perpetrator of the triple murder.

12

87.    The Appellate Court also noted certain irregularities with Flood's account, including: (a) Flood's failure to prepare a police report of his conversation with Murray; (b) the lack of a record of the polygraph test; (c) the failure of the prosecution to call the polygraph test operator to testify at the hearing; (d) the lack of a police report of the lineup; and (e) the failure of the prosecution to call Murray to testify at the hearing.

88.    Further, in a signed affidavit procured after the initial hearing on Mr. Jones's motion to quash his arrest, Murray averred that (a) she did not tell Flood that Mr. Jones was involved in the triple murder; and (b) she did not pick Mr. Jones out of the police lineup.

89.    McGuire and Bosco were the officers who interrogated Mr. Jones on December 11, 1982 about his involvement in the Mayfield murder.

90.    During Mr. Jones's bench trial, McGuire testified that he advised Mr. Jones of his Miranda rights, and thereafter began questioning him about the triple murder.

91.    McGuire further testified that, in Bosco's presence, Mr. Jones confessed to Geoffrey Mayfield's murder.

92.    McGuire explained that this spontaneous confession occurred because Mr. Jones was under the mistaken belief that his September 1982 acquittal for the UUW charge had also immunized him from prosecution for the Mayfield murder.

93.    In June 1983, the trial judge convicted Mr. Jones of the Mayfield murder.  The guilty verdict was based entirely on the false confession produced by the Defendant Officers and the trial judge's reliance on McGuire's testimony.

94.    The trial judge explained: "This case, like most others, boils down to the issue of credibility.  The police have testified as to certain alleged admissions that were made by [Mr. Jones], and [Mr. Jones] denies making any statements, and it is claimed–and I cannot state it any

other way–that he is being framed by the police. . . . My conclusion is that [Mr. Jones] was prosecuted for the Mayfield murder because he did make the statements [confessing his guilt]."

95. After Mr. Jones's trial counsel protested that Flood and McGuire had lied on the stand, the trial judge stated: "There is no doubt about one thing . . . if the police officers are lying, it is their testimony that is going to take away Mr. Jones'[s] freedom for the rest of his natural life."

96. The trial judge concluded: "[I]f there is some error on my part, I am sufficiently confident of the workings of the criminal justice [system] that they will be found on appeal; which is your next avenue."

97. In a 1987 opinion reversing Mr. Jones's murder conviction, the Appellate Court of Illinois, held that Mr. Jones "should not be imprisoned for his natural life on the trial record before us."

98. Specifically, the Appellate Court was troubled by several key facts that undermined the credibility of McGuire's trial testimony. These facts include:

a. Mr. Jones's alleged oral confession was never reduced to writing and there was no evidence that Mr. Jones was asked to put his confession into written form;

b. At trial, Mr. Jones denied that he committed the murder and he further denied that he had ever confessed to doing so; and

c. Bosco could have been called by the prosecution to corroborate McGuire's testimony about Mr. Jones's alleged confession, but he was never called as a witness at the trial.

99. On July 2, 1987, Mr. Jones's murder conviction was reversed and his case remanded for a new trial.

100. In 1989, Mr. Jones was re-tried on the same murder charge and was acquitted. He had spent five years in custody prior to his acquittal on re-trial.

14

**The conspiracy to torture suspects at Area 2 and Area 3 and to cover it up**

101.     Mr. Jones's torture was not an isolated incident of police brutality.  Rather, Mr. Jones's experience was part of a pattern and practice of torture and physical and psychological abuse of African American male arrestees, witnesses, and suspects by Burge, Byrne, and the CPD officers at Area 2 and Area 3.

102.     In a report which was approved by the Director of CPD's Office of Professional Standards (OPS) and forwarded to Police Superintendent LeRoy Martin in November 1990, the OPS found that from 1973 to 1985, there was a practice of systematic abuse of suspects held in custody at Area 2 and that certain Area 2 command personnel were aware of such abuse and condoned it.

103.     OPS further found that this practice included psychological techniques and planned torture, and that Area 2 command personnel were aware of the systematic abuse and encouraged in by either participating in it or by failing to take any action to stop it.

104.     The OPS report also found that Defendant Burge was a "player" in this pattern and practice of torture and other abuses.

Purposes of the conspiracy

105.     The individual Defendants engaged in a pattern and practice of the torture and abuse of African American male arrestees, witnesses, and suspects at Area 2 and Area 3 police headquarters in order to extract confessions to be used against these men in criminal prosecutions.

106.     The individual Defendants benefitted from the illicit torture program conducted at Area 2 and Area 3 through the criminal convictions obtained as a result of the forced confessions.

#10410943_v1

107.     Each of the individual Defendants stood to lose their power, prestige, and income if they broke the "code of silence" and came forward with their knowledge about the systematic torture regime at Area 2 and later Area 3.

108.     Defendants Burge, Daley, Devine, and Kunkle benefitted professionally and financially from the illicit torture program conducted at Area 2.  Each of these Defendants rose through the ranks of their professions or in prominence due to the criminal convictions obtained as a result of the confessions that were fabricated or forcefully coerced from Mr. Jones and the members of the Class.

The agreement among the Defendants

109.     The Defendants agreed to use torture, degrading, or otherwise inhuman treatment of African American male arrestees, witnesses, and suspects at Area 2 and Area 3 in order to extract confessions from them.

110.     The Defendants agreed to conceal or cover up the use of torture, degrading, or otherwise inhuman treatment against African American male arrestees, witnesses, and suspects at Area 2 and at Area 3.

111.     Although Burge directed and supervised the torture program at Area 2 and later, at Area 3, these illegal interrogations could not have continued without the aid of Brzeczek, Daley, Devine, and Kunkle.

112.     Despite numerous complaints and the anomaly of so many confessions arising from Area 2, Brzeczek refused to investigate any allegations of police torture that were repeatedly brought to his attention.

