**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

**1/15/2013**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| MELVIN JONES, ALNORAINDUS BURTON, AUBREE DUNGEY, JAMES FREEMAN, and SHERROD TILLIS on behalf of themselves and all others similarly situated, and in the interest of the general public, )))))) | |
| Plaintiffs, )) | |
| v. )) | Case No. 11 cv 4143 |
| JON BURGE, former Chicago Police Department (CPD) Commander; JOHN BYRNE, former CPD Sergeant; KENNETH BOUDREAU, MICHAEL BOSCO, MICHAEL CUMMINGS, ROBERT FLOOD, TIMOTHY FRENZER, MICHAEL KILL, DENNIS McGUIRE, DANIEL McWEENY, former and/or current CPD Detectives; RICHARD BRZECZEK, former CPD Superintendent; RICHARD M. DALEY, former Mayor and former State's Attorney; RICHARD A. DEVINE, former State's Attorney; WILLIAM J. KUNKLE; the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; the COOK COUNTY STATE'S ATTORNEY'S OFFICE, and JOHN DOE DEFENDANTS #1-50, )))))))))))))))))) | Honorable John W. Darrah  CLASS ACTION  JURY DEMAND |
| Defendants. )) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs MELVIN JONES, ALNORAINDUS BURTON, AUBREE DUNGEY, JAMES

FREEMAN, and SHERROD TILLIS, on behalf of themselves and all others similarly situated,

and in the interest of the general public, for their complaint against JON BURGE ("Burge");

JOHN BYRNE ("Byrne"); KENNETH BOUDREAU ("Boudreau"); MICHAEL BOSCO

("Bosco"); MICHAEL CUMMINGS ("Cummings"); ROBERT FLOOD ("Flood"); TIMOTHY

FRENZER ("Frenzer"); MICHAEL KILL ("Kill"); DENNIS McGUIRE ("McGuire"); DANIEL

**EXHIBIT**

**A**

McWEENY ("McWeeny"); RICHARD BRZECZEK ("Brzecezk"); RICHARD M. DALEY ("Daley"); RICHARD A. DEVINE ("Devine"); WILLIAM J. KUNKLE ("Kunkle"); the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; the COOK COUNTY STATE'S ATTORNEY'S OFFICE; and DOE DEFENDANTS #1-50 (collectively "the Defendants"), alleges the following upon information and belief, after due investigation by undersigned counsel:

## I.      INTRODUCTION

1.      When former Chicago Police Department ("CPD") Commander Jon Burge was convicted in this court of perjury and obstruction of justice on June 29, 2010, the first chapter of a long history of police torture in the City of Chicago closed.

2.      But the systemic and systematic torture of African American male arrestees, witnesses, and suspects and the conspiracy used to cover it up that began with Defendant Burge's first use of torture against a police suspect in 1973 did not end on the date of Burge's 2010 conviction.

3.      On the contrary, police torture of arrestees, witnesses, and suspects, and the department-wide "code of silence" conspiracy to cover it up continues and is ongoing even today.

4.      As evidenced by the November 2012 jury verdict against the City of Chicago in Karolina Obrycka's civil suit, the City of Chicago is a place where police brutality runs rampant and the "code of silence" provides immunity for its perpetrators.

5.      Plaintiff Melvin Jones was only one of an estimated 135 victims of the systemic police torture regime that the Defendants participated in by torturing or otherwise abusing criminal suspects, or by condoning the torture program through a knowing refusal to acknowledge, prevent, or punish the Defendants' interrogation tactics.

2

#10410943_v2

6.      Plaintiffs Alnoraindus Burton, Aubree Dungey, James Freeman, and Sherrod Tillis are among the 135 other estimated victims of the systemic police torture regime that the Defendants participated in by torturing or otherwise abusing criminal suspects, and/or by condoning the torture program through a knowing refusal to acknowledge, prevent, or punish the Defendants' illegal interrogation tactics.

7.      Mssrs. Jones, Burton, Dungey, Freeman, and Tillis bring this action for themselves as individuals and as representative plaintiffs acting for the interests of the general public.

8.      Mssrs. Jones, Burton, Dungey, Freeman, and Tillis also bring this case as a class action, on behalf of themselves and all other persons who are victims (the "Class") of the conspiracy to cover-up the CPD's systemic torture of African American male arrestees, witnesses, and suspects.

9.      Defendant Burge's conviction in 2010 marked the first time that Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the Class had a viable opportunity to obtain judicial relief for the abuses they suffered at the hands of Burge and the other Defendants.

10.     Because of the wrongful conduct of the Defendants, victims of police torture could not expect that their stories would be taken seriously by the courts.

11.     Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the Class seek damages for the injuries inflicted upon them as a result of the systematic deprivation of their constitutional rights.

II.     **JURISDICTION AND VENUE**

3

#10410943_v2

13.     This court has jurisdiction over this civil rights action, brought pursuant to 42 U.S.C. § 1983, et seq. and the United States Constitution and under 28 U.S.C. §§ 1331 and 1343(a).

14.     This court also has supplemental jurisdiction over the state law claims, under 28 U.S.C. § 1367(a).

15.     Venue is proper under 28 U.S.C. § 1391(b), as the parties reside or, at the time the events took place, formerly resided in this judicial district, and the events giving rise to the claims asserted herein occurred here.

## III.    PARTIES

16.     Plaintiff Melvin Jones is a fifty-nine-year-old African American man, a homeless resident of the City of Chicago and Cook County, and a citizen of the United States.

17.     Plaintiff Alnoraindus Burton is a forty-five-year-old African American man who is currently incarcerated at Pontiac Correctional Facility, and is a citizen of the United States.

18.     Plaintiff Aubree Dungey is a thirty-eight-year-old African American male who is currently incarcerated at Pontiac Correctional Facility, and is a citizen of the United States.

19.     Plaintiff James Freeman is a thirty-four-year-old African American man who is currently incarcerated at Pontiac Correctional Facility, and is a citizen of the United States.

20.     Plaintiff Sherrod Tillis is a thirty-year-old African American man who is currently incarcerated at Pontiac Correctional Facility, and is a citizen of the United States.

21.     Defendant Jon Burge was a duly appointed and sworn Chicago Police Lieutenant and the commanding officer of CPD Area 2 Detective Violent Crime Unit ("Area 2").  As the commanding officer at Area 2, Burge was the commanding officer of Defendants Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, and McWeeny.

4

22.     In 1988, Burge was promoted to Commander of Area 3 detectives and held this assignment until 1991 when he was suspended and ultimately fired for the torture and abuse of Andrew Wilson.

23.     Burge was acting in the scope of his employment at all material times is and is sued in his individual capacity.

24.     Defendant Byrne was a duly appointed and sworn Chicago Police Sergeant who was assigned to Area 2, under Burge's command, from 1982 to August 1986.

25.     From 1988 to 1991, Byrne was a sergeant at Area 3, also under Burge's command.

26.     Defendant Byrne was acting in the scope of his employment at all material times and is sued in his individual capacity.

27.     Defendants Boudreau, Bosco, Cummings, Flood, Kelly, Kill, McGuire, and McWeeny (collectively, the "Defendant Officers") were duly appointed and sworn Chicago police officers who were assigned to the Detective Division at Area 2 under Defendant Burge's command, and who engaged in the conduct complained of in the course and scope of their employment. The Defendant Officers are sued in their individual and official capacities.

28.     Defendant Frenzer was an Assistant Cook County State's Attorney assigned to the Felony Review Unit. He engaged in the conduct complained of in the course and scope of his employment and is sued in his individual capacity.

29.     Defendant Brzeczek was the CPD Superintendent from 1981-1983. Defendant Brzeczek was acting in the scope of his employment at all material times and is sued in his individual capacity.

#10410943_v2

30.     Defendant Daley was the State's Attorney of Cook County from 1981 to 1989. During that period, he was responsible for the policies, practices, and customs of that office.

31.     From 1989 to May 16, 2011, Defendant Daley was the Mayor of the City of Chicago and as such was the chief policymaker for the City of Chicago, CPD, City Council, and Police Board and was therefore responsible for policies, practices, and customs complained of herein.

32.     Defendant Daley was acting in the scope of his employment at all material times and is sued in his individual capacity.

33.     Defendant Devine served as Defendant Daley's First Assistant at the State's Attorney's Office from 1981 to 1983.

34.     From 1988 to 1997 Devine was, together with Defendant Kunkle, counsel for Defendants Burge, Byrne, and other Area 2 and Area 3 police officers, in several civil suits, defending them against claims of torture.

35.     As such, Devine was Special Assistant Corporation Counsel, paid by, and agents for, the City of Chicago, its Mayor, City Council, and Corporation Counsel's Office.

36.     Devine was the State's Attorney of Cook County from 1997 to 2008. During that period, he was responsible for the policies, practices, and customs of that office. Defendant Devine was acting in the scope of his employment at all material times and is sued in his individual capacity.

37.     Defendant Kunkle was the First Deputy State's Attorney of Cook County under Defendant Daley and answered directly to Defendant Devine during that period.

38.     In 1983, Kunkle became First Assistant State's Attorney and, as such, answered directly to Daley.

6

#10410943_v2

39.     In 1986 and 1987, Kunkle, then in private practice with Devine, was appointed Special Assistant State's Attorney of Cook County by Daley, and as such headed the re-prosecution of Andrew Wilson.

40.     From 1988 to 1997, Kunkle was, together with Devine, counsel for Defendants Burge, Byrne, and other Area 2 and Area 3 police officers in several civil suits, defending them against claims of torture.  As such, he and Devine were Special Assistant Corporation Counsel, paid by, and agents for, the City of Chicago, its Mayor, City Council, and Corporation Counsel's Office.

41.     Defendant Kunkle was acting in the scope of his employment at all material times and is sued in his individual capacity.

42.     Defendant City of Chicago is an Illinois municipal corporation, and is and/or was the employer of Defendant Burge and each of the Defendant Officers.

43.     The City of Chicago is responsible for the acts of Defendants Burge, Byrne, and of the Defendant Officers while employed by the City of Chicago and while acting within the scope of their employment.

44.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office (the "State's Attorney's Office").

45.     At all relevant times, Cook County and the State's Attorney's Office were responsible for the policies, practices, and customs of the State's Attorney's Office and the prosecutors working therein.

46.     At all relevant times, each of the named Defendants acted in the scope of his employment, and under the color of the laws, regulations, and customs of the State of Illinois.

7

#10410943_v2

47.     Each named Defendant's actions constituted "state action" as defined under federal law.

## IV.     CLASS ACTION ALLEGATIONS

49.     Mssrs. Jones, Burton, Dungey, Freeman, and Tillis bring this action as a class action under Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of themselves and all other victims of the conspiracy to cover-up the systemic torture of African American male arrestees, witnesses, and suspects.

50.     Mssrs. Jones, Burton, Dungey, Freeman, and Tillis's claims are typical of the claims of the other members of the Class, as Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and all other members were injured in the same way—by the torture, cruel, inhuman, or otherwise degrading treatment inflicted upon them by Burge and/or other CPD officers during questioning or interrogation; the failure of the Defendants to stop or prevent these abuses from recurring; and the conspiratorial cover-up of the systemic torture regime, in violation of federal and state law as complained of herein.

51.     Mssrs. Jones, Burton, Dungey, Freeman, and Tillis will fairly and adequately represent the interests of the Class and have retained or will retain counsel competent and experienced in class action litigation.

52.     Mssrs. Jones, Burton, Dungey, Freeman, and Tillis have no interests that are contrary to or in conflict with those of the Class.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because of the Defendants' unlawful and tortious conspiracy to cover up the systemic torture regime, it is impossible for the class members to individually seek redress for the unlawful conduct allege.

8

#10410943_v2

54.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy and substantial benefits will derive from proceeding as a class. For example:

      a.     Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that individual actions would engender;

      b.     Without the representation provided by Mssrs. Jones, Burton, Dungey, Freeman, and Tillis, few, if any, members of the Class will receive legal representation or redress for their injuries;

      c.     Class treatment also will permit the adjudication of claims by many members of the Class who could not afford to individually litigate such claims against the Defendants;

      d.     Class treatment is required for optimal deterrence;

      e.     Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the members of the Class have all suffered irreparable harm and damages as a result of the Defendants' unlawful and wrongful conduct; and

      f.     Absent a class action, the members of the Class will not receive restitution, and will continue to suffer losses.

55.     Mssrs. Jones, Burton, Dungey, Freeman, and Tillis know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

56.     Common questions of law and fact exist as to all members of the Class, including:

      a.     Whether the Defendants' acts or omissions constitute racketeering activity, a fraudulent scheme, and/or a conspiracy to violate the constitutional rights of Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class;

      b.     Whether the Defendants participated in and pursued the concerted action or common course of conduct complained of;

      c.     What state law(s) govern;

9

       d.      Whether Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and other members of the Class have sustained compensable damages and, if so, the proper measure of such damages; and

       e.      Whether Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class are entitled to punitive damages and/or civil penalties.