113.     Brzeczek's refusal to investigate violated police regulations, and permitted the torture to continue.

114.    Daley, Devine, and Kunkle also condoned the pattern and practice of torturing African American male arrestees, witnesses, and suspects at Area 2 and Area 3 by refusing to investigate the numerous complaints of torture or to intervene when Bzreczek refused to investigate.

115.    Burge, Brzeczek, Daley, Devine, Kunkle and Defendant Officers suppressed from Mr. Jones and the members of the Class and their respective counsel, and the jurors and judges in each of the Plaintiffs' criminal proceedings, all of the facts regarding the pattern of abuse and torture of African American men.

116.    Defendants Burge, Brzeczek, Daley, Devine, Kunkle, and Defendant Officers also suppressed the physical evidence of their pattern and practice of torture, including the homemade electrocution device (the shock box), used against Mr. Jones and other members of the Class.

Overt acts in furtherance of the conspiracy

117.    Over a 15-year period, Burge, Byrne, the Defendant Officers, and other Area 2 and Area 3 detectives tortured and otherwise abused an estimated 135 African American male arrestees, witnesses, and suspects.

118.    The interrogation and torture of Mr. Jones and the Class was part of a long-standing pattern and practice of similar acts of racially-motivated torture, including electric shock, baggings, mock executions, Russian roulette, and beatings committed against African American men under the supervision, and with the encouragement, participation, and ratification of Burge.

119.    Burge supervised, encouraged, participated in, failed to prevent, and ratified the abuse of Mr. Jones and the Class by various CPD officers, including the Defendant Officers.

120.    This systematic torture of African American male arrestees, witnesses, and suspects was part of an accepted pattern and practice at Area 2 and Area 3.

17

121.    Daley knew about or was on notice of the activities at Area 2, and later Area 3, as a result of a February 1982 investigation involving the arrest of Andrew Wilson.

122.    Daley and Bzreczek monitored each development during the investigation.

123.    Wilson confessed, but not until being tortured by electrocution, suffocated with a plastic bag, burned on a radiator, and beaten.

124.    The Defendants' wrongful conduct, including but not limited to lying, cover ups, suppression of evidence, failure to intervene, and/or failure to prevent the torture and abuses, created an atmosphere where Mr. Jones and the Class feared reprisals.

125.    This wrongful conduct constitutes a continuing course of conduct and is evident in the following actions:

126.    In February 1982, Brzeczek, Daley, and Devine received credible information from Dr. John Raba, the Director of Medical Services at Cook County Jail, that Andrew Wilson bore physical signs of torture after interrogation at Area 2.

127.    Dr. Raba wrote a letter to Brzeczek describing, in detail, his medical examination of Wilson and demanded a complete investigation.

128.     Brzeczek, in turn, forwarded Dr. Raba's letter to Daley explaining that there were allegations of torture at Area 2 and requesting advice on whether he should investigate further.

129.    Daley and Devine discussed the letter from Brzeczek with each other, but declined to investigate further.

130.    The CPD took no action to punish or restrain Burge at that time, and indeed took no action to punish or restrain Burge until 1991 when he was suspended for the torture and abuse of Andrew Wilson.

131.   Rather, Burge was assigned as a detective to Area 2 in 1972.  He rose in the ranks, as he was promoted to Sergeant and then Lieutenant.

132.   He was appointed the commanding officer of Area 2 in 1982.  In 1988, Burge was promoted to Commander of Area 3 detectives, and held this assignment until 1991 when he was suspended for the torture and abuse of Andrew Wilson.

133.   Burge was finally fired by CPD in 1993.

134.   During the fifteen-year period while he was assigned to Area 2, Burge led the Defendant Officers and others in the regular and repeated torture and abuse of suspects to obtain confessions.

135.   Burge engaged in the torture and abuse himself; he also supervised, encouraged, sanctioned, condoned, and ratified the torture and abuse by other Area 2 police officers and detectives.

136.   He also, in conspiracy with the other named Defendants, covered up this torture and abuse.

137.   In September 1988, the City of Chicago hired Defendants Devine and Kunkle to represent Burge and other Area 2 detectives in the civil rights lawsuit brought against them by Andrew Wilson.

138.   For the next eight years, Devine and Kunkle continued to represent Burge in the Wilson civil case and other civil rights cases, as well as in the Police Board Proceedings.

139.   Defendant Devine and his law practice received over $1 million in attorneys' fees.

140.   From 1988 to 1996, Devine and Kunkle were confronted with voluminous amounts of evidence that Burge was the central figure in a longstanding, well-organized program of the torture and abuse of suspects at Area 2.

141.    Despite this knowledge, Devine and Kunkle orchestrated a series of litigation decisions designed to shield Burge from criminal, civil, and administrative liability.

142.    In the Andrew Wilson civil suit, for example, Kunkle argued that some of Wilson's injuries were caused by two patrol officers who were not under Burge's command, while other injuries were self inflicted.

143.    In 1997, Devine became the State's Attorney of Cook County.

144.    Acting under the color of his authority as State's Attorney, Devine thereafter took several actions that protected the interests of Burge by further covering up his central role in orchestrating the systematic torture regime at Area 2.  For example:

        a.      making false statements in which he discredited evidence of torture against Burge and other Area 2 police officers, including evidence presented by other Area 2 torture victims, whereby they sought new suppression hearings, new trials, new sentences, pardons, and/or clemency on the basis that they were tortured or that the police obtained false confessions through torture;

        b.      refusing to further investigate the allegations that Burge and other Area 2 police officers were actors in a pattern and practice of torture and abuse which included the torture of Mr. Jones and the Class and obstructing all attempts to so investigate; and

        c.      suppressing evidence which further established that Burge and other Area 2 police officers were actors in a pattern and practice of torture and abuse which included the torture of Mr. Jones and the Class.

145.    In 1992, after the public release of the 1990 OPS Report, then Mayor of Chicago, Defendant Daley, announced that the reports contained "only allegations."