## V.    FACTUAL STATEMENTS

### A.    The Unlawful Arrest, Interrogation, and Torture of Melvin Jones

57.    On February 5, 1982, Defendant Detectives Flood and McGuire arrested Mr. Jones at his then-girlfriend's ("Jacqueline Quinn's") home while he was babysitting her three-year-old child. Flood and McGuire ransacked the house and produced an inoperable gun that they said they found in a drawer in the child's room.

58.    Thereafter, Flood and McGuire charged Mr. Jones with Unlawful Use of a Weapon ("UUW") and then took him by police vehicle to Area 2 police headquarters at 9059 South Cottage Grove Avenue in Chicago.

59.    Once at Area 2, Flood and McGuire placed Mr. Jones in an interrogation room and handcuffed him to the wall.

60.    Although Mr. Jones had been arrested for UUW, Flood and McGuire immediately began to question Mr. Jones about his alleged involvement in the murder of a Geoffrey Mayfield. Mr. Jones denied any involvement in the murder.

61.    Defendant Burge later entered the room. In the presence of Flood and McGuire, Burge threatened that Mr. Jones "was going to wish he had never set eyes on him."

62.    At this point, McGuire left the room.

63.    Thereafter, Burge and Flood resumed their interrogation of Mr. Jones. Flood first repositioned Mr. Jones so that he was handcuffed to the wall with his hands behind his back, in a standing position.

10

64.     Burge sat in a chair facing Mr. Jones and told him that he "hoped he had fucked that night" because Mr. Jones "was going to need it after he was through with him."

65.     Thereafter, Burge pulled Mr. Jones's pants down to his ankles and attached a homemade electrocution device (the "shock box") to his body and electrocuted him on his left foot, then his left thigh, and then on his penis.

66.     Mr. Jones screamed in pain and protested, saying: "You ain't supposed to be doing this to me."

67.     Burge turned to Flood and asked him whether he had seen anything.  Flood looked up at the ceiling and replied that he had not seen anything.

68.     Burge then turned back to Mr. Jones and said: "You see, it's just me and you.  No Court and no State are going to take your word against a Lieutenant's word."

69.     During the interrogation, Burge also gagged Mr. Jones's mouth with a brown sock and struck Mr. Jones on the head with a stapler at least twice.

70.     The next day, Defendant McWeeny and another unidentified police officer continued to interrogate Mr. Jones.

71.     Burge entered the room carrying a gun and asked McWeeny whether Mr. Jones had "started talking yet."

72.     When McWeeny said no, Burge put the gun to Mr. Jones's head and said he was going to "blow his black head off."

73.     At no point during Mr. Jones's four-day detention was he given his *Miranda* rights, nor was he allowed to speak to a lawyer although he had requested one.

74.     Despite the torture, Mr. Jones did not confess to the UUW crime for which he was ostensibly being detained.  Nor did Mr. Jones confess to participating in a homicide.

11

75. On February 10, 1982, Cassandra Watson, the lawyer representing Mr. Jones in his UUW case, filed a motion to quash arrest and to suppress evidence based on Mr. Jones's description of his torturous interrogation at Area 2.

76. A hearing on the motion to suppress was held on May 27, 1982.

77. During this hearing, Flood and McGuire testified and denied Mr. Jones's allegations that he had been tortured.

78. Flood further testified that he and McGuire were in the interrogation room with Mr. Jones, and denied that Burge was ever in the room.

79. McGuire testified that he did not remember speaking to Mr. Jones at all.

80. On August 5, 1982, Judge Roger J. Kiley of the Cook County Circuit Court presided over another hearing on the motion to suppress. At this hearing, both Burge and McGuire denied that they had ever abused Mr. Jones.

81. After hearing testimony from Burge and McGuire, and from Mr. Jones, Judge Kiley granted the motion to suppress on Fifth Amendment grounds.

82. Judge Kiley, however, rejected Mr. Jones's Fourth and Fourteenth Amendment arguments based on his torture at Area 2, not finding that Mr. Jones's testimony on that "particular question to be particularly credible or corroborated."

83. At Mr. Jones's subsequent UUW trial, on September 9, 1982, he was found not guilty and released from jail.

84. Upon his release, Attorney Watson warned Mr. Jones that "in [her] opinion it was obvious the police were going to get him and that they were going to put the [Mayfield] murder case on him any way they could. [They] had an extended conversation about that [and she] warned him to be very careful." Her warning would prove to be prescient.

12

#10410943_v2

85.   Three months later, on December 10, 1982, Flood and McGuire arrested Mr. Jones again.

86.   McGuire and Bosco were the officers who interrogated Mr. Jones on December 11, 1982 about his involvement in the Mayfield murder.

87.   During Mr. Jones's bench trial, McGuire testified that he *had* advised Mr. Jones of his *Miranda* rights, and thereafter began questioning him about the triple murder.

88.   McGuire further testified that, in Bosco's presence, Mr. Jones confessed to Geoffrey Mayfield's murder.

89.   McGuire explained that this spontaneous confession occurred because Mr. Jones was under the mistaken belief that his September 1982 acquittal for the UUW charge had also immunized him from prosecution for the Mayfield murder.

90.   McGuire committed perjury because Mr. Jones did not confess to the Mayfield murder.

91.   In June 1983, the trial judge convicted Mr. Jones of the Mayfield murder.  The guilty verdict was based entirely on the false confession produced by the Defendant Officers and the trial judge's reliance on McGuire's testimony.

92.   The trial judge explained: "This case, like most others, boils down to the issue of credibility.  The police have testified as to certain alleged admissions that were made by [Mr. Jones], and [Mr. Jones] denies making any statements, and it is claimed—and I cannot state it any other way—that he is being framed by the police. . . . My conclusion is that [Mr. Jones] was prosecuted for the Mayfield murder because he did make the statements [confessing his guilt]."

93.   After Mr. Jones's trial counsel protested that Flood and McGuire had lied on the stand, the trial judge stated: "There is no doubt about one thing . . . if the police officers are

13

#10410943_v2

lying, it is their testimony that is going to take away Mr. Jones'[s] freedom for the rest of his natural life."

94.     The trial judge concluded: "[I]f there is some error on my part, I am sufficiently confident of the workings of the criminal justice [system] that they will be found on appeal; which is your next avenue."

95.     Since his 1982 motion to suppress hearing, Mr. Jones has consistently asserted his claim that he was tortured by the CPD officers named in the paragraphs above.

96.     Since Mr. Jones's trial, the following evidence has emerged:

   a.     In 1990, the OPS concluded after an internal investigation that there had been systemic abuse at Area 2 for over 10 years. The OPS Report was not released publicly until 1992.

   b.     On November 12, 1991, Burge was suspended, and on February 11, 1993, the Police Board of the City of Chicago separated him from his position as a Commander with the Department of Police after finding him guilty of abusing Andrew Wilson at Area 2 in 1982.

   c.     In 2002, Chief Cook County Criminal Judge Paul Biebel appointed a Special State's Attorney to investigate allegations of torture by police officers under the command of Burge at Areas 2 and 3 to determine if any criminal prosecutions were warranted. Although the 2006 Report concluded that the statute of limitations barred any criminal prosecutions, the Report found that "[t]here are many other cases which lead us to believe that the claimants were abused." On the occasion of the Report's release, the Special State's Attorney stated that he believed the abuse was an "ongoing" practice, and had occurred in approximately half of the 148 cases which were investigated.

   d.     In 2006, because many victims of the Burge-led torture regime are still in prison, the community group Black People Against Police Torture led the lobbying effort to establish a State-funded civil commission to review the criminal cases of persons who claimed to have been tortured into confessing to a crime. In 2009, Governor Patrick Quinn signed a law creating the Illinois Torture Inquiry and Relief Commission ("ITIRC"). The ITIRC's charge is to "conduct inquiries into claims of torture with priority to be given to those cases in which the convicted person is currently incarcerated solely for the crime to which he or she claims

14

torture by Jon Burge or officers under his command, or both." 775 ILCS 40/35 (2).

e.    In 2010, Burge was convicted in federal court of perjury and obstruction of justice for denying that he had ever engaged in or was aware of physical abuse or torture of suspects at Area 2. One of the witnesses for the prosecution was Mr. Jones, who testified to being beaten and electrocuted by Burge and others at Area 2 in 1982.

f.    In June 2012, the ITIRC issued its first nine decisions. The ITIRC found the claims of police torture in five of those cases to be credible and meritorious of judicial review. These five cases were referred to the Chief Judge of the Circuit Court of Cook County, Timothy Evans.

g.    The ITIRC has compiled an extensive database of police torture, brutality, and other abuse allegations against many of the Defendants. These database records have been published, in part, in the nine case dispositions that the ITIRC handled in 2012.

h.    On September 18, 2012, Judge Evans ordered a judicial review of ITIRC Petitioner Gerald Reed's criminal case. Upon Reed's motion, Judge Evans excluded Judges Henry Singer, Dan Locallo, and James Egan, from the Circuit Court judges who would be eligible to review Reed's case because of their ties to the conspiracy to cover-up police torture.

i.    On November 13, 2012, a jury awarded $850,000 in civil damages to a female plaintiff, finding that a widespread code of silence had emboldened off-duty CPD Officer Anthony Abbate to beat her in a 2007 attack that occurred at her workplace. "At the center of the trial was the allegation that a long-standing code of silence protects officers who use excessive force or engage in other misconduct. As a result, [the plaintiff's] lawyers maintained that Abbate acted with impunity in the bar because he was unafraid of consequences." *Police Cover-Up Found in Bartender Beating*, Chi. Tribune, Nov. 14, 2012.

97.    Because the facts in Paragraph 96 were not available at the time of Mr. Jones's 1982 arrest or subsequent motion to suppress hearings and criminal trials, the extent of the police conspiracy to torture and to cover-up the torture was not known to Mr. Jones.

**B.    The Unlawful Arrest, Torture, and Imprisonment of Alnoraindus Burton**

98.    Alnoraindus Burton is a forty-five-year-old African American male who is currently incarcerated at Pontiac Correctional Facility.

99. In 1991, Mr. Burton was convicted for the murder of Anthony Watkins, a high-ranking member of the Black Gangster Disciples street gang.

100. Because the Black Gangster Disciples has a "hit" ordered for him, Mr. Burton has been in protective custody since April 30, 1999.

101. On the date of his arrest, January 23, 1989, Mr. Burton was sleeping in the basement apartment of his mother's house after a family gathering in the home following his grandmother's funeral. Burton's cousin Sean Burton ("Sean"), a female friend of Sean's, Mackel Washington, Anthony LaShon Smith, and Elmore Theodore were also sleeping in the basement apartment.

102. At approximately 4:30 a.m., without producing a warrant, the CPD broke open the door to the basement apartment and ordered all of the occupants to get down on the floor. The police took Mr. Burton, who was clothed only in his boxer shorts, upstairs and then outside.

103. The police arrested Burton, Washington, Smith, and Theodore. The three men were taken to Area 3 police headquarters at 39th and California.

104. At the station, the police handcuffed Mr. Burton to a ring on the wall. Police officers came in and out all day and night and did not allow Mr. Burton to sleep. The officers questioned him about the shooting of Anthony Williams, an associate of Anthony Watkins's.

105. The next day, on January 24, 1989, at approximately 1 or 2 p.m., three new detectives came into the interrogation room. These detectives asked Mr. Burton about the Williams murder, and Mr. Burton replied that he did not know anything. These detectives beat him with a phone book. Mr. Burton, who was still only wearing his shorts, urinated and defecated on himself. The officers laughed and left.

16

106.   Mr. Burton was repeatedly tortured and beaten by police during the next few days.

107.   On January 28, 1989, Detectives Jon Burge, Michael Kill, and William Kelly came into the interrogation room. Burge said, "we will get your confession before the night is over."

108.   At this time, Burton's hand was cuffed to the wall and Detective Kelly hit it.

109.   Detective Kill then choked Burton until he passed out. Burton later woke up on the floor, hanging from the ring on the wall.

110.   Approximately one to two hours later, Detectives Kill and Kelly came back with a written confession that stated that Burton and Mackel Washington kidnapped Watkins and later killed him.

111.   Kill and Kelly beat and choked Mr. Burton until he signed the false confession. At one point, Kill put a gun in Mr. Burton's mouth.

112.   At approximately 1:30 a.m. on January 29, 1989, after Burton signed the confession, Kill and Kelly let him wash his soiled underwear in the sink. They also rehearsed what Mr. Burton should say to the ASA.