146.    Defendant Daley insisted that "These are not substantiated cases."

147.    Prior March 28, 1994, the City had consistently maintained that Defendant Burge had been acting within the scope of his employment.

148.    On December 6, 1999, the television show "60 Minutes II" aired an interview with Defendant Byrne, who had identified himself as Burge's "right-hand man" at Area 2. Byrne denied that any suspect was ever tortured or abused at Area 2.

149.    In 2003, Burge was named as a defendant in a civil rights lawsuit filed in this court by torture victim Madison Hobley.

150.    Hobley's lawsuit alleged that, in January 1987, he had been tortured and abused in order to obtain a confession.

151.    Specifically, Hobley's lawsuit alleged that Area 2 police officers had placed a plastic bag over his head until he lost consciousness.

152.    The lawsuit also alleged that Burge was aware of a pattern and practice of torture and abuse at Area 2.

153.    During the civil discovery phase of the Hobley litigation, Burge was served with written interrogatories.

154.    In response to questions that specifically asked Burge whether he knew of or participated in torture or abuse of persons in police custody at Area 2, Burge denied having participated in or any knowledge of the torture or abuse at Area 2.

155.    On June 1, 2010, Mr. Jones's public defender during his first UUW trial in 1982, Cassandra Watson, testified that she had several conversations with Defendant Burge over the years about the homemade torture device that he had used to electrocute Mr. Jones.

156.    Burge sometimes responded by saying: "There is no box, Watson" or "What are you talking about Watson?"

157.    Eventually, however, Defendant Burge's responses became more sinister and revealing: "There is no box today" and "The black box leaves no marks."

21

158.    On June 17, 18, and 21, 2010, Burge took the stand in his federal perjury and obstruction of justice trial.

159.    Under oath, Burge repeatedly denied having participated in the torture of any criminal suspect.

160.    He denied condoning the use of torture to extract confessions from criminal suspects by the CPD officers under his command.

161.    He also denied having knowledge of any CPD officer under his command having ever tortured any criminal suspects.

162.    In January 2011, just prior to Burge's sentencing hearing, Kunkle wrote a letter to U.S. District Judge Joan Lefkow in support of Burge.

163.    In that letter, Kunkle argued that the claims that Burge tortured Andrew Wilson were untrue.

<u>Injuries to the Plaintiffs</u>

164.    As a direct and proximate result of the failure of Brzeczek, Daley, Devine, and Kunkle to intervene, discipline, or to adequately supervise, Burge, Byrne, the Defendant Officers, and other Area 2 detectives tortured numerous African American male arrestees, witnesses, and suspects with electrocution, baggings, mock executions, death threats, and beatings, often while using racial slurs and epithets.

22

**Plaintiffs' Damages**

165.     In total, Mr. Jones spent over five years in prison for crimes that he did not commit.  This time was emotionally, physically, and psychologically dehumanizing.

166.     While incarcerated, Mr. Jones suffered from the loss of sustained contact with his children and from his mother.

167.     As a result of his wrongful imprisonment, Mr. Jones has been deprived of the opportunity to hold gainful employment.

168.     Mr. Jones has been homeless since 1993.

169.     At night, he typically sleeps in abandoned buildings.

170.     As a result of his torture and the subsequent police cover-up, Mr. Jones suffers from recurring nightmares.  In these nightmares, he is trapped in an enclosed space where he cannot move.  He often has nightmares about being attacked.

171.     Mr. Jones suffers from constant fear and anxiety, nervousness, despair, and loneliness.

172.     Mr. Jones and the Class suffer the distrust of the police and all law enforcement in the City of Chicago.

173.     Because Mr. Jones distrusts the police, he has been reluctant to seek aid, assistance, or protection from the police since he was tortured.

174.     On occasion, this means that Mr. Jones will elect to sleep in the street or in an abandoned building, rather that to seek shelter at a police station during freezing winter nights.

175.     Because members of the Class distrust the police, they have been reluctant to seek aid, assistance, or protection from the police or other law enforcement.

#10410943_v1

176.     This means that members of the Class are less likely to aid law enforcement in criminal investigations even when they have material information that can be used to bring criminal suspects to justice.

177.     This is injurious to all residents of the City of Chicago.

## COUNT I

### (RICO Claim Under 18 U.S.C. § 1961, et seq.)

178.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

179.     Beginning in 1973, the Defendants engaged in and devised a fraudulent scheme to engage in the systematic torture and/or abuse of suspects and then to cover-up their wrongful conduct, actions, and omissions.

180.     This scheme did not end until at least June 29, 2010, when Defendant Burge was convicted in federal court of the crimes of perjury and obstruction of justice.

181.     In furtherance of this fraudulent scheme to engage in and cover-up their misconduct, the individual Defendants and others engaged in the following pattern of racketeering activity, as previously detailed:

  a.     Obstruction of justice, in violation of 18 U.S.C. § 1503, as detailed above;

  b.     Obstruction of criminal investigations, in violation of 18 U.S.C. § 1510, as detailed above;

  c.     Obstruction of State or local law enforcement, in violation of 18 U.S.C. § 1511, as detailed above;

  d.     Tampering with witnesses, in violation of 18 U.S.C. § 1512, as detailed above;

  e.     Retaliating against a witness, victim, or an informant, in violation of 18 U.S.C. §1513, as detailed above;

24

f.    Making and filing false police reports, including sworn affidavits, in violation of 720 ILCS 5/26-1, as detailed above;

g.    Testifying falsely and committing perjury before the Courts of the State of Illinois in violation of 720 ILCS 5/32-2, as detailed above;

h.    Upon information and belief, for the purpose of executing and attempting to execute the fraudulent scheme to engage in and cover-up their wrongful conduct, the Defendants repeatedly caused to be made and made telephone calls and other uses of interstate wire facilities to and from this federal District and elsewhere, in violation of 18 U.S.C. § 1343 (wire fraud);

i.    Upon information and belief, for the purpose of executing and attempting to execute the fraudulent scheme to engage in and cover-up their wrongful conduct, the Defendants repeatedly caused letters and other matters and things to be delivered by the United States Postal Service to and from this federal District and elsewhere, in violation of 18 U.S.C. § 1341 (mail fraud); and

j.    Committing attempted murder, in violation of 720 ILCS 5/8-4, 9-1(a), as detailed above.