113.   When ASA Timothy Frenzer came into the interrogation room to take Mr. Burton's confession, Mr. Burton told him that Kill and Kelly had beat him.

114.   ASA Frenzer then called Kill and Kelly back into the room and asked Mr. Burton again if he wanted to confess in their presence.

115.   ASA Frenzer knew that Kill and Kelly's presence would have the effect of coercing Mr. Burton into confessing.

116.   Mr. Burton then made a confession pursuant to Kill and Kelly's instructions.

17

117.    However, Watkins was killed on January 28, 1989 while Mr. Burton was in custody.

118.    Police records provide that Mr. Burton was arrested on January 29, 1989 but he was actually in custody since January 23, 1989.

119.    Mr. Burton suffered a broken wrist and swollen hands and fingers as a result of the beatings.  He was treated at Cook County Jail and the Fanus Hand Clinic for these injuries.

120.    Mr. Burton filed a motion to suppress his confession ("MSS") on the basis that Detective Kill beat Mr. Burton into falsely confessing.

121.    The MSS hearing was held on October 26 and November 1, 1989.  Detective Kill testified at the MSS hearing on behalf of the State.  A medical technician from Cook County Jail testified that Mr. Burton never stated that he was injured.

122.    Mr. Burton testified on his own behalf at the MSS hearing.  The court found that Burton's statement was made willingly and voluntarily and denied the MSS.

123.    During a separate hearing on November 1, 1990, Assistant Public Defender Mary Danahy testified that she visited and interviewed Mr. Burton on February 1, 1989 while he was in custody at Branch 66.  Mr. Burton told her that he had complained to his lawyers about the police had injured him, and then showed her the bruises on his hands.  Danahy contemporaneously recorded these injuries in her files.

124.    The Illinios Torture Inquiry and Relief Commission ("ITIRC") has collected an extensive history of allegations of abuse against Detective Kill.  "Included in the [twenty-four] cases [against Detective Kill] is that of Ronald Kitchen, who was beaten into confessing but was exonerated in 2009.  Also included is the case of Peter Williams who was beaten into confessing

18

to a crime he could not have committed because he was incarcerated at the time." *In re Claim of Gerald Reed*, TIRC Claim No. 2011.030-R, at para. 12, Exhibit E (filed June 18, 2012).

125.    Mr. Burton's torture by Detective Kill is consistent with other reports of police torture performed by Detective Kill. As he did with Ronald Kitchen, Detective Kill beat Mr. Burton until he confessed. As he did with Peter Williams, Detective Kill also obtained a confession from Mr. Burton for a crime he could not have committed because he was in police custody at the time.

126.    Detective Kill has pled the Fifth Amendment privilege against self-incrimination when questioned about physically abusing detainees.

127.    Former-ASA Frenzer was named as a defendant in Michael Tillman's 2010 police torture civil suit. Tillman alleged that Frenzer actively participated in Tillman's interrogation and helped to coerce Tillman's confession. Frenzer moved to dismiss the deprivation of fair trial and wrongful conviction count against him based on prosecutorial immunity. This court denied Frenzer's motion. *Tillman v. Burge*, 813 F. Supp. 2d 946, 967 (N.D. Ill. 2011).

128.    Mr. Burton was tried before a jury in 1991. Marcus Shaw ("Shaw") was the State's only witness at trial.

129.    Shaw testified on behalf of the State at Mr. Burton's trial, and said that he heard Burton confess to these murders at the family gathering after Mr. Burton's grandmother's funeral.

130.    Shaw, Mr. Burton's best friend, who had also been arrested and questioned in connection with the murders of Williams and Watkins, was given a four-year plea deal in exchange for his testimony.

19

131.    Shaw later signed an affidavit stating that Shaw lied when he testified against Mr. Burton during Burton's criminal trial.  Shaw's affidavit provides, in part: "I made a statement to the police because they beat me up and threatened that they was going to kill me if I didn't make no statement.  I had no knowledge about what happened that day when the murders and the aggravated kidnappings occurred because I went skating that night and didn't know who or what happened."

132.    Anthony LaShon Smith, who had been arrested with Mr. Burton on January 23, 1989, testified to the Grand Jury that he overheard Burton and Washington talking about Watkins's murder.

133.    In 1996, Smith recanted that Grand Jury testimony in a signed affidavit which provides, in part: "I did not hear girt [Burton's nickname] burton or micheal [(sic)] Washington talk about the murder of anthony [watkins].  I was told and forced and beating to lie by the CHICAGO POLICE OFFICERS."

134.    After a jury trial before Judge James J. Heyda on July 31, 1991, Mr. Burton was found guilty of first-degree murder.

135.    Apart from Shaw's coerced testimony, the State's criminal case against Mr. Burton was very weak.

136.    In a 1995 supplemental petition for post-conviction relief, Mr. Burton alleged ineffective assistance of counsel based on, *inter alia*, his trial counsel's failure to preserve issues for appeal and failure to "inform the jury that he was beaten by police."

137.    In 2011, Burton filed a claim with the ITIRC.  Burton's ITIRC claim is not being pursued because the State Assembly defunded the ITIRC in June 2012.

20

#10410943_v2

138. Mr. Burton has consistently claimed, since his 1989 MSS hearing, that he was coerced into confessing because he was tortured by CPD officers, specifically by Detective Kill.

**C.    The Unlawful Arrest, Torture, and Imprisonment of Aubree Dungey**

139. Aubree Dungey is a thirty-eight-year-old African American male who is currently incarcerated at Pontiac Correctional Facility.

140. In September 2000, Mr. Dungey was convicted for the murder of Demone Mims.

141. Mr. Dungey is currently held in protective custody.

142. On June 1, 1999, Mr. Dungey was at a local gas station refueling his car when an unmarked police car pulled up. Officer Robert Garcia (badge number 17234) and Officer Michael Grubbs (badge number 19975) were the two officers in the car.

143. Officers Garcia and Grubbs dispersed the bystanders in the immediate area, and then took Mr. Dungey into police custody.

144. Officers Garcia and Grubbs beat Mr. Dungey at the gas station. Officer Grubbs hit the side of Mr. Dungey's body with a gun, and Officer Garcia punched Mr. Dungey all over his body.

145. Officers Garcia and Grubbs then took Mr. Dungey to Area 2.

146. Once at Area 2, the officers placed Mr. Dungey in an interrogation room where he was handcuffed for three and a half days.

147. During the three and a half days he was held in the interrogation room, Mr. Dungey was unable to sleep because he was in pain from the beating at the gas station.

148. Mr. Dungey suffered internal bleeding and a black eye after being beaten by Officers Garcia and Grubbs. Mr. Dungey had blood in his urine as a result of the beating and had an operation to stop the bleeding.

21

149.    Mr. Dungey was offered food only once (on June 2), during the three and a half days that he was held at Area 2.  Police never asked if Mr. Dungey wanted water or if he needed to use the restroom.

150.    Detective David Fidyk interrogated Mr. Dungey at Area 2.

151.    Mr. Dungey explained to Detective Fidyk that he had been kidnapped by Abdul Muhammad, the man who killed Mims.  After killing Mims, Muhammad approached Mr. Dungey--who was driving at the time--shoved a gun in Mr. Dungey's face, threatened him, and forced him to drive away.

152.    After three and a half days in custody at Area 2, Mr. Dungey signed a statement provided to him by the police because he believed that he was signing a complaint against Muhammad.  However, this statement was actually a "confession" about Mr. Dungey's participation in Mims's murder.

153.    Mr. Dungey's criminal trial began in August 2000.

154.    ASA Robin Mitchell testified on behalf of the State.  ASA Mitchell testified that she did not give Mr. Dungey the option of writing his confession himself.  Rather, she wrote it by hand herself.  ASA Mitchell further acknowledged that the signed confession was not a verbatim recording of everything Mr. Dungey had told her.

155.    Over his objection, Mr. Dungey's signed "confession" was introduced into evidence.

156.    Mr. Dungey testified on his on behalf at his trial.  Mr. Dungey told the court that his public defender was working with CPD and was railroaded into not fully addressing the issues of police torture and misconduct both before and during the trial.

22

#10410943_v2

157.    Mr. Dungey also testified about being beaten by Officers Garcia and Grubbs before taken to Area 2 and his torturous treatment while held at Area 2.

158.    Mr. Dungey's trial jury returned a guilty verdict.

159.    On September 27, 2000, Mr. Dungey appeared before the court for sentencing and moved for a new trial, arguing that the State had not provided sufficient evidence to prove him accountable for Mims's murder.  The court denied the motion, finding the evidence--consisting primarily of Mr. Dungey's confession--sufficient.

160.    The sentencing judge (Judge Michael Toomin) indicated that Mr. Dungey's testimony during trial had not been credible, and that this ultimately led to his conviction.  Judge Toomin then sentenced Mr. Dungey to forty years in prison.

161.    When Mr. Dungey then made a motion for reconsideration of sentence, arguing that it was excessive under the circumtances, Judge Toomin again commented on what he saw as Mr. Dungey's "outrageous" lack of truthfulness.

162.    On May 31, 2010, Mr. Dungey filed a successive Petition for Post-Conviction Relief.  This petition was denied on September 16, 2012.

163.    Mr. Dungey has consistently asserted his claim that he was tortured and otherwise mistreated by the CPD officers named above.

D.      **The CPD Tortured James Freeman by Depriving Him of Food and Sleep for Three Days**

164.    James Freeman is a thirty-four-year-old African American male and is currently incarcerated at Pontiac Correctional Facility.

165.    In 2009, Mr. Freeman he was convicted for the murder of Robert Green.

166.    On January 13, 2004, CPD officers took Mr. Freeman into custody, brought him to Area 2, and began an interrogation that lasted for three days.

167.    Mr. Freeman was handcuffed to a wall, and deprived of sleep and food during the entire three-day-long interrogation.

168.    During his interrogation, Mr. Freeman was barraged with questions by a series of law enforcement agencies, including CPD, the FBI, DEA, ATF, IRS, and the Indiana State Police.

169.    The list of CPD officers who were involved in Mr. Freeman's interrogation includes, but is not limited to the following: Officer Robert Myers, and Detectives William Svilar and Kenneth Boudreau.

170.    In 2001, the *Chicago Tribune* published a report which concluded: "In a long career, [Detective Kenneth] Boudreau helped obtain confessions from more than a dozen defendants in murder cases in which the charges later were dismissed or the defendant was acquitted at trial. . . . Boudreau . . . got a confession from a man accused of two murders, though both later were undermined by DNA.  He also helped obtain confessions from two mentally disabled teenagers for two separate murder cases, but both were acquitted at trial.  He has been accused in both criminal trials and civil suits of punching, slapping and kicking suspects as well as taking advantage of suspects with mental impairments or low IQs."

171.    Mr. Freeman repeatedly requested an attorney during his interrogation, but received none.

172.    The law enforcement agents who interrogated Mr. Freeman threatened to arrest Sonia Montgomery, Mr. Freeman's live-in girlfriend at the time and mother of his daughter, for aiding and abetting him.

24

173.    The law enforcement agents threatened to place Montgomery and Freeman's minor daughter, Journie Freeman, in the custody of the Department of Children and Family Services.

174.    The law enforcement agents also threatened other members of Mr. Freeman's family, and specifically named Mr. Freeman's mother, Gwendolyn Freeman.

175.    At this point during his interrogation, and after being deprived of sleep and food for three days, Mr. Freeman was willing to agree to whatever the police wanted him to say.

176.    The police finally allowed Mr. Freeman to eat, just before he taped his video confession.

177.    At approximately 6:30 a.m. on January 15, 2004, Mr. Freeman made a videotaped "confession" in which he stated that, on December 26, 2002, he pretended to buy drugs from Green so his two accomplices--"JR" and "Chachi"--could kidnap and rob Green.  According to the "confession," after Freeman, JR, and Chachi forced Green to tell them where his money was, the trio retrieved $60,000 from Green's girlfriend's residence, and Chachi shot and killed the victim.  In the taped "confession," Mr. Freeman also said that Montgomery told him that the police wanted to question him, and he and Chachi fled to Tennessee together, returning approximately seven months later after they ran out of money.

178.    ASA Jeffrey Levine and one police officer were in the room when Mr. Freeman made the videotaped "confession."

179.    On April 25, 2005, Mr. Freeman filed a motion to suppress statements ("MSS") on the basis of psychological coercion and torture, misrepresentations made by the police, and Freeman's requests for counsel not being honored.

25

#10410943_v2

180. At the MSS hearing on March 29, 2007, Detective Svilar testified that Mr. Freeman did not request counsel and that his statements were made voluntarily. Svilar was the only witness who testified on behalf of the State.

181. Freeman and Montgomery testified on Freeman's behalf. Montgomery testified that CPD detectives threatened to take her to jail and to take her daughter away if she did not cooperate with them.