182.    Each of the aforesaid violations by the Defendants constitutes an instance of "racketeering activity" as defined in 18 U.S.C. § 1961(1).

183.    As detailed above, these multiple acts of racketeering activity by the Defendants and others were interrelated, part of a common and continuous pattern of fraudulent schemes to cover-up their wrongful conduct, and were perpetrated for the same or similar purpose, thus constituting a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

184.    As detailed above, the Defendants committed at least two acts of racketeering activity, at least one of these acts occurred after the effective date of 18 U.S.C. § 1961, et seq., and the last of these acts occurred within ten years after the commission of a prior act of racketeering activity, pursuant to 18 U.S.C. § 1961(5).

185.    As a direct and proximate result of the Defendants' fraudulent scheme to cover-up their wrongful conduct by engaging in a pattern of racketeering activity, Mr. Jones and the Class

suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, emotional distress, and other consequential damages.

186.    Mr. Jones and the Class have and continue to be injured by the Defendants' conduct, actions and omissions.

187.    Such injuries will continue until remedies are redressed by this Court.

WHEREFORE, Plaintiffs demand the following relief jointly and severally against all of the Defendants:

      a.      Compensatory damages for Plaintiffs in amount that exceeds $75,000 per plaintiff;

      b.      Punitive damages for Plaintiffs against the Defendants in an amount to be determined at trial;

      c.      Costs and attorneys' fees, pursuant to 42 U.S.C. § 1988, involved in maintaining this action; and

      d.      Such other and further relief as this court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

## COUNT II

### (42 U.S.C. § 1983 Claim for Race-Based Equal Protection Violations)

188.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

189.    Defendants Burge, Byrne, and Defendant Officers engaged in intentional and unlawful racial discrimination when they tortured and otherwise abused Mr. Jones and the Class because they are African American men, thereby causing the Plaintiffs to be deprived of their right to equal protection of the law under the 14th Amendment.

190.    Defendants Burge, Byrne, and the Defendant Officers were acting under color of State law when they consistently used racial slurs and epithets during their torture and abuse of

Mr. Jones and the Class, demonstrating that their illegal treatment of the Plaintiffs was intentionally racially-motivated.  For example:

a.  On or about May 30, 1973, Anthony Holmes was interrogated at Area 2 by a group of CPD officers, including Burge.  During this interrogation, Holmes was repeatedly bagged, beaten, electrocuted with the shock box, and called "nigger."

b.  In 1973, while interrogating Lawrence Poree, Burge and Detective Michael Hoke showed Poree the shock box and Burge threatened, "this is what we got for niggers like you."

c.  On or about November 13, 1979, Edward James was interrogated at Area 2 by a group of CPD officers, including Burge.  During this interrogation, James was beaten, threatened, and called "nigger."

d.  On or about September 28 through September 29, 1979, Tony Thompson was interrogated at Area 2 by a group of CPD officers, including Burge.  During this interrogation, Thompson was beaten and repeatedly electrocuted with the shock box, which CPD officers referred to as the "nigger box."

e.  On or about November 13, 1981, Sylvester Green was arrested and interrogated at Area 2.  Three white detectives (Grunhard, McCabe, and McNally) entered the interrogation room, beat him, choked him, and called him a "nigger" and a "nigger bastard."  Burge later entered the interrogation room and further threatened Green.

f.  On February 6, 1982, during his interrogation of Mr. Jones, Burge put a loaded gun to Mr. Jones's head and said he was going to "blow his black head off."

g.  On or about February 14, 1982, during his interrogation of Andrew Wilson, Burge used the shock box and other torture tactics to elicit a confession from Wilson and told Wilson that he was going to "fry his black ass."

h.  On or about September 9, 1982, Rodney Benson was interrogated about his alleged participation in a rape.  When Benson denied the allegations, the police officers who were interrogating him beat him, threatened him with hanging, and told him that they "had hung other niggers," and threatened to kill him if they ever saw him in a white neighborhood.

i.  On or about October 28 through October 29, 1983, Byrne and Detective Peter Dignan repeatedly beat, suffocated with a plastic bag, and racially taunted Gregory Banks.  When Banks refused to make a statement,

27

Dignan held a plastic bag and told Banks "we have something special for niggers" and then placed the bag over Banks' head for up to 2 minutes.

j.     On or about November 2, 1982, Byrne struck Darrell Cannon on his testicles, penis, and mouth with a cattle prod. While he did this, Byrne repeatedly called Cannon a "nigger."

k.     On or about January 28, 1984, Lavert Jones was interrogated at Area 2 by a group of CPD officers, including Byrne. During this interrogation, Lavert Jones was beaten, kicked in the genitals, and called "nigger."

l.     On or about June 7, 1984, Phillip Adkins was interrogated at Area 2 by a group of CPD officers, including Byrne. During this interrogation Adkins was beaten on his body and groin, and repeatedly called "nigger."

m.     On or about October 30, 1985, Shadeed Mu'min was interrogated at Area 2 by a group of CPD officers, including Burge. During this interrogation, Burge repeatedly threatened Mu'min's life, bagged him with a typewriter cover, and repeatedly called him "nigger."

n.     On or about January 6, 1987, Madison Hobley was interrogated at Area 2 by a group of CPD officers, including Defendants Burge and McWeeny, and Detective Robert Dwyer. During this interrogation, Hobley was beaten, bagged, threatened with death, and called racial epithets, including "nigger."

o.     In mid-January 1987, Burge and Area 2 Detective Robert Dwyer had a conversation with Dwyer's sister (Eileen Pryweller), in which they described how they dealt with "niggers" during interrogation; stating that they "give them hell," "beat the shit out of them, throw them against walls, burn them against the radiator, smother them, poke them with objects, [and] do something to some guys' testicles." While Burge laughed, Detective Dwyer also said, "this skinny little nigger, boy I got him [by] just torturing him, smothering him."

p.     On or about June 5, 1991, TyShaun Ross was interrogated at Area 3 by a group of CPD officers, including Defendant McWeeny. During this interrogation, Ross was repeatedly beaten, electrocuted, and called "nigger."

q.     During a March 1, 2000 deposition in the People v. Patterson case, Byrne admitted that he, Burge, and other Area 2 police officers commonly used the term "nigger."