182. The judge denied the MSS. The judge stated that he did not believe Mr. Freeman's testimony or that Mr. Freeman asked for an attorney, and determined that the statement was made voluntarily.

183. Mr. Freeman's trial began on February 10, 2009 in front of Judge Michael Brown.

184. During trial, Detective Svilar testified that he along with Detective Boudreau read Mr. Freeman his *Miranda* rights and thereafter conducted his interrogation.

185. Detective Svilar testified that no law enforcement agency deprived Mr. Freeman of food or sleep, nor did anyone threaten or beat him.

186. ASA Levine testified that Mr. Freeman was not mistreated in anyway; that he was given food, and that he voluntarily agreed to the videotaping of his confession.

187. Over Mr. Freeman's objections, Judge Brown admitted the video confession and a transcript of confession into evidence.

188. After the State rested its case, Mr. Freeman made a motion for directed verdict, arguing that the only evidence proffered against him was the video confession, which was coerced. The State denied that the confession had been coerced and the trial court denied Freeman's motion.

26

189. At trial, the State relied heavily on Mr. Freeman's video confession as proof of his guilt for the crime charged.

190. The trial jury returned a guilty verdict against Mr. Freeman.

191. Mr. Freeman's conviction was based on his coerced confession.

192. On September 21, 2012, Mr. Freeman filed a *pro se* petition for post-conviction relief. The circuit court has not yet ruled on the petition. In the petition, Mr. Freeman argues that his rights were violated because his requests for an attorney during interrogation were denied, that his statements were coerced, and that his counsel was ineffective.

193. Mr. Freeman has consistently asserted his claim that he was tortured and otherwise mistreated by the CPD officers named in the paragraphs above.

**E.     The Police Torture and False Confession of Sherrod Tillis**

194. Sherrod Tillis is a thirty-year-old African American male who is currently incarcerated at Pontiac Correctional Facility.

195. In 2005, Mr. Tillis was convicted on an accountability theory for the April 4, 2002 murder of Brenda Worship.

196. The CPD took Mr. Tillis in police custody in the early morning of April 22, 2002 and brought him to a police station on Holman Street on the West Side of the city and administered a polygraph test.

197. After the polygraph test, the police took Mr. Tillis to Area 2. The police put Mr. Tillis in a small room and told him that they were awaiting the results of his polygraph test.

198. The police later told Mr. Tillis that he had failed the polygraph test and would not be allowed to leave the police station. Mr. Tillis was then escorted to another room and waited.

27

199. After five minutes or so, Detectives Paul Spagnola and Thomas A. Filipiak came in, yelled obscenities at Mr. Tillis, accusing him of lying and of failing the lie detector test.

200. Detectives Spagnola and Filipiak then took Mr. Tillis to a room with a concrete bench and a ring on the wall and handcuffed him to the ring.

201. Approximately ten minutes later, Detective Michael Cummings, Myers, and an unidentified third CPD officer came into the room. These police officers yelled at Mr. Tillis, using obscenities, and accused him, again, of failing the lie detector test.

202. Mr. Tillis was still handcuffed to the ring on the wall when Detective Cummings smacked Mr. Tillis hard across the face with an open hand.

203. When Detective Cummings smacked him, Mr. Tillis began to realize that he was in very serious trouble because Area 2 had a reputation for torturing people.

204. Then, one of the detectives uncuffed Mr. Tillis, and the three detectives "rushed" him. All three repeatedly struck and kicked Mr. Tillis. Mr. Tillis fell back against the concrete bench and curled into the fetal position in an effort to protect himself.

205. The same detectives beat Mr. Tillis approximately three more times during the period of between April 22-24, 2002.

206. Detective Cummings was named in the ITIRC's disposition of Darryl Christian's claim of torture. Consistent with Mr. Tillis's account, Cummings also yelled, hit, and threatened Mr. Christian if he did not confess. The ITIRC found Mr. Christian's claims of torture to be credible and recommended judicial review. *In re Claim of Darryl Christian*, TIRC Claim No. 2011.004-C (filed June 13, 2012).

207. Myers and Detective Cummings told Mr. Tillis that they knew that he did not shoot Worship, but they threatened to charge him with her murder if he did not cooperate. They

28

also promised him that if he cooperated and told them who did it and what happened, that Mr. Tillis would not be charged, would be released, and would be used as a witness for the State.

208. After being tortured by the police, and believing that the torture would continue until and unless he admitted some sort of involvement in the crime, Mr. Tillis falsely confessed that he had set up Worship to be robbed by Darrell Smith, in order to repay a debt Mr. Tillis owed to Smith.

209. Following Detective Spagnola's command to embellish the "confession" with details, Mr. Tillis thereafter filmed a videotape confession of his involvement in the crime.

210. Mr. Tillis was kept in lockup at Area 2 for the next three days, from April 25 to April 27, 2002, before being taken to Cook County Jail.

211. The three-day lag in time allowed the bruises and other visible signs of the police's torture to heal.

212. When he was being processed at the Cook County Jail, Mr. Tillis told medical personnel that he had been beaten by the police and that he had bad pain in his knees.

213. To this day, the injuries to Mr. Tillis's knee still impact his ability to move around.

214. On December 18, 2003, Tillis filed a motion to quash arrest and suppress evidence ("MTQASE").

215. The hearing on the MTQASE was held on May 27, 2003.

216. Mr. Tillis testified on his own behalf and Frank Beamon, Detectives John Dougherty and Paul Spagnola testified for the State. The State also presented the stipulated testimony of CPD Officer Robert Batrick.

29

217. The court denied Mr. Tillis's MTQASE as well as Mr. Tillis's subsequent July 25, 2003 Motion to Reconsider the MTQASE.

218. On September 24, 2003, Mr. Tillis filed a Motion to Suppress Statements ("MSS") that he made while in police custody.

219. At the hearing on Mr. Tillis's Motion to Supress Statements, Myers, Spagnola, Filipiak, and Cummings each testified that they did not beat Mr. Tillis. Mr. Tillis was the only other witness at the MSS hearing.

220. The judge at the MSS hearing determined that Mr. Tillis was not a credible witness.

221. At his jury trial in 2004, Mr. Tillis was found guilty of Worship's murder on an accountability theory. None of the witnesses at Mr. Tillis's trial identified Tillis as man who attacked and shot Worship. One witness identified Darrell Smith, Mr. Tillis's co-defendant, as the shooter. Smith was acquitted of the murder charge.

222. Mr. Tillis's conviction was based primarily upon his coerced confession.

223. Mr. Tillis filed an OPS complaint in June of 2002. OPS determined that his allegations were unfounded.

224. Mr. Tillis filed a petition for post-conviction relief on April 19, 2012. Judge Rosemary Grant Higgins entered an order denying Mr. Tillis's petition for post conviction relief on July 12, 2012.

225. Mr. Tillis has consistently asserted his claim that he was tortured by the CPD officers named in the paragraphs above.

30

#10410943_v2

**B.     The Conspiracy To Torture Suspects At Area 2 And Area 3, And To Cover It Up**

226.     The torture of Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the members of the Class were not isolated incidents of police brutality.  Rather, their experiences were part of a pattern and practice of torture and physical and psychological abuse of African American male arrestees, witnesses, and suspects by Burge, Byrne, and the Defendant Officers at Area 2 and later, at Area 3.

227.     In a report which was approved by the Director of CPD's Office of Professional Standards ("OPS") and forwarded to Police Superintendent LeRoy Martin in November 1990, the OPS found that from 1973 to 1985, there was a practice of systematic abuse of suspects held in custody at Area 2 and that certain Area 2 command personnel were aware of such abuse and condoned it.

228.     OPS further found that this practice included psychological techniques and planned torture, and that Area 2 command personnel were aware of the systematic abuse and encouraged it by either participating in it or by failing to stop it.

229.     The OPS report also found that Defendant Burge was a "player" in this pattern and practice of torture and other abuses.

**1.     Purposes Of The Conspiracy**

230.     The individual Defendants engaged in a pattern and practice of the torture and cruel, inhuman, or otherwise degrading treatment of African American male arrestees, witnesses, and suspects at Area 2 and Area 3 police headquarters in order to extract confessions to be used against them in criminal prosecutions.

#10410943_v2

231.    When the Defendants could not produce a confession through the use of torture and cruel, inhuman, or otherwise degrading treatment, they frequently fabricated confessions to serve the same purpose.

232.    The individual Defendants benefitted from the illicit torture program conducted at Area 2 and Area 3 through the criminal convictions obtained as a result of the forced or fabricated confessions.

233.    Defendants Burge, Daley, Devine, Frenzer, and Kunkle benefitted professionally and financially from the illicit torture program conducted at Area 2, and later, at Area 3. Each of these Defendants rose through the ranks of their professions or in prominence due to the criminal convictions obtained as a result of the confessions that were fabricated or forcefully coerced from Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class.

234.    Each of the individual Defendants stood to lose their power, prestige, and income if they broke the "code of silence" and came forward with their knowledge about the systemic torture regime at Area 2 and later, at Area 3.

### 2.    The Agreement Among The Defendants

235.    The Defendants agreed to use torture, and cruel, inhuman, or otherwise degrading treatment of African American male arrestees, witnesses, and suspects at Area 2 and Area 3 in order to extract confessions from them.

236.    The Defendants agreed to conceal or cover up the use of torture, and cruel, inhuman, or otherwise degrading treatment against African American male arrestees, witnesses, and suspects at Area 2 and at Area 3.

237.    Although Burge directed and supervised the torture program at Area 2 and later, at Area 3, these illegal interrogations could not have continued without the aid of the Defendant Officers, Brzeczek, Daley, Devine, Frenzer, and Kunkle.

32

238.    Despite numerous complaints and the anomaly of so many confessions arising from Area 2, Brzeczek refused to investigate any allegations of police torture that were repeatedly brought to his attention.

239.    Brzeczek's refusal to investigate violated police regulations permitted the torture to continue.

240.    Daley, Devine, and Kunkle also condoned the pattern and practice of torturing African American male arrestees, witnesses, and suspects at Area 2 and Area 3 by refusing to investigate the numerous complaints of torture or to intervene when Bzreczek refused to investigate.

241.    Burge, Brzeczek, Daley, Devine, Frenzer, Kunkle, and Defendant Officers suppressed from Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class and their respective counsel, and the jurors and judges in each of the Plaintiffs' criminal proceedings, the facts regarding the pattern of abuse and torture of African American men.

242.    Defendants Burge, Brzeczek, Daley, Devine, Frenzer, Kunkle, and Defendant Officers also suppressed the physical evidence of their pattern and practice of torture, including the shock box, used against Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class.

### 3.    Overt Acts In Furtherance Of The Conspiracy

243.    Over a 15-year period, Burge, Byrne, the Defendant Officers, and other Area 2 and Area 3 CPD officers tortured and/or utilized cruel, inhuman, or otherwise degrading treatment against an estimated 135 African American male arrestees, witnesses, and suspects.

244.    The torture and/or cruel, inhuman, or otherwise degrading treatment targeted by CPD officers against African American male arrestees, witnesses, and suspects has continued and occurs in police stations in Chicago today.

33

245.    Although Defendant Burge left active police duties in 1991, his influence has tainted the police department and has laid the foundation for continuing torture and/or cruel, inhuman, or otherwise degrading treatment against African American male arrestees, witnesses, and suspects today.

246.    The interrogation and torture of Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class is part of a long-standing pattern and continuing practice of similar acts of racially-motivated torture, including electric shock, baggings, mock executions, Russian roulette, and beatings perpetrated against African American men under the supervision, and with the encouragement, participation, and ratification of Burge, and later, Burge's protégées.

247.    Burge supervised, encouraged, participated in, failed to prevent, and ratified the abuse of Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class by various CPD officers, including the Defendant Officers.

248.    This systematic torture of African American male arrestees, witnesses, and suspects was and is part of an accepted pattern and practice at Area 2, Area 3, and other police stations throughout the City of Chicago.

249.    Daley knew about or was on notice of the activities at Area 2, and later Area 3, as a result of a February 1982 investigation involving the arrest of Andrew Wilson.

250.    Andrew Wilson's arrest in February 1982 was contemporaneous with Mr. Jones's.

251.    Daley and Bzreczek monitored each development during the Wilson investigation.

252.    Wilson confessed, but not until after he was tortured by electrocution, suffocated with a plastic bag, burned on a radiator, and beaten.

34

253.    The Defendants' wrongful conduct, including but not limited to lying, cover ups, suppression of evidence, failure to intervene, and/or failure to prevent the torture and cruel, inhuman, or otherwise degrading treatment, created an atmosphere where Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class reasonably feared reprisals.