191.    The actions of Burge, Byrne, and the Defendant Officers individually, jointly, and in conspiracy, motivated by a racial animus in using excessive force against Mr. Jones and the Class, violated the Plaintiffs' Fourteenth Amendment rights to equal protection of the laws.

192.    The misconduct described in this Count was undertaken intentionally and arbitrarily and with wilful indifference to Plaintiffs' constitutional rights to be free from racial discrimination in the enforcement of the laws.

193.    Mr. Jones and the Class have been treated differently than other arrestees, witnesses, and suspects on account of their race and/or color.

194.    There is no compelling interest warranting such disparate treatment nor is such treatment narrowly tailored to serve any compelling interest.

195.    As a direct, foreseeable, and proximate result of the wrongful acts by the Defendants described in this Count, Mr. Jones and the Class suffered and will continue to suffer humiliation, anxiety, shame, despair, embarrassment, depression, mental pain, anguish, injury to their reputations, and economic losses, all to Plaintiffs' damages in an amount to be proven at time of trial.

196.    Because the conspiracy or conspiracies and the overt action in furtherance thereof where done and continue to be done with the knowledge and purpose of depriving Plaintiffs, who are African American, and numerous other African American torture victims of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward Plaintiffs and other victims of this racially-motivated conspiracy, the Defendants also deprived Plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1985.

WHEREFORE, Plaintiffs demand judgment against Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek, for compensatory damages, and, because these Defendants acted with purpose and or intent to discriminate for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

### COUNT III

**(42 U.S.C. § 1985 Claim for Conspiracy to Deprive Constitutional Rights)**

197.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

198.    Defendants, acting in their individual capacities and under color of law, conspired together and with other unsued co-conspirators, and reached a mutual understanding to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves, to deprive Mr. Jones and the Class of their constitutional rights, including their rights to be free from unreasonable search and seizure, to be free from wrongful conviction and imprisonment, and to due process of law.  Defendants' conspiracies deprived Mr. Jones and the Class of rights protected by the Fourth and Fourteenth Amendments of the United States Constitution, as protected by 42 U.S.C. § 1983.

199.    Defendants conspired to commit the overt acts set forth in the Factual Statements above.  The overt acts included the torture, wrongful arrest, prosecution, conviction, and imprisonment of Plaintiffs.  It also included the manufacture of knowingly false and knowingly unreliable evidence which was intended to inculpate Plaintiffs; the suppression of exculpatory evidence; and intentional failure to investigate evidence which would have exculpated Plaintiffs.

200.    The conspiracy resulted in the violation of Plaintiffs' constitutionally protected rights.

30

#10410943_v1

201.    The Defendants' conspiracy and overt acts were continuing in nature and caused Plaintiffs constitutional deprivations, injuries, paid, suffering, mental anguish, conviction, incarceration, humiliation, and loss of freedom, companionship, and income.

202.    The Defendants shared the general conspiratorial objective, which was to cause Plaintiffs' unlawful arrest, prosecution, conviction, and imprisonment as previously described.

203.    Additionally or alternatively, Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, Brzeczek, Daley, Devine, and Kunkle, knowing that the above § 1985 conspiracy to torture and wrongfully convict Plaintiffs was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

204.    The acts of Defendants as described were motivated by a racial animus, an evil motive and intent, and involved a reckless and callous indifference to the federally protected rights of the Plaintiffs, thus entitling Plaintiffs to an award of punitive damages against the individually named Defendants.

205.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages in an amount that is fair and reasonable, including for lost wages, and for punitive damages, plus costs of this action, attorneys' fees, and whatever additional relief this court finds equitable and just.

## COUNT IV

### (42 U.S.C. § 1986 Claim for Negligence in Preventing a Conspiracy to Deprive Constitutional Rights)

206.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

207.    Because in their actual participation in the torture and abuse of Mr. Jones and the other Plaintiffs, Defendants Burge, Byrne, Bosco, Flood, McGuire, and McWeeny had actual knowledge of a conspiracy under 42 U.S.C. § 1985 to deprive Mr. Jones and the other Plaintiffs of their constitutional rights.

208.    During his tenure as Police Superintendent, Defendant Brzeczek supervised the receipt of numerous allegations of police torture of suspects at Area 2.  Defendant Brzeczek therefore had sufficient knowledge of a conspiracy under 42 U.S.C. § 1985 to deprive Mr. Jones and the other Plaintiffs of their constitutional rights.

209.    Defendants had actual knowledge of a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights.

210.    Defendants had the power to prevent or aid in preventing the commission of a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights as described in above.

211.    Defendants neglected or refused to prevent a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights.

212.    As a direct and proximate cause of the Defendants' failure to prevent a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights, the Plaintiffs suffered injuries and damages, including but not limited to severe emotional distress.

#10410943_v1

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages in an amount that is fair and reasonable, including for lost wages, and for punitive damages, plus costs of this action, attorneys' fees, and whatever additional relief this court finds equitable and just.

## COUNT V

### (42 U.S.C. § 1983 Claim for Failure to Intervene)

213.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

214.     During Mr. Jones's torture, Defendants Burge, Flood, McGuire, and McWeeny, and possibly others, stood by without intervening to prevent the violence to which Plaintiff was subjected by Defendants Burge and McWeeny.