254.    This wrongful conduct constitutes a continuing course of conduct and is evident in the following actions:

### 4.    Brzeczek

255.    In February 1982, Brzeczek, Daley, Devine, and Kunkle received credible information from Dr. John Raba, the Director of Medical Services at Cook County Jail, that Andrew Wilson bore physical signs of torture after interrogation at Area 2.

256.    Dr. Raba wrote a letter to Brzeczek describing, in detail, his medical examination of Wilson and demanded a complete investigation.

257.    Brzeczek, in turn, forwarded Dr. Raba's letter to Daley explaining that there were allegations of torture at Area 2 and requested advice on whether he should investigate further.

258.    Daley, Devine, and Kunkle discussed the letter from Brzeczek with each other, but declined to investigate further.

259.    Rather, in May 1983, despite having received notice from Superintendent Brzeczek about the signs of police torture endured by Andrew Wilson during his 1982 interrogations, Daley publicly commended Burge and other Area 2 detectives for their fine work on the Wilson case.

### 5.    Brzeczek, Burge, Byrne, and the Defendant Officers

260.    The CPD took no action to punish or restrain Burge at that time, and indeed took no action to punish or restrain Burge until 1991 when he was suspended for the torture and abuse of Andrew Wilson.

35

261.    Rather, Burge rose through the ranks, as he was promoted to Sergeant and then Lieutenant. He was appointed the commanding officer of Area 2 in 1982. In 1988, Burge was promoted to Commander of Area 3 detectives, and held this assignment until 1991 when he was suspended for the torture and abuse of Andrew Wilson.

262.    Burge was finally fired by CPD in 1993.

263.    During the fifteen-year period while he was assigned to Area 2, Burge led the Defendant Officers and others in the regular and repeated torture and cruel, inhuman, or otherwise degrading treatment of African American male arrestees, witnesses, and suspects to obtain confessions.

264.    Burge engaged in the torture and cruel, inhuman, or otherwise degrading treatment himself. He also supervised, encouraged, sanctioned, condoned, and ratified the torture and abuse by other Area 2 police officers and detectives.

265.    Burge also, in conspiracy with the other named Defendants, covered up this torture and abuse.

266.    Although Defendant Burge left active police duties in 1991, his influence has tainted the police department and has laid the foundation for continuing torture and/or cruel, inhuman, or otherwise degrading treatment against African American male arrestees, witnesses, and suspects today.

267.    Burge, Byrne, the Defendant Officers, and other CPD police officers under Burge's command consistently denied their active participation in the systematic torture regime, often under oath while they served as witnesses during criminal prosecutions. These instances include, but are not limited to:

        a.    In 1980, Derrick King filed a motion to suppress his confession to murder, arguing that the confession was solely the result of police coercion.

During the hearing, various Area 2 police officers testified under oath and denied that they had ever threatened or beaten King, or seen anyone at Area 2 threatening or beating King.

b.  During Mr. Jones's May 1982 motion to suppress hearing, both Flood and McGuire testified and denied that they or any other Area 2 officer had tortured Mr. Jones while he was in custody.

c.  During a subsequent hearing in August 1982, Burge also denied having tortured Mr. Jones.

d.  On November 12, 1982 and on several occasions thereafter, Andrew Wilson testified that he had been tortured by Burge and other Area 2 detectives. "The State's witnesses uniformly denied that [Wilson] was threatened or beaten, and they testified that the only injury they noticed on [Wilson] while he was in their custody was one to his right eye." *People v. Wilson*, 506 N.E.2d 571, 572 (Ill. 1987).

e.  During a motion to suppress hearing prior to Stanley Wrice's May 1983 criminal trial, Area 2 Detectives Byrne and Dignan testified, under oath, that "they did not beat [Wrice], nor did they see anyone else beat [him]." *People v. Wrice*, 940 N.E.2d 102, 105 (Ill. App. 2010).

f.  During a motion to suppress hearing in February 1984, Reginald Mahaffey testified that he had been tortured while in custody at Area 2. At that same hearing, Byrne, and Detectives William Kurschner, Raymond Benkowski, and Charles Grunhard, each testified that Mahaffey was not physically abused on September 2, 1983. *People v. Mahaffey*, 742 N.E.2d 251, 258 (Ill. 2000).

g.  On May 30, 1985, Area 2 detectives under Burge's command--Glynn, Hines, Lacey, and Dignan--testified that they did not beat, physically abuse, threaten, or holler at Lonza Holmes during his interrogation. *People v. Holmes*, 556 N.E.2d 539, 542-43 (Ill. App. 1989).

h.  During Leroy Orange's May 1985 trial, CPD officers under Burge's command denied Orange's claims that the police had mistreated him during his interrogation on January 12, 1984. Specifically, they denied claims that they had "bagged" him. *See People v. Orange*, 749 N.E.2d 932, 936 (Ill. 2001). Orange was eventually granted a full pardon on January 10, 2003, based on his actual innocence.

i.  On June 3, 1985, Bryne testified in court before Judge Robert Sklowdowski that Gregory Banks was not physically abused while in police custody.

j.   During a motion to suppress hearing in July 1985, Leonard Hinton testified that he was tortured by Area 2 detectives on November 25, 1983. At the same hearing, Burge and Detectives Leonard Bajenski, Thomas Krippel, and Patrick Mokry, each denied that any abuse had occurred. *People v. Hinton*, 706 N.E.2d 1017, 1020 (Ill. App. 1998).

k.   In November 1986, during a hearing on a motion to suppress statements made by Michael Tillman, Byrne and other Area 2 detectives under Burge's command (Boffo, Yucaitis, Dignan, Hines, Patton, and Frenzer) each testified, falsely denying that they had abused Tillman in any way and further asserting that they treated them humanely and with consideration. Based on this false testimony, the hearing judge denied Tillman's motion to suppress and found that Tillman had been "treated humanely and with consideration."

l.   In March 1987, during Lavert Jones's motion to suppress hearing, Lavert Jones testified that he had been tortured by Byrne, Dignan, and Yucaitis while being held in custody at Area 2 after his January 28, 1984 arrest. Testifying for the State, Detective Yucaitis denied ever beating Jones or ever seeing Jones being beaten by other CPD officers. *See People v. Jones*, 601 N.E.2d 1080, 1084 (Ill. App. 1992).

m.   In March 1989, during the Andrew Wilson civil rights trial where he was named as a defendant, Burge testified, under oath, that he never saw any police abuse at Area 2. Wilson eventually prevailed in this civil rights lawsuit.

n.   Prior to and during his criminal trial in 1990, Madison Hobley claimed that Area 2 detectives Robert Dwyer, James Lotito, and then-Officer McWeeny tortured him by beating and bagging him in order to extract a confession. Hobley averred that the three police also racially harassed him during interrogation. Dwyer, Lotito, and McWeeny each denied physically brutalizing or otherwise intimidating Hobley. *People v. Hobley*, 637 N.E.2d 992, 998-99 (Ill. 1994).

o.   In 1990, Area 3 detectives Kill, Byron, Smith, and Lukanich, under Burge's command, falsely testified at the hearing on Ronald Kitchen's motion to suppress that Kitchen had voluntarily confessed and denied that Kitchen had been tortured or coerced. After serving 21 years in prison, Kitchen received a certificate of innocence on August 19, 2009. *Kitchen v. Burge*, 2011 WL 1485301 (April 19, 2011).

p.   After his arrest in September 1991, Jesse Clemon complained that he had been beaten by Area 3 police in order to extract a confession. At a pre-trial hearing to suppress Clemon's statement to police, James O'Brien and Tony Maslanka, Area 3 detectives who had worked under Burge's

command testified, under oath, that neither they nor other police officers had abused Clemon while he was in custody. The trial court granted Clemon's motion and the appellate court affirmed. *People v. Clemon*, 630 N.E.2d 1120 (1994).

q. During a motion to suppress hearing prior to his 1991 criminal trial, Keith Walker argued that his confession was the result of coercive interrogation at Area 2 that included beating and electrocution. McWeeny testified under oath at that hearing and denied that he had knowledge of or had participated in the torture or abuse of Walker. Three other Area 2 detectives testified to the same.

r. In 1992, during the Police Board hearings against Burge, Burge, Flood, and McGuire each provided sworn testimony in which they denied knowledge of or participation in any police torture or abuse.

s. ITIRC records demonstrate that similar false testimony took place regularly between 1993 and 2000.

t. On March 1, 2001, Byrne gave deposition testimony in Aaron Patterson's post-conviction relief proceedings. He provided false testimony regarding his involvement in ten separate criminal cases.

u. In 2003, Burge, Byrne, and others were named as defendants in a civil lawsuit filed by Madison Hobley. The lawsuit alleged that Area 2 police officers had tortured Hobley in order to extract a confession. The lawsuit claimed that Burge was aware of a pattern of torture and abuse at Area 2. Burge was served with written interrogatories relating to the lawsuit and provided written answers in which he lied about his knowledge of and participation in the systematic torture at Area 2. Burge's responses to these interrogatories became the basis of the 2003 federal grand jury indictment against him for perjury and obstruction of justice. Burge was found guilty of these charges in 2010.

v. In November 2003, McWeeny was also served with written interrogatories in the Hobley civil suit. In his responses, McWeeny denied knowledge of or participation in torture and abuse. McWeeny provided similar denials in the Cannon, Orange, and Patterson civil suits in 2006.

w. In 2004, during depositions in the civil cases filed by Madison Hobley, Stanley Howard, Aaron Patterson, and Leroy Orange (the death row inmates pardoned by Governor Ryan in 2003), Burge, Byrne, and other Area 2 detectives invoked the Fifth Amendment and refused to answer questions related to allegations of torture.

x.   In November 2005, McWeeny appeared before a Special Grand Jury as part of the Special Prosecutors' investigation into police torture. He denied any wrongdoing. In April and June 2006, McWeeny again denied that he had participated in or witnessed any acts of police torture or abuse.

y.   In November 2006, in sworn interrogatory answers in the Darrell Cannon civil suit, Bosco denied any knowledge of or participation in any police torture. He repeated these denials during sworn deposition testimony in December 2006.

z.   In December 2006, in sworn interrogatory answers in the Cannon civil suit, Byrne denied any knowledge of or participation in any police torture. Byrne repeated these denials during sworn deposition testimony later that same month. Byrne's December 15, 2006 deposition testimony included specific denials regarding the torture of Darrell Cannon and Gregory Banks.

aa.  During his federal trial for perjury and obstruction of justice in June 2010, Burge testified that he had never tortured any criminal suspects during his tenure as a CPD officer.

268.   On December 7, 1999, Byrne was interviewed by Carol Marin for a television news show. During that interview, he claimed that "he never tortured anyone" while working at Area 2. Byrne further denied that Aaron Patterson had been tortured with a typewriter bag.

269.   In the summer of 2002, Area 2 Detective Robert Dwyer, who had worked under Burge's command, threatened Eileen Pryweller. Pryweller, Dwyers' sister, was present during a 1987 conversation during which Dwyer and Burge boasted about torturing African American crime suspects and using racial epithets to demean them. Dwyer did not want Pryweller to disclose this conversation and used a threat to achieve his purpose.

270.   On December 6, 1999, the television show "60 Minutes II" aired an interview with Defendant Byrne, who had identified himself as Burge's "right-hand man" at Area 2. Byrne denied that any suspect was ever tortured or abused at Area 2.

   **6.   Devine and Kunkle**

#10410943_v2

271.    In September 1988, the City of Chicago hired Defendants Devine and Kunkle to represent Burge and other Area 2 detectives in the civil rights lawsuit brought against them by Andrew Wilson.

272.    For the next eight years, Devine and Kunkle continued to represent Burge in the Wilson civil case and other civil rights cases, as well as in the Police Board Proceedings.

273.    Devine and his law practice received over $1 million in attorneys' fees.

274.    From at least 1988 to 1996, Devine and Kunkle were confronted with voluminous amounts of evidence that Burge was the central figure in a longstanding, well-organized program of the torture and cruel, inhuman, and otherwise degrading treatment of African American male arrestees, witnesses, and suspects at Area 2.

275.    Despite this knowledge, Devine and Kunkle orchestrated a series of litigation decisions designed to shield Burge from criminal, civil, and administrative liability.

276.    In the Andrew Wilson civil suit, for example, Kunkle argued that some of Wilson's injuries were caused by two patrol officers who were not under Burge's command, while other injuries were self-inflicted.