215.     As a result of Defendants Burge, Flood, McGuire, and McWeeny's failure to intervene to prevent the unjustified and excessive use of force, Plaintiff suffered pain and injury, as well as emotional distress.   Defendants Burge, Flood, McGuire, and McWeeny had a reasonable opportunity to prevent this harm, but failed to do so.

216.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with wilful indifference to Plaintiff Jones's constitutional rights.

217.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the CPD in the manner described in the preceding paragraphs.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Bosco, Brzeczek, Burge, Daley, Devine, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

33

## COUNT VI

### (42 U.S.C. § 1983 Claim for Torture and Physical Abuse)

218.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

219.     By torturing Mr. Jones with electrocution, beatings, and threats to his life, and by threatening him with additional torture and physical abuse, Defendants Bosco, Burge, Flood, McGuire, and McWeeny, individually, jointly, and in conspiracy violated Plaintiff's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

220.     As a result of Defendants Burge, Flood, and McWeeny's unjustified and excessive use of force and torturous interrogation methods, Mr. Jones suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages.

221.     Defendants Bosco, Burge, Flood, McGuire, and McWeeny were aware of the torture and physical abuse of the Plaintiff, and participated in it by encouraging and/or allowing the torture to continue while having the obligation and duty to stop it, and by failing to report the abuse to superiors in the Police Department and the State's Attorney's Office.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Brzeczek, Burge, Daley, Devine, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

#10410943_v1

## COUNT VII

### (42 U.S.C. § 1983 Claim for Torture and Physical Abuse)

222.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

223.     By torturing the Class with electrocution, beatings, and threats to their lives, and by threatening them with additional torture and physical abuse, Burge, Byrne, and the Defendant Officers individually, jointly, and in conspiracy violated Plaintiffs' Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

224.     As a result of Burge, Byrne, and the Defendant Officers' unjustified and excessive use of force and torturous interrogation methods, the Class suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages.

225.     Burge, Byrne, and the Defendant Officers were aware of the torture and physical abuse of the Class, and participated in it by encouraging and/or allowing the torture to continue while having the obligation and duty to stop it, and by failing to report the abuse to superiors in the Police Department and the State's Attorney's Office.

226.     Additionally, Brzeczek, Daley, Devine, and Kunkle repeatedly failed to intervene to prevent Burge, Byrne, and the Defendant Officers from continuing their coercive interrogations and torture tactics and thus and essentially consented to the torture and abuse of the Class.

WHEREFORE, Plaintiffs demand judgment against Defendants Brzeczek, Burge, Daley, Devine, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for the

#10410943_v1

Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT VIII

### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

227.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

228.    The actions of Bosco, Burge, Flood, McGuire, and McWeeny, individually, jointly, and in conspiracy, in coercively interrogating Mr. Jones, using torture techniques which shock the conscience, and resulting in false and fabricated confession to the Mayfield murder, violated his Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without the due process of law.

229.    The actions of the above-named Defendants in using torture to coercively interrogate Mr. Jones were the direct and proximate cause of his injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Bosco, Burge, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT IX

### (42 U.S.C. § 1983 Claim for False Imprisonment)

230.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

#10410943_v1

231.    The actions of Defendants Bosco, Brzeczek, Burge, Daley, Devine, Flood, McGuire, and McWeeny, individually, jointly, and in conspiracy, in falsely imprisoning Mr. Jones for the UUW charge (eight months) and for the Mayfield murder (six years), without probable cause, violated Mr. Jones's Fourth and Fourteenth Amendment rights to be free from unreasonable seizures.

232.    The actions of the Defendants in falsely imprisoning Mr. Jones and covering up their own misconduct were the direct and proximate cause of Mr. Jones's injuries and damages as more fully set out in the preceding paragraphs.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Bosco, Brzeczek, Burge, Daley, Devine, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiff Jones's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT X

### (42 U.S.C. § 1983 Claim for Deprivation of Due Process)

233.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

234.    As described more fully above, Burge, Byrne, and the Defendant Officers, while acting under color of law and within the scope of their employment as police officers, deprived Mr. Jones and the Class of their constitutional rights to a fair trial.

235.    The Defendants deliberately provided false evidence, thereby misleading and misdirecting the state criminal prosecutions of Mr. Jones and the Class.

#10410943_v1

236. To wit, the Defendants provided false allegations that were the bases of the criminal complaint, withheld exculpatory evidence throughout the proceedings, and fabricated evidence that was the bases of the criminal prosecution.

237. Specifically, during Mr. Jones's murder trial McGuire concealed the fact that Mr. Jones had never confessed as alleged by the prosecution.

238. The misconduct of the Defendants also resulted in a criminal conviction of Mr. Jones, thereby denying him his Constitutional right to a fair trial as it is secured to Mr. Jones in the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

239. The misconduct of the Defendants also resulted in a criminal conviction of the members of the Class, thereby denying them their Constitutional rights to a fair trial as guaranteed in the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

240. As a result of the violation of this constitutional right to fair trial, the Plaintiffs suffered injuries, including but not limited to emotional distress.

241. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with wilful indifference to Plaintiff's constitutional rights.

242. The misconduct described in this Count was undertaken pursuant to the policy and practice of the CPD in the manner described in the preceding paragraphs.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT XI

### (42 U.S.C. § 1986 Monell Policy Claim Against the City of Chicago)

243.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

244.    The actions of Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek, as alleged above, were done pursuant to one or more interrelated de facto policies, practices, and/or customs of the Defendant City of Chicago.