277.    In 1997, Devine became the State's Attorney of Cook County.

278.    Acting under the color of his authority as State's Attorney, Devine thereafter took several actions that protected Burge's interests by further covering up his central role in orchestrating the systematic torture regime at Area 2.  For example:

        a.    making false statements in which he discredited evidence of torture against Burge and other Area 2 police officers, including evidence presented by other Area 2 torture victims, whereby they sought new suppression hearings, new trials, new sentences, pardons, and/or clemency on the basis that they were tortured or that the police obtained false confessions through torture;

41

  b. refusing to further investigate the allegations that Burge and other Area 2 police officers were actors in a pattern and practice of torture and abuse which included the torture of Mr. Jones and other members of the Class and obstructing all attempts to so investigate; and

  c. suppressing evidence which further established that Burge and other Area 2 police officers were actors in a pattern and practice of torture and abuse which included the torture of Mr. Jones and other members of the Class.

279. After activists and lawyers filed a petition for the appointment of a special prosecutor to investigate the numerous claims of police torture under Burge's command in 2001, Devine authored briefs to the court arguing against the proposed investigation.

280. In 2002, Judge Biebel found that Devine had a conflict of interest arising from his prior legal representation of Burge, and granted the petition.

281. In April 2003, Judge Biebel disqualified Devine and the Cook County State's Attorney's Office from prosecuting any cases in which the criminal defendant alleged police torture.

282. In January 2011, after Burge had been convicted of federal perjury and obstruction of justice charges, and just prior to Burge's sentencing hearing, Kunkle wrote a letter to U.S. District Judge Joan Lefkow in support of Burge.

283. In that letter, Kunkle argued, despite all public evidence to the contrary, that the claims that Burge tortured Andrew Wilson were untrue.

   **7.** **Daley**

284. From at least 1988 to 1996, Daley was confronted with voluminous amounts of evidence that Burge was the central figure in a longstanding, well-organized program of the torture and cruel, inhuman, and otherwise degrading treatment of African American male arrestees, witnesses, and suspects at Area 2.

#10410943_v2

285.    Despite this knowledge, in 1992, after the public release of the 1990 OPS Report, then-Mayor Daley, attempted to obscure the participation of Burge and other City employees by announcing that the reports contained "only allegations."

286.    Attempting to quell the public outcry from African American voters and calls for accountability that resulted from the revelations of systematic torture in the CPD, Defendant Daley insisted that "[t]hese are not substantiated cases."

287.    Daley further stated: "it's allegations, rumors, stories, things like that" and denied that the torture at Area 2 was "systematic."

288.    In 1996, despite his knowledge that Peter Dignan had been accused in more than a dozen police torture cases and was a key figure in the systematic torture regime, Daley promoted him to lieutenant.

289.    In October 2006, while Daley was mayor, the City of Chicago entered into a secret agreement with Madison Hobley, Stanley Howard, and Leroy Orange, conditioning the financial settlement on a promise not to name Daley as a defendant in any future civil rights, obstruction of justice, or racketeering conspiracy lawsuits.

### 8.    Jon Burge

290.    Prior March 28, 1994, the City had consistently maintained that Defendant Burge had been acting within the scope of his employment.

291.    In 2003, Burge was named as a defendant in a civil rights lawsuit by torture victim Madison Hobley.

292.    Hobley's lawsuit alleged that, in January 1987, he had been tortured and abused in order to obtain a confession.  Specifically, Hobley's lawsuit alleged that Area 2 police officers had placed a plastic bag over his head until he lost consciousness.

43

293.   The lawsuit also alleged that Burge was aware of a pattern and practice of torture and abuse at Area 2.

294.   During the civil discovery phase of the Hobley litigation, Burge was served with written interrogatories.  In response to questions that asked Burge whether he knew of or participated in torture or abuse of persons in police custody at Area 2, Burge denied having participated in or any knowledge of the torture or abuse at Area 2.

295.   On June 1, 2010, Mr. Jones's public defender during his first UUW trial in 1982, Cassandra Watson, testified that she had several conversations with Defendant Burge over the years about the shock box that he had used to electrocute Mr. Jones.

296.   Burge sometimes responded by saying: "There is no box, Watson" or "What are you talking about Watson?"  Eventually, however, Burge's responses became more sinister and revealing: "There is no box today" and "The black box leaves no marks."

297.   On June 17, 18, and 21, 2010, Burge took the stand in his federal perjury and obstruction of justice trial.

298.   Under oath, Burge repeatedly denied having participated in the torture of any criminal suspect.

299.   He denied condoning the use of torture to extract confessions from criminal suspects by the CPD officers under his command.

300.   He also denied having knowledge of any CPD officer under his command having ever tortured any criminal suspects.

### 9.   Continuing Federal Investigation

301.   On July 14, 2011, the *Chicago Tribune* reported that federal prosecutors from Chicago and the Justice Department's civil rights office in Washington are continuing the criminal investigation related to the successful perjury and obstruction of justice charges against

44

Burge. Notwithstanding the *Chicago Tribune* report, one or more of the Defendants know that they are being investigated.

302. According to the *Chicago Tribune* report, the federal investigation includes scrutiny of "detectives who worked under Burge and . . . former Cook County prosecutors."

303. "Federal prosecutors and FBI agents have been collecting court records and conducting interviews." Steve Mills & Todd Lighty, *Feds Investigate Jon Burge's Detectives, Ex-Cook County Prosecutors, Sources Say*, Chi. Tribune, July 14, 2011.

### 10. Injuries to the Plaintiffs

304. As a direct and proximate result of the failure of Brzeczek, Daley, Devine, and Kunkle to intervene, discipline, or to adequately supervise, Burge, Byrne, the Defendant Officers, and other unnamed Area 2 (and later Area 3) detectives, at least 135 African American male arrestees, witnesses, and suspects were tortured with electrocution, baggings, mock executions, death threats, and beatings, often while using racial slurs and epithets.

### C. Plaintiffs' Damages

305. Mr. Jones spent over five years in prison for crimes that he did not commit. This time was physically, emotionally, and psychologically dehumanizing.

306. While incarcerated, Mr. Jones suffered from the loss of sustained contact with his children and from his mother.

307. As a result of his wrongful imprisonment, Mr. Jones has been deprived of the opportunity to hold gainful employment.

308. Mr. Jones has been homeless since 1993.

309. At night, he often sleeps in abandoned buildings.

45

310.    As a result of his torture and the subsequent police cover-up, Mr. Jones suffers from recurring nightmares. In these nightmares, he is trapped in an enclosed space where he cannot move. He often has nightmares about being attacked.

311.    Mr. Jones suffers from constant fear and anxiety, nervousness, despair, and loneliness.

312.    Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class suffer the distrust of the police and all law enforcement in the City of Chicago.

313.    After enduring torture by the police and serving decades in prison, Mr. Burton has trouble sleeping, has frequent nightmares, and severe mental health issues. Mr. Burton is taking prescription medication for these symptoms. Mr. Burton has attempted suicide several times. Mr. Burton also has anger and trust issues.

314.    Mr. Burton has also been the target of reprisals by the Black Gangster Disciples, including but not limited to: multiple beatings, a stabbing attack while he slept, daily rapes, and one occasion on which where gasoline and a lighted match were thrown into his cell for the purpose of killing or seriously injuring him.

315.    Mr. Dungey has suffered severe emotional injuries as a result of the beating, and these injuries still negatively impact him. Mr. Dungey was treated for years by Dr. Sean, a psychologist at Cook County Hospital, as a result of the trauma associated with the police torture.

316.    To this day, the injuries to Mr. Tillis's knee still impact his ability to move around without pain or discomfort.

317.    Several members of the Class have left the City of Chicago because they are terrified that if they remain, they will be victimized by the police.

46

318. Because Mr. Jones distrusts the police, he has been reluctant to seek aid, assistance, or protection from the police since he was tortured.

319. On occasion, this means that Mr. Jones will elect to sleep in the street or in an abandoned building, rather that to seek shelter at a police station during freezing winter nights.

320. Because members of the Class distrust the police, they have been reluctant to seek aid, assistance, or protection from the police or other law enforcement.

321. This means that members of the Class are less likely to aid law enforcement in criminal investigations even when they have material information that can be used to bring criminal suspects to justice.

322. During the last 37 years, the democratic system of justice under the law has been substantially undermined by the unlawful acts of and omissions by the Defendants, as described in the preceding paragraphs.

323. The unlawful acts of and omissions by the Defendants are injurious not only to Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class, but to all residents of the City of Chicago.

## COUNT I

### (42 U.S.C. § 1983 Claim for Race-Based Equal Protection Violations)

324. Each of the preceding paragraphs is incorporated as if restated herein.

325. Defendants Burge, Byrne, and Defendant Officers engaged in intentional and unlawful racial discrimination when they tortured and otherwise abused Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class because they are African American men, thereby causing the Plaintiffs to be deprived of their right to equal protection of the law under the Fourteenth Amendment.

47

#10410943_v2

326.    Defendants Burge, Byrne, and the Defendant Officers were acting under color of

Illinois law when they consistently used racial slurs and epithets during their torture and abuse of

Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class,

demonstrating that their illegal treatment of the Plaintiffs was intentionally racially-motivated.

For example:

    a.    On or about May 30, 1973, Anthony Holmes was interrogated at Area 2 by a group of CPD officers, including Burge. During this interrogation, Holmes was repeatedly bagged, beaten, electrocuted with the shock box, and called "nigger." While Burge was electrocuting him, he told Holmes, "you going to talk, nigger, you going to talk."

    b.    In 1973, while interrogating Lawrence Poree, Burge and Detective Michael Hoke showed Poree the shock box and Burge threatened, "this is what we got for niggers like you."

    c.    On or about November 13, 1979, Edward James was interrogated at Area 2 by a group of CPD officers, including Burge. During this interrogation, James was beaten, threatened, and called "nigger."

    d.    On or about September 28 through September 29, 1979, Tony Thompson was interrogated at Area 2 by a group of CPD officers, including Burge. During this interrogation, Thompson was beaten and repeatedly electrocuted with the shock box, which CPD officers referred to as the "nigger box."

    e.    On or about June 25 and 26, 1981, McWeeny and Area 2 Detective John McCann interrogated sixteen-year-old Mark Clements. While beating Clements, McCann yelled, "nigger boy, you gonna cooperate?"

    f.    On or about November 13, 1981, Sylvester Green was arrested and interrogated at Area 2. Three white detectives (Grunhard, McCabe, and McNally) entered the interrogation room, beat him, choked him, and called him a "nigger" and a "nigger bastard." Burge later entered the interrogation room and further threatened Green.

    g.    On February 6, 1982, during his interrogation of Mr. Jones, Burge put a loaded gun to Mr. Jones's head and said he was going to "blow his black head off."

    h.    On or about February 14, 1982, during his interrogation of Andrew Wilson, Burge used the shock box and other torture tactics to elicit a

48

confession from Wilson and told Wilson that he was going to "fry his black ass."

i. On or about September 9, 1982, Rodney Benson was interrogated about his alleged participation in a rape. When Benson denied the allegations, the police officers who were interrogating him beat him, threatened him with hanging, and told him that they "had hung other niggers," and threatened to kill him if they ever saw him in a white neighborhood.

j. On or about October 28 through October 29, 1983, Byrne and Detective Peter Dignan repeatedly beat, suffocated with a plastic bag, and racially taunted Gregory Banks. When Banks refused to make a statement, Dignan held a plastic bag and told Banks "we have something special for niggers" and then placed the bag over Banks' head for up to 2 minutes.

k. On or about November 2, 1982, Byrne struck Darrell Cannon on his testicles, penis, and mouth with a cattle prod. While he did this, Byrne repeatedly called Cannon a "nigger."

l. On or about January 28, 1984, Lavert Jones was interrogated at Area 2 by a group of CPD officers, including Byrne. During this interrogation, Lavert Jones was beaten, kicked in the genitals, and called "nigger."

m. On or about June 7, 1984, Phillip Adkins was interrogated at Area 2 by a group of CPD officers, including Byrne. During this interrogation Adkins was beaten on his body and groin, and repeatedly called "nigger."

n. On or about October 30, 1985, Shadeed Mu'min was interrogated at Area 2 by a group of CPD officers, including Burge. During this interrogation, Burge repeatedly threatened Mu'min's life, bagged him with a typewriter cover, and repeatedly called him "nigger."

o. On or about January 6, 1987, Madison Hobley was interrogated at Area 2 by a group of CPD officers, including Defendants Burge and McWeeny, and Detective Robert Dwyer. During this interrogation, Hobley was beaten, bagged, threatened with death, and called racial epithets, including "nigger."

p. In mid-January 1987, Burge and Area 2 Detective Robert Dwyer had a conversation with Dwyer's sister (Eileen Pryweller), in which they described how they dealt with "niggers" during interrogation; stating that they "give them hell," "beat the shit out of them, throw them against walls, burn them against the radiator, smother them, poke them with objects, [and] do something to some guys' testicles." While Burge laughed, Detective Dwyer also said, "this skinny little nigger, boy I got him [by] just torturing him, smothering him."