245.    At all times material to this complaint the Defendant City of Chicago, through its Police Department, Superintendents,  Police Board, Office of Professional Standards and Internal Affairs Division (IAD), Personnel Division, Mayors, City Council, and/or Corporation Counsel's Office had interrelated de facto policies, practices, and customs which included, inter alia:

      a.    conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects, and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3;

      b.    manufacturing, fabricating, and/or using improper suggestive tactics to obtain false witness statements;

      c.    the filing of false reports, and giving false statements and testimony about said interrogations and confessions, and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of, Defendants Burge and Byrne;

      d.    failure to video and/or audio tape the interrogations or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in paragraphs a-b, above;

#10410943_v1

e.     the failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuses of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; of making false reports and statements; and/or of physically, psychologically, or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, and arrestees, particularly persons who were tortured and/or physically and/or psychologically abused during questioning.  This failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control includes Defendants Burge, Byrne, Bosco, Flood, McGuire, and McWeeny, and all other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f.     the police "code of silence," specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (*i.e.*, police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed, and destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report.  The code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee, or witness, or falsely arrested, imprisoned, and prosecuted a criminal defendant, particularly in cases where torture techniques were utilized under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3.  This code of silence in the torture cases has most recently been evidenced and invoked in response to the federal government's investigation and prosecution of Defendant Burge and the investigation of the men under his command; and

g.     covering up and suppressing evidence and findings, refusing to properly investigate, arrest, and charge, continuing to finance Defendant Burge's defense and otherwise attempting to both publicly and judicially defend his actions long after repeatedly acknowledging that he had committed repeated acts of torture, and after he had been indicted and convicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

40

246. The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both well before and after Mr. Jones and the Class were tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Byrne; Defendant Daley (before and throughout his tenure as Mayor of Chicago) and his Chiefs of Staff; successive Police Superintendents, including Defendant Brzeczek, Fred Rice, Leroy Martin, Matt Rodriguez, Terry Hillard, and Phil Cline; to the successive OPS Directors, including Gayle Shines; various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke, and Townsend; the Chiefs of Detectives, including William Hanhardt and Terry Hillard; to the Chicago City Council and the Chicago Police Board; and to other policy-making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of Mr. Jones, the Plaintiffs, and other torture victims, and the denial of their full and fair access to the courts, inter alia, in the manner set forth in this complaint.

247. Said interrelated policies, practices, and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, inter alia, the coercing of statements from suspects, witnesses, and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and federal courts, and the pursuit and continuation of false arrests, wrongful prosecutions and convictions; and were, separately and

41

together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their unnamed co-conspirators, and the injuries suffered by Mr. Jones and the Class.

248.    Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek was also done with deliberate indifference and likewise served as a direct and proximate cause of the injuries to Mr. Jones and the Class.

249.    Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental and police policymakers, including, but not limited to, successive Police Superintendents, including Defendant Brzeczek, and several Mayors, most notably Defendant Daley, establish that said violations were directly and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiffs demand judgment against the Defendant City of Chicago for substantial compensatory damages, plus costs and attorneys' fees, and whatever additional relief this court finds equitable and just.

## COUNT XII

### (42 U.S.C. § 1986 Monell Policy Claim Against the Cook County and Cook County State's Attorney's Office)

250.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

251.    The actions of Defendants Daley, Devine, and Kunkle, as alleged above, were done pursuant to one or more de facto policies, practices, and/or customs of the Defendants Cook County and the Cook County State's Attorney's Office.

252.    These de facto policies, practices, and customs included, inter alia:

a.   the routine and regular "blind-eye" turned by individual members of the Cook County State's Attorney's Office, including its Felony Review Division, who were expressly on notice that the Defendant Officers and other offices under Defendant Burge's command at Area 2 were torturing and abusing arrestees, witnesses, and suspects;

b.   the failure to intervene, halt, or investigate coercive and abusive interrogations at Area 2 leading to false confessions despite being put on notice that such practices were regularly occurring;

c.   the suppression and cover-up of favorable exculpatory evidence to defendants who were prosecuted and wrongfully convicted on the basis of tortured confessions or illegal interrogations, and continuing to maliciously prosecute cases in reliance on false confessions.

253.   The above-described policies, practices, and customs of Cook County and the Cook County State's Attorney's Office were so widespread, permanent, and well-settled as to constitute a custom or usage, and were undertaken with malice, wilfulness, and reckless indifference to the rights of others.   These policies, practices, and customs directly and proximately caused the constitutional deprivations suffered by Mr. Jones and the Plaintiff class.

WHEREFORE, Plaintiffs demand judgment against Defendants Cook County and the Cook County State's Attorney's Office for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this court finds equitable and just.

## COUNT XIII

### (State Law Claim for Civil Conspiracy)

254.   Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

255.   As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

43

256.     In furtherance of the conspiracy, Defendants committed overt acts and were otherwise wilful participants in joint activity.

257.     The misconduct described in this Count was undertaken with malice, wilfulness, and reckless indifference to the rights of the Plaintiffs.

258.     As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including, but not limited to, severe emotional distress and anguish.

WHEREFORE, Plaintiffs demand judgment against Defendants Burge, Byrne, Daley, Devine, Kunkle, Bosco, Flood, McGuire, McWeeny, and Brzeczek, for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this court deems equitable and just.

## COUNT XIV

### (State Law Claim for Violations of the Constitution of the State of Illinois)

259.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

260.     Defendants violated Plaintiffs' rights and privileges as guaranteed to them under the Constitution of the State of Illinois.

## COUNT XV

### (State Law Claim for Violation of Illinois Hate Crime Act, 720 ILCS 5/12-7.1)

261.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

262.     As described more fully in the preceding paragraphs, Defendant Burge and the Defendant Officers committed an assault and battery upon Plaintiff Jones because of Plaintiff's race, thereby committing a hate crime as defined by Illinois statute.

44

263.    As a direct and proximate result of this hate crime, Plaintiff Jones suffered damages, including physical injuries and severe emotional distress.

264.    The misconduct alleged herein was within the scope of Defendant Burge and the Defendant Officers' employment.

265.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of Mr. Jones.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Burge, Bosco, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, wilfully, wantonly, and/or with reckless disregard for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this court deems equitable and just.