49

q.  In letters dated March 15 and June 16, 1989, addressed to Andrew Wilson's civil lawsuit attorneys, an anonymous CPD source reported: "Burge hates black people."

r.  On or about June 5, 1991, TyShaun Ross was interrogated at Area 3 by a group of CPD officers, including Defendant McWeeny. During this interrogation, Ross was repeatedly beaten, electrocuted, and called "nigger."

s.  During a March 1, 2000 deposition in the *People v. Patterson* case, Byrne admitted that he, Burge, and other Area 2 police officers commonly used the term "nigger.

t.  In October and November 2004, five African American, retired former Area 2 detectives gave sworn testimony confirming that Burge, Byrne, and the Defendant Officers were motivated by a racial animus in selecting the victims of their torturous interrogation tactics.

u.  On November 10, 2006, former Area 2 Detective Frank Laverty provided a sworn statement in which he described the racist attitudes that prevailed amongst Burge, Byrne, and many of the other white police officers and detectives at Area 2. Laverty declared that the word "nigger" was commonly used at Area 2.

v.  In 2010, during deposition testimony videotaped for in Ronald Kitchen's civil suit against the City of Chicago, Detective Michael Kill proclaimed that he had used the word "nigger" during interrogations "more than a million times."

w.  The Defendant Officers and other CPD officers consistently referred to the homemade electrocution device that was used to torture Mr. Jones and other members of the Class as "the nigger box."

327.  The actions of Burge, Byrne, and the Defendant Officers individually, jointly, and in conspiracy, motivated by a racial animus in using excessive force against Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class, violated the Plaintiffs' Fourteenth Amendment rights to equal protection of the laws.

328.  Burge, Byrne, Frenzer, and the Defendant Officers operated in a police and prosecutorial climate that allowed and even encouraged racial discrimination and racial animus

50

against Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class. Prosecutors in Defendant Cook County State's Attorney's Office ("SAO") played a game called the "two-ton contest" or alternatively, "niggers by the pound." The object of this "game" was to be the first to prosecute a group of defendants whose weight totaled 4,000 pounds (i.e., two tons). African Americans defendants became the prosecutors' game tokens as they were taken to rooms and placed on scales to be weighed. A chart in the State's Attorney's Office tracked the prosecutors' progress in this "game."

329.    The misconduct described in this Count was undertaken intentionally and arbitrarily and with willful indifference to Plaintiffs' constitutional rights to be free from racial discrimination in the enforcement of the laws.

330.    Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class have been treated differently than other arrestees, witnesses, and suspects on account of their race and/or color.

331.    There is no compelling interest warranting such disparate treatment nor is such treatment narrowly tailored to serve any compelling interest.

332.    As a direct, foreseeable, and proximate result of the wrongful acts by the Defendants described in this Count, Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class suffered and will continue to suffer humiliation, anxiety, shame, despair, embarrassment, depression, mental pain, anguish, injury to their reputations, and economic losses, all to Plaintiffs' damages in an amount to be proven at time of trial.

333.    Because the conspiracy or conspiracies and the overt action in furtherance thereof where done and continue to be done with the knowledge and purpose of depriving Plaintiffs, who are African American, and numerous other African American torture victims of the equal

#10410943_v2

protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward Plaintiffs and other victims of this racially-motivated conspiracy, the Defendants also deprive Plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment and 42 U.S.C. § 1985.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory damages, and, because these Defendants acted with purpose and or intent to discriminate for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT II

### (42 U.S.C. §§ 1985, 1986 Claim for Conspiracy to Deprive Constitutional Rights)

334.    Each of the preceding paragraphs is incorporated as if restated herein.

335.    Defendants, acting in their individual capacities and under color of law, conspired together and with other unsued co-conspirators, and reached an understanding to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves, to deprive Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class of their constitutional rights, including their rights to be free from unreasonable search and seizure, to be free from wrongful conviction and imprisonment, and to due process of law. Defendants' conspiracies deprived Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class of rights protected by the Fourth and Fourteenth Amendments of the United States Constitution, as protected by 42 U.S.C. § 1983.

336.    Defendants conspired to commit the overt acts set forth in the Factual Statements above.  The overt acts included the torture, wrongful arrest, prosecution, conviction, and imprisonment of Plaintiffs.  It also included the manufacture of knowingly false and unreliable

evidence which was intended to inculpate Plaintiffs; the suppression of exculpatory evidence; and intentional failure to investigate evidence which would have exculpated Plaintiffs.

337.    The conspiracy resulted in the violation of Plaintiffs' constitutionally protected rights.

338.    The Defendants' conspiracy and overt acts are continuing in nature and cause Plaintiffs constitutional deprivations, injuries, pain, suffering, mental anguish, conviction, incarceration, humiliation, and loss of freedom, companionship, and income.

339.    The Defendants shared the general conspiratorial objective, which was to cause Plaintiffs' unlawful arrest, prosecution, conviction, and imprisonment.

340.    Additionally or alternatively, Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, Brzeczek, Daley, Devine, Frenzer, and Kunkle, knowing that the above § 1985 conspiracy to torture and wrongfully convict Plaintiffs was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

341.    The acts of Defendants as described were motivated by a racial animus, an evil motive and intent, and involved a reckless and callous indifference to the protected rights of the Plaintiffs, thus entitling Plaintiffs to an award of punitive damages against the individually named Defendants.

342.    If Plaintiffs prevail, they are entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages in an amount that is fair and reasonable, including for lost wages, and for

#10410943_v2

punitive damages, plus costs of this action, attorneys' fees, and whatever additional relief this court finds equitable and just.

## COUNT III

### (42 U.S.C. § 1986 Claim for Negligence in Preventing a Conspiracy to Deprive Constitutional Rights)

343.    Each of the preceding paragraphs is incorporated as if restated herein.

344.    Because of their participation in the torture and abuse of Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class, Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Frenzer, Kill, McGuire, and McWeeny had actual knowledge of a conspiracy under 42 U.S.C. § 1985 to deprive Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class of their constitutional rights.

345.    During his tenure as Police Superintendent, Defendant Brzeczek supervised the receipt of numerous allegations of police torture of suspects at Area 2.   Defendant Brzeczek therefore had sufficient knowledge of a conspiracy under 42 U.S.C. § 1985 to deprive Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class of their constitutional rights.

346.    Defendants had actual knowledge of a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights.

347.    Defendants had the power to prevent or aid in preventing the commission of a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights.

348.    Defendants neglected or refused to prevent a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights.

#10410943_v2

349.     As a direct and proximate cause of the Defendants' failure to prevent a conspiracy under 42 U.S.C. § 1985 to deprive Plaintiffs of their constitutional rights, the Plaintiffs suffered injuries and damages, including but not limited to severe emotional distress.

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, for compensatory damages in an amount that is fair and reasonable, including for lost wages, and for punitive damages, plus costs of this action, attorneys' fees, and whatever additional relief this court finds equitable and just.

## COUNT IV

### (42 U.S.C. § 1983 Claim for Failure to Intervene)

350.     Each of the preceding paragraphs is incorporated as if restated herein.

351.     During Mr. Jones's torture, Defendants Burge, Flood, McGuire, and McWeeny, and possibly others, stood by without intervening to prevent the violence to which Plaintiff was subjected by Defendants Burge and McWeeny.

352.     As a result of Defendants Burge, Flood, McGuire, and McWeeny's failure to intervene to prevent the unjustified and excessive use of force, Mr. Jones suffered pain and injury, as well as emotional distress. Defendants Burge, Flood, McGuire, and McWeeny had a reasonable opportunity to prevent this harm, but failed to do so.

353.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. Jones's constitutional rights.

354.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the CPD in the manner described above.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Bosco, Brzeczek, Burge, Daley, Devine, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for

55

Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT V (A)

### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

355.   Each of the preceding paragraphs is incorporated as if restated herein.

356.   The actions of Bosco, Burge, Flood, McGuire, and McWeeny, individually, jointly, and in conspiracy, in coercively interrogating Mr. Jones, using torture techniques which shock the conscience, and resulting in false and fabricated confession to the Mayfield murder, violated his Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without the due process of law.

357.   The actions of the above-named Defendants in using torture to coercively interrogate Mr. Jones were the direct and proximate cause of his injuries and damages as more fully set forth above.

WHEREFORE, Plaintiff Jones demands judgment against Defendants Bosco, Burge, Flood, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT V (B)

### (42 U.S.C. § 1983 Claim for Coercive Interrogation)

358.   Each of the preceding paragraphs is incorporated as if restated herein.

359.   Defendants individually, jointly, and in conspiracy, caused the wrongful charging, prosecution, and imprisonment of members of the Class.  Additionally, these same Defendants, individually, jointly, and in conspiracy, caused the continuation of those wrongful convictions.

#10410943_v2

360. Defendants caused and/or continued the Class wrongful charging, prosecution, conviction, and imprisonment by committing or causing to be committed one or more of the following acts: coercing, constructing and/or fabricating the false and unreliable statements and admissions which formed the basis for the Class members' chargings, prosecutions, and convictions; by withholding from the prosecutors, judges, and defense attorneys involved in the Class prosecutions the fact that these statements and admissions were false, unreliable, constructed, and coerced; by suppressing, destroying, and preventing the discovery and development of additional exculpatory torture findings and evidence, including, but not limited to, the instruments of torture as well as other exculpatory evidence; by giving a false and incomplete version of events to prosecutors; by writing false reports and giving false testimony; by improperly influencing the judges hearing the Class cases, inter alia, by making false public statements; by obstructing and improperly influencing investigations which would have led to discovery of further exculpatory evidence; by suppressing and attempting to discredit findings of individual and systematic torture and abuse; and by the additional wrongdoing set forth above, thereby unconstitutionally depriving the Class of their liberty and violating their right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

361. Additionally and/or alternatively, the Defendants failed to intervene to stop the Class's wrongful prosecutions and convictions and resultant imprisonment despite having the opportunity to do so.

362. The actions of the Defendants in depriving the Class of their right to a fair trial and not to be wrongfully convicted and imprisoned, and additionally and/or alternatively, in

#10410943_v2

failing to intervene to stop said violations, were the direct and proximate cause of the injuries to the Class which are set forth above.

WHEREFORE, the Class demand judgment against Defendants for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for the Class constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

**COUNT VI**

**(42 U.S.C. § 1983 Claim for Deprivation of Due Process)**

363.    Each of the preceding paragraphs is incorporated as if restated herein.

364.    As described more fully above, Burge, Byrne, and the Defendant Officers, while acting under color of law and within the scope of their employment as police officers, deprived Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class of their constitutional rights to a fair trial.

365.    The Defendants deliberately provided false evidence, thereby misleading and misdirecting the state criminal prosecutions of Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class.

366.    To wit, the Defendants provided false allegations that were the bases of the criminal complaint, withheld exculpatory evidence throughout the proceedings, and fabricated evidence that was the bases of the criminal prosecution.

367.    The misconduct of the Defendants also resulted in the criminal convictions of Mssrs. Jones, Burton, Dungey, Freeman, and Tillis, thereby denying them of their Constitutional right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

58

368.    The misconduct of the Defendants also resulted in the criminal convictions of the other members of the Class, thereby denying them their Constitutional rights to a fair trial as guaranteed in the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

369.    As a result of the violation of this constitutional right to fair trial, the Plaintiffs suffered injuries, including but not limited to emotional distress.

370.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

371.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the CPD in the manner described in the preceding paragraphs.

WHEREFORE, Plaintiffs demand judgment against the Defendants for compensatory damages, and because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

## COUNT VII

### (42 U.S.C. § 1986 *Monell* Policy Claim Against the City of Chicago)

372.    Each of the preceding paragraphs is incorporated as if restated herein.

373.    The actions of Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek, as alleged above, were done pursuant to one or more de facto policies, practices, and/or customs of the City of Chicago.