## COUNT XVI

### (State Law Claim for Intentional Infliction of Emotional Distress)

266.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

267.    Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek individually, jointly, and in conspiracy, by, inter alia, torturing false confessions from Plaintiffs and/or by failing to prevent or stop such torture; by constructing and fabricating confessions; and by procuring the Plaintiffs' prosecutions and convictions, for crimes they did not commit by means of these false confessions, engaged in extreme and outrageous conduct.  Additionally, these same Defendants, individually, jointly, and in conspiracy, inter alia, by fabricating, coercing, and suppressing other evidence, by refusing to investigate or discipline the torturers, and by making false public statements, engaged in additional extreme and outrageous conduct.

268. Defendants Daley, Devine, Kunkle, Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek intended, by subjecting Plaintiffs to such humiliating and degrading conduct, to inflict severe emotional distress on the Plaintiffs, and knew that their conduct would cause Plaintiffs to suffer severe emotional distress.

269. As a direct and proximate cause of Defendants' outrageous conduct, Plaintiffs were and continue to be injured, and have, and continue to experience, severe emotional distress, including but not limited to constant fear and anxiety, nightmares, sleep disruption, depression, and a recurring fear of re-arrest, torture, and re-prosecution.

WHEREFORE, Plaintiffs demand judgment against Defendants Daley, Devine, Kunkle, Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek for compensatory damages, plus the costs of this action, and such other relief as this court deems equitable and just.

## COUNT XVII

### (State Law Claim for False Arrest and Imprisonment)

270. Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

271. The arrest and imprisonment of Mr. Jones, without probable cause, individually jointly, and in conspiracy by Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek, constituted the torts of false arrest and imprisonment under Illinois law.

272. Defendants' actions in arresting and imprisoning Mr. Jones were wilful and wanton.

WHEREFORE, Mr. Jones demands compensatory damages against Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek, and because these Defendants acted in a malicious, wilful, and/or wanton manner towards Mr. Jones, punitive damages, and such other and additional relief as this court deems equitable and just.

46

## COUNT XVIII

### (State Law Claim for Malicious Prosecution)

273.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

274.     Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Mr. Jones, and these same Defendants, together with Defendants Daley, Devine, Kunkle, individually, jointly, and in conspiracy, continued that prosecution, again and without probable cause.  Mr. Jones's prosecution for the murder of Geoffrey Mayfield was ultimately terminated in his favor.  The Defendants' actions were done in a wilful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

275.     As a result of the misconduct described in this Count, Plaintiff Jones has suffered and continues to suffer injuries including pain and suffering, and severe emotional distress.

WHEREFORE, Plaintiff Jones demands actual or compensatory damages against Defendants Daley, Devine, Kunkle, Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek, and, because these Defendants acted in a malicious, wilful, and/or wanton manner towards Mr. Jones, punitive damages, and such other and additional relief as this court deems equitable and just.

## COUNT XIX

### (State Law Respondeat Superior Claim)

276.     Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

277.     Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek were, at all times material to this complaint, employees of the Defendant City of Chicago, were

47

acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City under State law pursuant to respondeat superior.

278.    Defendant Daley, at the times specified in this complaint, was an employee of the City of Chicago, was acting at these times within the scope of his employment as a City employee, and those acts which are actionable under State law are directly chargeable to the Defendant City under State law pursuant to respondeat superior.

WHEREFORE, Plaintiffs demand judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiffs' State law claims against the Defendants named in this Count, plus the costs of the action, and whatever additional relief this court deems equitable and just.

## COUNT XX

### (State Law Claim–Indemnification)

279.    Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

280.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

281.    Defendants Burge, Byrne, the Defendant Officers, and Defendant Brzeczek, were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs demand judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiffs' State law claims against the Defendants named in this Count, plus the costs of the action, and whatever additional relief this court deems equitable and just.

## COUNT XXI

### (745 ILCS 10/9-102 and Common Law Claims Against the City, County, and SAO)

282. Each of the preceding paragraphs of this Complaint is incorporated as if restated fully herein.

283. The Defendant City of Chicago was the employer of Defendants Burge, Byrne, Bosco, Flood, McGuire, McWeeny, and Brzeczek at all times relevant and material to this complaint.

284. These Defendants committed the acts alleged above under color of law and within the scope of their employment as employees of the City of Chicago.

285. Additionally, the Defendant City of Chicago was the employer of Defendant Daley at the times specified in this complaint.

286. Defendant Daley committed the acts alleged above under color of law and within the scope of his employment as an employee of the City of Chicago.

287. The Defendant Cook County and its State's Attorney's Office was the employer of Defendants Daley and Devine while each were, during their respective terms, State's Attorney of Cook County.

288. Additionally, it was the employer of Defendants Devine and Kunkle while each were, during their respective terms, Assistant State's Attorney of Cook County.

289. The Defendant Cook County is therefore responsible for any judgment entered against Defendants Daley, Devine, and Kunkle for acts committed by them during their employment with the Defendant Cook County, making the County a necessary party to this complaint.

49

#10410943_v1

290.    Defendants Daley, Devine, and Kunkle committed the acts alleged above under color of law, and, while so employed, in the scope of their employment as employees of Cook County and its State's Attorney's Office.

WHEREFORE, Plaintiffs, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, Cook County, and its State's Attorney's Office, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs, and interest, and for whatever additional relief this court deems equitable and just.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated:  June 17, 2011                    Respectfully submitted,


 /s/ Sam E. Adam
Sam E. Adam
James D. Montgomery
Attorneys for Plaintiff

**Plaintiffs demand trial by jury on all counts.**


Sam E. Adam, Esq.
6133 South Ellis
Chicago, IL  60615
Tel:  (773) 752-6950
Fax:  (773) 752-6970

James D. Montgomery, Esq.
One North LaSalle
Suite 2450
Chicago, IL  60602
Tel:  (312) 977-0200
Fax: (312) 977-0209

#10410943_v1