374.    At all material times the City of Chicago, through its Police Department, Superintendents, Police Board, Office of Professional Standards and Internal Affairs Division ("IAD"), Personnel Division, Mayors, City Council, and/or Corporation Counsel's Office had de facto policies, practices, and customs which included, inter alia:

59

a. conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects, and arrestees in order to obtain confessions and wrongful convictions, particularly the use of torture techniques under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3;

b. manufacturing, fabricating, and/or using improper suggestive tactics to obtain false witness statements;

c. the filing of false reports, and giving false statements and testimony about said interrogations and confessions, and fabricating or constructing parts or all of said confessions, suppressing evidence concerning said interrogations and confessions, pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of confessions obtained during said interrogations, denying suspects their right to full and fair access to the courts, and otherwise covering up the true nature of said interrogations and confessions particularly in circumstances where torture techniques were used by Area 2 and Area 3 detectives under the command and supervision, and with the active participation of, Defendants Burge and Byrne;

d. failure to video and/or audio tape the interrogations or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in paragraphs a-b, above;

e. the failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of torture and related abuses of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; of making false reports and statements; and/or of physically, psychologically, or otherwise illegally or improperly coercive questioning or interrogation of witnesses, suspects, and arrestees, particularly persons who were tortured and/or physically and/or psychologically abused during questioning. This failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control includes Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, and McWeeny, and all other Area 2 and 3 detectives who were repeatedly accused of torturing and physically abusing suspects;

f. the police "code of silence," specifically in cases where officers engaged in the violations articulated in paragraphs a-d above (i.e., police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3 under the command and supervision of Defendants Burge and Byrne) whereby police officers refused to report or otherwise covered-up instances of police misconduct, and/or fabricated, suppressed, and

60

destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. The code of silence also includes police officers either remaining silent or giving false and misleading information during official investigations and Grand Jury proceedings in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have tortured or coercively or otherwise unconstitutionally interrogated a suspect, arrestee, or witness, or falsely arrested, imprisoned, and prosecuted a criminal defendant, particularly in cases where torture techniques were utilized under the command and supervision of Defendants Burge and Byrne at Area 2, and later at Area 3. This code of silence in the torture cases has most recently been evidenced and invoked in response to the federal government's investigation and prosecution of Defendant Burge and the investigation of the men under his command; and

g. covering up and suppressing evidence and findings, refusing to properly investigate, arrest, and charge, continuing to finance Defendant Burge's defense and otherwise attempting to both publicly and judicially defend his actions long after repeatedly acknowledging that he had committed repeated acts of torture, and after he had been indicted and convicted for lying about these acts, and otherwise obstructing justice in police torture cases, particularly those that arose at Area 2 and Area 3 under the supervision, and with the participation of, Defendant Burge.

375. The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 insiders before and after Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class were tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Byrne; Defendant Daley (before and throughout his tenure as Mayor of Chicago) and his Chiefs of Staff; successive Police Superintendents, including Defendant Brzeczek, Fred Rice, Leroy Martin, Matt Rodriguez, Terry Hillard, and Phil Cline; to the successive OPS Directors, including Gayle Shines; various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke, and Townsend; the Chiefs of Detectives, including William Hanhardt and Terry Hillard;

61

#10410943_v2

to the Chicago City Council and the Chicago Police Board; and to other policy-making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecution and conviction of the Plaintiffs and other torture victims, and the denial of their full and fair access to the courts, inter alia, in the manner set forth above.

376.    Said policies, practices, and customs, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, inter alia, the coercing of statements from suspects, witnesses, and arrestees, by torture and related abusive tactics and techniques, the construction and fabrication of confessions, admissions, statements, and other false witness evidence, the suppression and destruction of evidence of torture and other exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, the obstruction of justice, the manipulation and obstruction of the State and federal courts, and the pursuit and continuation of false arrests, wrongful prosecutions and convictions; and were, separately and together, a direct and proximate cause of the unconstitutional acts and perjury committed by the named Defendants and their unnamed co-conspirators, and the injuries suffered by Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class.

377.    Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzezcek was also done with deliberate indifference and likewise served as a direct and proximate cause of the injuries to Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class.

62

378.     Additionally, and/or alternatively, the involvement in, and ratification of, the

unconstitutional actions set forth above, by Chicago governmental and police policymakers,

including, but not limited to, successive Police Superintendents, including Defendant Brzezcek,

and several Mayors, most notably Defendant Daley, establish that said violations were directly

and proximately caused by the City of Chicago and its Police Department.

WHEREFORE, Plaintiffs demand judgment against the Defendant City of Chicago for

substantial compensatory damages, plus costs and attorneys' fees, and whatever additional relief

this court finds equitable and just.

## COUNT VIII

### (42 U.S.C. § 1986 *Monell* Policy Claim Against County and Cook County State's Attorney's Office)

379.     Each of the preceding paragraphs is incorporated as if restated herein.

380.     The actions of Defendants Daley, Devine, Frenzer, and Kunkle, as alleged above,

were done pursuant to one or more de facto policies, practices, and/or customs of Cook County

and the Cook County State's Attorney's Office.

381.     These de facto policies, practices, and customs included, *inter alia*:

a. the routine and regular "blind-eye" turned by individual members of the Cook County State's Attorney's Office, including its Felony Review Division, who were expressly on notice that the Defendant Officers and other offices under Defendant Burge's command at Area 2 were torturing and abusing arrestees, witnesses, and suspects;

b. the failure to intervene, halt, or investigate coercive and abusive interrogations at Area 2 leading to false confessions despite being put on notice that such practices were regularly occurring; and

c. the suppression and cover-up of favorable exculpatory evidence to defendants who were prosecuted and wrongfully convicted on the basis of tortured confessions or illegal interrogations, and continuing to maliciously prosecute cases in reliance on false confessions.

63

#10410943_v2

382. The above-described policies, practices, and customs of Cook County and the Cook County State's Attorney's Office were so widespread, permanent, and well-settled as to constitute a custom or usage, and were undertaken with malice, willfulness, and reckless indifference to the rights of others. These policies, practices, and customs directly and proximately caused the constitutional deprivations suffered by Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class.

WHEREFORE, Plaintiffs demand judgment against Cook County and the Cook County State's Attorney's Office for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this court finds equitable and just.

## COUNT IX

### (State Law Claim for Civil Conspiracy)

383. Each of the preceding paragraphs is incorporated as if restated herein.

384. As described more fully above, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

385. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in their joint activity.

386. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of the Plaintiffs.

387. As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including, but not limited to, severe emotional distress and anguish.

WHEREFORE, Plaintiffs demand judgment against Defendants Burge, Byrne, Daley, Devine, Frenzer, Kunkle, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek, for compensatory damages, and, because these Defendants acted maliciously,

64

#10410943_v2

willfully, wantonly, and/or with reckless disregard for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this court deems equitable and just.

## COUNT X

### (State Law Claim for Violations of the Constitution of the State of Illinois)

388.    Each of the preceding paragraphs is incorporated as if restated herein.

389.    Defendants violated Plaintiffs' rights and privileges as guaranteed to them under the Constitution of the State of Illinois.

WHEREFORE, Plaintiffs demand judgment against Defendants Burge, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, and McWeeny for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this court deems equitable and just.

## COUNT XI

### (State Law Claim for Violation of Illinois Hate Crime Act, 720 ILCS 5/12-7.1)

390.    Each of the preceding paragraphs is incorporated as if restated herein.

391.    As described more fully in the preceding paragraphs, Defendant Burge and the Defendant Officers committed an assault and battery upon Plaintiffs because of Plaintiffs' race, thereby committing a hate crime as defined by Illinois statute.

392.    As a direct and proximate result of this hate crime, Plaintiffs suffered damages, including physical injuries and severe emotional distress.

393.    The misconduct alleged herein was within the scope of Defendant Burge and the Defendant Officers' employment.

65

394.    The misconduct described was undertaken with malice, willfulness, and reckless indifference to the rights of the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant Officers for compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiffs' constitutional rights, for punitive damages, plus the costs of this action, attorneys' fees, and such other relief as this court deems equitable and just.

## COUNT XII

### (State Law Claim for Intentional Infliction of Emotional Distress)

395.    Each of the preceding paragraphs is incorporated as if restated herein.

396.    Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek individually, jointly, and in conspiracy, by, inter alia, torturing false confessions from Plaintiffs and/or by failing to prevent or stop such torture; by constructing and fabricating confessions; and by procuring the Plaintiffs' prosecutions and convictions, for crimes they did not commit by means of these false confessions, engaged in extreme and outrageous conduct.  Additionally, these same Defendants, individually, jointly, and in conspiracy, inter alia, by fabricating, coercing, and suppressing other evidence, by refusing to investigate or discipline the torturers, and by making false public statements, engaged in additional extreme and outrageous conduct.

397.    Defendants Daley, Devine, Frenzer, Kunkle, Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek intended, by subjecting Plaintiffs to such humiliating and degrading conduct, to inflict severe emotional distress on the Plaintiffs, and knew that their conduct would cause Plaintiffs to suffer severe emotional distress.

398.    As a direct and proximate cause of Defendants' outrageous conduct, Plaintiffs were and continue to be injured, and have, and continue to experience, severe emotional distress,

#10410943_v2

including but not limited to constant fear and anxiety, nightmares, sleep disruption, depression, and a recurring fear of re-arrest, torture, and re-prosecution.

WHEREFORE, Plaintiffs demand judgment against Defendants Daley, Devine, Frenzer, Kunkle, Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek for compensatory damages, plus the costs of this action, and such other relief as this court deems equitable and just.

### COUNT XIII

### (State Law Claim for Malicious Prosecution)

399. Each of the preceding paragraphs is incorporated as if restated herein.

400. Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against the Plaintiffs, and these same Defendants, together with Defendants Daley, Devine, Frenzer, Kunkle, individually, jointly, and in conspiracy, continued that prosecution, again and without probable cause. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused the injury and damage to Plaintiff set forth above.

401. As a result of the misconduct, Plaintifs have suffered and continue to suffer injuries including pain and suffering, and severe emotional distress.

WHEREFORE, Plaintiffs demands actual or compensatory damages against Defendants Daley, Devine, Frenzer, Kunkle, Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek, and, because these Defendants acted in a malicious, willful, and/or wanton manner towards Plaintiffs, punitive damages, and such other and additional relief as this court deems equitable and just.

67

#10410943_v2

## COUNT XIV

### (State Law Respondeat Superior Claim)

402.    Each of the preceding paragraphs is incorporated as if restated herein.

403.    Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek were, at all material times to this complaint, employees of the Defendant City of Chicago, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant City under State law pursuant to respondeat superior.

404.    Defendant Daley, at the times specified in this complaint, was an employee of the City of Chicago, was acting at these times within the scope of his employment as a City employee, and those acts which are actionable under State law are directly chargeable to the Defendant City under State law pursuant to respondeat superior.

WHEREFORE, Plaintiffs demand judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiffs' State law claims against the Defendants named in this Count, plus the costs of the action, and whatever additional relief this court deems equitable and just.

## COUNT XV

### (State Law Claim–Indemnification)

405.    Each of the preceding paragraphs is incorporated as if restated herein.

406.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

68

407.    Defendants Burge, Byrne, the Defendant Officers, and Defendant Brzeczek, were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs demand judgment against the City of Chicago for any and all compensatory damages awarded on Plaintiffs' state law claims against the Defendants named in this Count, plus the costs of the action, and whatever additional relief this court deems equitable and just.

## COUNT XVI

### (745 ILCS 10/9-102 and Common Law Claims Against the City, County, and SAO)

408.    Each of the preceding paragraphs is incorporated as if restated herein.

409.    The Defendant City of Chicago was the employer of Defendants Burge, Byrne, Boudreau, Bosco, Cummings, Flood, Kill, McGuire, McWeeny, and Brzeczek at all times relevant and material to this complaint.

410.    These Defendants committed the acts alleged above under color of law and within the scope of their employment as employees of the City of Chicago.

411.    Additionally, the Defendant City of Chicago was the employer of Defendant Daley at the times specified in this complaint.

412.    Defendant Daley committed the acts alleged above under color of law and within the scope of his employment as an employee of the City of Chicago.

413.    The Defendant Cook County and its State's Attorney's Office was the employer of Defendants Daley and Devine while each were, during their respective terms, State's Attorney of Cook County.

414.    Additionally, it was the employer of Defendants Devine, Frenzer, and Kunkle while each were, during their respective terms, Assistant State's Attorney of Cook County.

69

415.    The Defendant Cook County is therefore responsible for any judgment entered against Defendants Daley, Devine, Frenzer, and Kunkle for acts committed by them during their employment with the Defendant Cook County, making the County a necessary party to this complaint.

416.    Defendants Daley, Devine, Frenzer, and Kunkle committed the acts alleged above under color of law, and, while so employed, in the scope of their employment as employees of Cook County and its State's Attorney's Office.

WHEREFORE, Plaintiffs, pursuant to 745 ILCS § 10/9-102, and otherwise pursuant to law, demands judgment against the Defendants City of Chicago, Cook County, and its State's Attorney's Office, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs, and interest, and for whatever additional relief this court deems equitable and just.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

Dated:  December 4, 2012                          Respectfully submitted,


                                                  /s/ Sam E. Adam
                                                  Sam E. Adam
                                                  James D. Montgomery

                                                  Attorneys for Plaintiff


Sam E. Adam, Esq.
6133 South Ellis Ave.
Chicago, IL 60615
(773) 752-6950
(773) 752-6970 (fax)

70

#10410943_v2

James D. Montgomery, Esq.
One North LaSalle St., Suite 2450
Chicago, IL  60602
(312) 977-0200
(312) 977-0209 (fax)

71