## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN JONES, ALNORAINDUS BURTON, AUBREE DUNGEY, JAMES FREEMAN, and SHERROD TILLIS on behalf of themselves and all others similarly situated, and in the interest of the general public, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 CV 4143 |
| vs. | ) ) | Judge John W. Darrah |
| JON BURGE, former Chicago Police Department (CPD) Commander; JOHN BYRNE, former CPD Sergeant; KENNETH BOUDREAU, MICHAEL BOSCO, MICHAEL CUMMINGS, ROBERT FLOOD, WILLIAM KELLY, MICHAEL KILL, DENNIS McGUIRE, DANIEL McWEENY, ROBERT MYERS, PAUL SPAGNOLA, WILLIAM SVILAR, former and/or current CPD Detectives; RICHARD BRZECZEK, former CPD Superintendent; RICHARD M. DALEY, former Mayor and former State's Attorney; RICHARD A. DEVINE, former State's Attorney; WILLIAM J. KUNKLE; the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; the COOK COUNTY STATE'S ATTORNEY'S OFFICE, and JOHN DOE DEFENDANTS #1-50, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION

JURY DEMAND |
| Defendants. | ) | |

### Plaintiffs' Response to the Joint Motion to Dismiss
### Submitted by the Defendants

Victor P. Henderson, Esq.
Samuel E. Adam, Esq.
Vivian Tarver-Varnado, Esq.
Henderson Adam, LLC
330 South Wells Street, Suite 1410
Chicago, Illinois 60606
(312) 262-2900
(312) 262-2901 (fax)

James D. Montgomery, Esq.
One North LaSalle Street, Suite 2450
Chicago, Illinois 60602
(312) 977-0200
(312) 977-0209 (fax)

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELVIN JONES, ALNORAINDUS BURTON, AUBREE DUNGEY, JAMES FREEMAN, and SHERROD TILLIS on behalf of themselves and all others similarly situated, and in the interest of the general public, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 CV 4143 |
| vs. | ) ) | Judge John W. Darrah |
| JON BURGE, former Chicago Police Department (CPD) Commander; JOHN BYRNE, former CPD Sergeant; KENNETH BOUDREAU, MICHAEL BOSCO, MICHAEL CUMMINGS, ROBERT FLOOD, WILLIAM KELLY, MICHAEL KILL, DENNIS McGUIRE, DANIEL McWEENY, ROBERT MYERS, PAUL SPAGNOLA, WILLIAM SVILAR, former and/or current CPD Detectives; RICHARD BRZECZEK, former CPD Superintendent; RICHARD M. DALEY, former Mayor and former State's Attorney; RICHARD A. DEVINE, former State's Attorney; WILLIAM J. KUNKLE; the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; the COOK COUNTY STATE'S ATTORNEY'S OFFICE, and JOHN DOE DEFENDANTS #1-50, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION JURY DEMAND |
| Defendants. | ) ) | |

**Table of Contents**

Summary of Allegations in the Second Amended Complaint....................................2

Argument....................................................................................................6

I.     It is premature to grant a 12(b)(6) motion in this conspiracy action before Plaintiffs have had the opportunity to conduct discovery...................7

II.    Plaintiffs' claims are not barred by the statute of limitations......................10

i

A.  Plaintiffs' claims allege continuing violations within the limitations period...........................................................................11

B.  Even if one or more of the Plaintiffs' claims are untimely, equitable theories toll the statute of limitations................................14

C.  Equitable estoppel also bars Defendants from claiming a time-bar defense........................................................................19

III.  Plaintiffs properly state their 5th Amendment coerced confessions and due process claims...........................................................................20

A.  Mr. Jones has properly stated his 5th Amendment coerced confession claim and due process claims and they are not time-barred.................................................................................20

B.  Plaintiffs' 5th Amendment coerced confession and due process claims are properly stated and not barred by *Heck*....................................22

IV.  Plaintiffs have properly stated their conspiracy claims.............................26

V.  Defendants Daley, Devine, and Kunkle do not have immunity from the claims that Plaintiffs allege against them for misconduct as Cook County State's Attorneys...........................................31

A.  Neither Daley, Devine, nor Kunkle are shielded by prosecutorial immunity from Plaintiffs' claims against them arising from their actions and inactions as Cook County State's Attorneys...............................................38

B.  Neither Daley, Devine, nor Kunkle are shielded by sovereign immunity from Plaintiffs' claims against them arising from their actions and inactions as Cook County State's Attorneys...............................................42

VI.  The SAC states viable claims against Defendant Daley arising from his actions and inactions as Mayor of Chicago.......................43

VII.  Plaintiffs' SAC states a claim for intentional infliction of emotional distress.............................................................................50

VIII.  Plaintiffs have adequately pleaded several interrelated

*Monell* policy and practice claims, including, *inter alia*, a longstanding pattern and practice of racially-motivated torture of African American male arrestees, witnesses, suspects during interrogation, directed by Defendants Burge and Byrne, which was a direct cause of Plaintiffs' torture and wrongful convictions...................................................................54

Conclusion.......................................................................................58

## Table of Authorities

**Federal Cases**

*Anderson v. Cornejo*, 355 F.3d 1021 (7th Cir. 2004)…………………………………………33

*Andrews v. Burge*, 660 F. Supp. 2d 868 (N.D. Ill. 2009)…………………………………56

*Al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009)…………………………………………32, 33

*American Civil Liberties Union v. City of Chicago*, 431 F. Supp. 25 (N.D. Ill. 1976)…..9

*Ashcraft v. Tennessee*, 322 U.S. 143 (1944)………………………………………………21

*Ashcroft v. Al-Kidd*, 131 S. Ct. 2074 (2011)……………………………………………32

*Ashcroft v Iqbal*, 556 U.S. 662 (2009)…………………………………………………6

*Barnes v. Hindsdale Hosp.*, 1986 WL 4745 (N.D. Ill. 1986)…………………………9

*Bell Atlantic Co. v. Twombly*, 550 U.S. 544 (2007)………………………………………6, 8

*Bodner v. Banque Paribas*, 114 F. Supp. 2d 117 (E.D.N.Y. 2000)…………………………15

*Brown v. Walt Disney World Co.*, 805 F. Supp. 1554 (M.D. Fla. 1992)…………………12

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)…………………………………………39, 41

*Burns v. Reed*, 500 U.S. 478 (1991)…………………………………………………39

*Caine v. Burge*, 2012 WL 2458640 (N.D. Ill. June 27, 2012)………………………………21

*Cannon v. Burge*, 2006 WL 273544 (N.D. Ill. Feb. 2, 2006)……………………………48, 56

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999)…………………………………….......54

*Chaparro v. City of Chicago,* 11 C 2659, 2012 WL 104629 (N.D. Ill. 2012)……………7

*Choyce v. Friar,* 2008 WL 2567037 (N.D. Ill. 2008)……………………………………8

*Cook v. City of Chicago*, 2008 WL 1883437 (N.D. Ill. Apr. 25, 2008)……………………19

*Cooney v. Casady*, 652 F. Supp. 2d 948 (N.D. Ill. 2009)........................................44

*DeWalt v. Carter*, 224 F.3d 607 (7th Cir. 2000)..................................................24

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010)...........................................36

*Evans v. City of Chicago*, 434 F.3d 916 (7th Cir. 2006)........................................13

*Farmer v. Brennan*, 511 U.S. 825 (1994)..........................................................33

*Glover v. Village of Oak Lawn*, 2000 WL 1847599 (N.D. Ill. 2000)...........................55

*Griffin v. Breckinridge*, 403 U.S. 83 (1971)....................................................29

*Guzman v. City of Chicago*, 565 F.3d 393 (7th Cir. 2009)......................................18

*Hardin v. Straub*, 490 U.S. 536 (1989)...........................................................17

*Hartford Acc. and Indem. Co. v. Sullivan*, 846 F.2d 377, 383 (7th Cir. 1988)...........43

*Heck v. Humphrey*, 512 U.S. 477 (1984)....................................................1, 22, 23

*Heritage Commons Partners v. Vill. of Summit*, 1987 WL 6598 (N.D. Ill. 1987)........9

*Herring v. United States,* 555 U.S. 135 (2009)................................................18

*Hickman v. Taylor*, 329 U.S. 495 (1947)..........................................................13

*Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994
    (N.D. Ill. Jan. 26, 2009)....................................................................40

*Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005)........................................57

*Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992)..............................................43

*Howard v. City of Chicago*, 2004 WL 2397281 (N.D. Ill. Oct. 25, 2004)...................48

*Hudson v. Michigan*, 547 U.S. 586 (2006)........................................................18

*Imbler v. Pactman*, 424 U.S. 409 (1976).........................................................38

*Jefferson v. City of Chicago*, 1999 WL 116223 (N.D. Ill. 1999)............................55

v

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)...............................33, 35, 45

*Karim-Panahi v. L.A. Police Dept.*, 839 F. 2d 621 (9th Cir. 1988).........................55

*Kitchen v. Burge*, 781 F. Supp. 2d 721 (N.D. Ill. 2011).......................................56

*Kleen Products, LLC v. Packaging Corp. of America*,
    775 F. Supp.2d 1071, 1075 (N.D. Ill. 2011)..................................................8

*Knapp v. City of Markham*, 2011 WL 3489788 (N.D. Ill. 2011)........................54, 55

*Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904 (7th Cir. 1991).......................42

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991)....................................33

*Leatherman v. Tarrant County Narcotics Intelligence and*
    *Coordination Unit*, 507 U.S. 163 (1993)....................................................55

*Lessman v. McCormick*, 591 F.2d 605 (10th Cir. 1979)..........................................9

*Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006)........................................26, 27

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).............................................14

*McGhee v. Pottawattamie*, 547 F.3d 922 (8th Cir. 2009).......................................39

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)............................................43

*Orange v. Burge*, 2005 WL 742641 (N.D. Ill. Mar. 30, 2005)................................48

*Orange v. Burge*, No. 04 C 168, 2008 WL 4443280 (N.D. Ill. Sept. 29, 2008)............40

*Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004)........................27, 40, 44, 48

*Perez v. Laredo Jr. Coll.*, 706 F. 2d 731 (5th Cir. 1983).......................................11

*Pontarelli Limousine, Inc. v. City of Chicago*, 704 F. Supp. 1503 (N.D. Ill. 1989).........11

*Prieser v. Rodriguez*, 411 U.S. 475 (1973).....................................................22

*Quinones v. Szorc*, 771 F.2d 289 (7th Cir. 1985)................................13, 20, 26, 27

vi

*Reiser v. Residential Funding Corp.*, 380 F.3d 1027 (7th Cir. 2004).........................8

*Rosner v. United States*, 231 F. Supp. 2d 1202 (S.D. Fla. 2002)..............................16

*Santiago v. Wells*, 599 F.3d 749 (7th Cir. 2010)...................................................7

*Sherer v. Balkema*, 840 F.2d 437 (7th Cir. 1988)..............................................11, 13

*Smith v. Rowe*, 761 F.2d 360 (7th Cir. 1985)...................................................32, 35

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006).........................36

*Spencer v. Kemna*, 523 U.S. 1 (1998)..................................................................23

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007)...................................................44

*Stringer v. Young's Lessee*, 28 U.S. (3 Pet.) 320 (1830)........................................14

*Swanson v. Citibank. N.A.*, 614 F.3d 400 (7th Cir. 2010)..................................7, 28

*Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204 (7th Cir. 1980)....................9

*Tillman v. Burge*, 2011 U.S. Dist. LEXIS 79320 (N.D. Ill. July 20, 2011)...........*passim*

*United States v. Burge*, 2013 WL 1285582 (7th Cir. Apr. 1 2013)............................15

*United States v. Harju*, 466 F.3d 602 (7th Cir. 2006)............................................18

*United States v. Porter*, 542 F.3d 1088 (5th Cir. 2008)..........................................45

*United States v. Read*, 658 F.2d 1225 (7th Cir. 1981).............................................45

*United States v. Watson*, 558 F.3d 702 (7th Cir. 2009)...........................................18

*United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078 (N.D. Ill. 1999)...........56

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009)..............................................39, 41

*White v. Texas*, 310 U.S. 530 (1940)...................................................................12

*Williams v. Valtierra*, No. 00 C 5734, 2001 WL 686782
    (N.D. Ill. Jun. 18, 2001)...........................................................................40

*Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997)……………………………………57

*Wilson v. Civil Town of Clayton*, 839 F.2d 375 (7th Cir. 1988)…………..……………………42

**State Cases**

*Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1995)……………………………………26

*Feltmeier v. Feltmeier*, 798 N.E.2d 75 (Ill. 2003)……………………………………18, 51

*McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242 (Ill. 1999)…….…………30

*McGrath v. Fahey*, 533 N.E.2d 806 (1988)………………………………………………51

*People v. Wrice*, 962 N.E.2d 934 (Ill. 2012)……………………………………21, 24, 25

**Statutes**

18 U.S.C. § 2340……………………………………………………………………………53

42 U.S.C. § 1985……………………………………………………………………………29

Fed. R. Civ. P. 8……………………………………………………………………………6

Fed. R. Civ. P. 15………………………………………………………………………......10

**Secondary Sources**

*Defining the Reach of* Heck v. Humphrey: *Should the Favorable
    Termination Rule Apply to Individuals Who Lack Access to Habeas
    Corpus?*, 121 Harv. L. Rev. 868 (2008)……………………..……………………22, 24


Eric Lichtblau, *The Holocaust Just Got More Shocking*, N.Y. Times, Mar. 3, 2013……16

Hal Dardick and John Byrne, *Chicago Counsel OK's Nearly $33M in
    Settlements for Copy Misconduct*, Chi. Trib., Jan. 17, 2013……………………18

Restatement 2d of Torts, § 46…………………………………………………………51

Suzette M. Malveaux, *Statutes of Limitations: A Policy Analysis in the*

*Context of Reparations Litigation*, 74 Geo. Wash. L. Rev. 68 (2005)……….....14, 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELVIN JONES, ALNORAINDUS BURTON, AUBREE DUNGEY, JAMES FREEMAN, and SHERROD TILLIS on behalf of themselves and all others similarly situated, and in the interest of the general public, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 CV 4143 |
| vs. | ) ) | Judge John W. Darrah |
| JON BURGE, former Chicago Police Department (CPD) Commander; JOHN BYRNE, former CPD Sergeant; KENNETH BOUDREAU, MICHAEL BOSCO, MICHAEL CUMMINGS, ROBERT FLOOD, WILLIAM KELLY, MICHAEL KILL, DENNIS McGUIRE, DANIEL McWEENY, ROBERT MYERS, PAUL SPAGNOLA, WILLIAM SVILAR, former and/or current CPD Detectives; RICHARD BRZECZEK, former CPD Superintendent; RICHARD M. DALEY, former Mayor and former State's Attorney; RICHARD A. DEVINE, former State's Attorney; WILLIAM J. KUNKLE; the CITY OF CHICAGO; COOK COUNTY, ILLINOIS; the COOK COUNTY STATE'S ATTORNEY'S OFFICE, and JOHN DOE DEFENDANTS #1-50, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION JURY DEMAND |
| Defendants. | ) | |

**Plaintiffs' Response to the Joint Motion to Dismiss
Submitted by the Defendants**

The Defendants have filed a joint motion to dismiss the Plaintiffs' Second

Amended Complaint (SAC). The Defendants argue, mainly, that the Plaintiffs' claims

are time-barred. Additionally, the Defendants argue that the coercive interrogation

claims raised by the Plaintiff class are barred by *Heck v. Humphrey*, 512 U.S. 477

1

(1994). Each of these contentions and the remaining arguments presented by Defendants lack merit. The Plaintiffs' civil rights claims against the Defendants, originating in an undisputed history of torture by the Chicago Police Department, should be allowed to proceed to discovery and then jury trial.

## The Second Amended Complaint

On February 5, 1982, Plaintiff Melvin Jones was arrested and detained at Area 2 police headquarters. SAC ¶¶ 57-58. During a four-day-long detention, Defendant Jon Burge, assisted by Defendants Robert Flood and Daniel McWeeny, brutally tortured Mr. Jones by electrocuting his foot, thigh, and penis with a homemade device known as the "shock box." *See* SAC ¶¶ 61-73. In December 1982, Flood and Defendant Dennis McGuire arrested Mr. Jones again. SAC ¶ 85. Mr. Jones was subsequently charged and tried for the murder of Geoffrey Mayfield. *See* SAC ¶ 91. McGuire testified under oath that Mr. Jones had "spontaneously" confessed during his detention and interrogation on December 11, 1982. *See* SAC ¶¶ 86-90. Relying on this false testimony and additional sworn statements provided by Flood, Mr. Jones' trial judge entered a guilty verdict. SAC ¶¶ 89-94.

Mr. Jones and the other Class representatives represent five of "an **estimated 135 victims** of the systemic police torture regime that the Defendants participated in by torturing or otherwise abusing criminal suspects, or by condoning the torture program through a knowing refusal to acknowledge, prevent, or punish the Defendants' interrogation tactics." SAC ¶ 5. Their individual stories tell only part of the

2

Defendants' vast "conspiracy to cover up the CPD's systemic torture of African American male arrestees, witnesses, and suspects." SAC ¶ 8.

In January 1989, Area 3 CPD detectives beat Plaintiff Alnoraindus Burton with a phone book. SAC ¶ 105. Defendants Burge and Michael Kill then participated in a separate interrogation session in which Kill choked Burton until he passed out. SAC ¶¶ 107-10. Later, Kill and Detective William Kelly beat Mr. Burton until he confessed. SAC ¶ 111. The Illinois Torture Inquiry and Relief Commission (ITIRC) has collected an extensive history of torture and other abuse incidents involving Kill and other CPD officers. *See* SAC ¶ 124.

In June 1999, Area 2 police officers took Plaintiff Aubree Dungey into custody and beat him. SAC ¶¶ 142-44. As a result of the police beating, Mr. Dungey suffered internal bleeding and required surgery. SAC ¶ 148. Police tricked Mr. Dungey into signing a confession to a murder, and Mr. Dungey was later convicted for this crime on the strength of this coerced confession. SAC ¶¶ 152-58.

In April 2002, Area 2 police officers took Plaintiff Sherrod Tillis into custody in connection with a murder investigation. *See* SAC ¶¶ 195-96. During the period of time when he was in police custody at Area 2, Mr. Tillis was beaten by police on several occasions. *See* SAC ¶¶ 199-205. Defendant Detective Michael Cummings was one of the police officers who beat Mr. Tillis. SAC ¶¶ 202. As a result of this police torture, Mr. Tillis falsely confessed to the murder. SAC ¶ 208. Mr. Tillis later filed a motion to suppress statements, arguing that his confession had been coerced. *See* SAC ¶ 218. At

the hearing on this motion, Defendant Cummings and three other police officers testified that they did not beat Mr. Tillis. SAC ¶ 219. Mr. Tillis's 2004 conviction was based primarily on his coerced confession. SAC ¶ 222.

In January 2004, Area 2 police officers tortured Plaintiff James Freeman during an interrogation that lasted three days by depriving him of food and sleep for that entire time. SAC ¶¶ 166-67. As a result of this torture, Mr. Freeman falsely confessed to participating in a crime. SAC ¶¶ 175-77. The trial court relied heavily on Mr. Freeman's coerced confession as proof and found him guilty of the crime charged. SAC ¶ 189.

The SAC alleges a race-based equal protection violation as "Burge, Byrne, and Defendant Officers engaged in intentional and unlawful discrimination when they tortured and abused Mssrs. Jones, Burton, Dungey, Freeman, Tillis, and the other members of the Class because they are African American men." SAC ¶ 325. *See also* SAC ¶ 326-28 (listing specific instances of police violence motivated by racial animus).

The SAC further alleges that the torture of the Plaintiffs was not an isolated occurrence, but was rather "part of a pattern and practice of torture and physical and psychological abuse of African American male arrestees, witnesses, and suspects by Burge, Byrne, and the CPD officers at Area 2 and later, at Area 3." SAC ¶ 226. The SAC alleges that each of the "individual Defendants engaged in a pattern and practice of the torture and cruel, inhuman, or otherwise degrading treatment [of the Plaintiffs and other members of the Class] in order to extract confessions to be used against them

4

in criminal prosecutions." SAC ¶ 230. The Defendants engaged in a conspiracy of police torture, which included an agreement (the "Code of Silence") to conceal the torture program. SAC ¶¶ 234-36.

Between 1973 (the first reported incident of Burge's use of torture against an African American male suspect at Area 2) and at least 2011, the Defendants engaged in a variety of actions and omissions designed to conceal their conspiracy, including but not limited to: continued concealment of the use of torture against the Plaintiffs (SAC ¶¶ 2, 96, 234-42, 244-46); continued use of coerced confessions to win prosecutions (SAC ¶ 230); repeated refusals to investigate the growing number of complaints about police torture (*see* SAC ¶¶ 238-40, 284-89); and continued denials about the conspiracy (SAC ¶¶ 267-70, 282-83, 298-300).

The Defendants' conspiracy to conceal the crime of police torture has not ended; it continues even today. In January 2011, Defendant William Kunkle took an overt act in furtherance of the conspiracy when he wrote to U.S. District Court Joan Lefkow, arguing that the police torture claims against Defendant Burge were untrue. SAC ¶¶ 282-83. That the CPD "Code of Silence" is widespread and hinders accountability for police crimes was central to the jury's verdict in November 2012 in favor Karolina Obrycka during her civil suit against CPD Officer Anthony Abbate. *See* SAC ¶¶ 4, 96(i). These are two known examples of the continuous and ongoing policy of the CPD "Code of Silence," the source of the continuing harms against the Plaintiffs and other members of the Class.

5

Defendants challenge each of the Plaintiffs' claims; their contentions will be addressed herein. *First*, the Plaintiffs' claims are not barred by the statute of limitations. *Second*, Plaintiffs' 5th Amendment coerced confession and due process claims are properly before the court and are not time-barred. *Third*, the Plaintiffs' 5th Amendment coerced confession and due process claims are properly stated, and are not barred by *Heck*. *Fourth*, Defendant Daley and the SAO Defendants (Devine, Kunkle, the SAO, and Cook County) are not shielded from civil liability for their participation in the conspiracy to cover up the violation of Plaintiffs' constitutional rights. *Fifth*, the Plaintiffs have adequately pleaded a *Monell* claim. Because the Plaintiffs' SAC is properly pleaded and is not time-barred, the Defendants' joint motion to dismiss should be denied.

## Argument

To state a claim upon which relief can be granted, a plaintiff's complaint need only contain "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff is not required to make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, the complaint must contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Chaparro v. City of Chicago*, 2012 WL 104629, *2 (N.D. Ill. Jan. 12, 2012) (citing *Iqbal*, 129 S.Ct. at 1949). To determine whether the Plaintiffs have met this standard, the court must "tak[e] all well-pleaded allegations of the complaint as true and view[] them in the light most favorable to the plaintiff." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The Seventh Circuit has interpreted the Supreme Court's decision in *Iqbal* to mean that "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen. For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010) (emphases in original). *See also Tillman v. Burge*, 2011 U.S. Dist. LEXIS 79320, *77 (N.D. Ill. July 20, 2011), *mtn. for reconsideration denied*, 2011 U.S. Dist. LEXIS 126627 (Nov. 2, 2011) (citing *Swanson*, 614 F.3d at 406-07).

## I. It is premature to grant a 12(b)(6) motion in this conspiracy action before Plaintiffs have had the opportunity to conduct discovery.

The Defendants have still not provided a compelling reason to dismiss this conspiracy action before the Plaintiffs have had the opportunity to conduct discovery.

"[B]ecause the period of limitations is an affirmative defense, it is rarely a good reason to dismiss under Rule 12(b)(6)." *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004). The Supreme Court addressed motions to dismiss under Rule 12(b)(6) in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). In *Twombly*, the Supreme Court granted a motion to dismiss a claim sounding in conspiracy because the plaintiff claimed parallel conduct by the defendants and did not plausibly allege facts from which the Court could infer agreement among the defendants. *Id*. at 507. In reaching this conclusion, however, the Court made clear that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. at 556. Moreover, the Court then noted that, "of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Id*.

The implication of this language is clear: in conspiracy cases, the essential information required to prove many elements of the conspiracy can only be obtained through discovery, meaning that a court should deny a pre-discovery motion to dismiss under Rule 12(b)(6) even if a claim appears improbable at that time. And indeed, this court recently used the above language from *Twombly* to deny a pre-discovery motion to dismiss a conspiracy claim that alleged little more than parallel behavior by the defendants. *See Kleen Products, LLC v. Packaging Corp. of America*, 775 F. Supp.2d

8

1071, 1075 (N.D. Ill. 2011) (quoting *Twombly*, 550 U.S. 556).

Moreover, in granting motions to dismiss, this court has often focused upon the fact that plaintiffs in those cases were able to conduct complete discovery, unlike plaintiffs in cases where such motions have been denied. For instance, in granting a motion to dismiss under Rule 12(b)(6) in *Choyce v. Friar,* 2008 WL 2567037 (N.D. Ill. 2008), this court highlighted the fact that "[t]his is not a case where the plaintiff has not been given the opportunity to conduct discovery in order to properly identify the defendants and properly state a claim against specific defendants." Instead, this court noted that the plaintiff had "been given ample time for discovery." *Id*.

The Seventh Circuit has also recognized the legal and public policy reasons why it is important not to grant pre-discovery motions to dismiss under Rule 12(b)(6), particularly in conspiracy cases. For instance, in *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1207 (7th Cir. 1980), the Seventh Circuit cited *Lessman v. McCormick*, 591 F.2d 605, 611 (10th Cir. 1979), for the proposition that: "In many cases of conspiracy essential information can only be produced through discovery, and the parties should not be thrown out of court before being given an opportunity through that process to ascertain whether the linkage they think may exist actually does." This court has cited this language on more than one occasion. *See, e.g., Heritage Commons Partners v. Vill. of Summit*, 1987 WL 6598 at *6 (N.D. Ill. 1987); *Barnes v. Hindsdale Hosp.*, 1986 WL 4745 at *2 (N.D. Ill. 1986).

The present case is similar to *American Civil Liberties Union v. City of Chicago*,

9

431 F. Supp. 25 (N.D. Ill. 1976). In that case, the plaintiff opposed a motion to dismiss by alleging "that the activities of defendants [we]re, by their nature, covert and difficult to determine." *Id*. at 32. The plaintiffs thus claimed "that that until discovery ha[d] commenced, they w[ould] be unable to specify the extent of each defendant's involvement." *Id*. This court denied the defendant's motion, concluding that" [p]laintiffs will need the opportunity to avail themselves of liberal discovery allowed by the Federal Rules in order to further specify their claims against defendant." *Id*. Similarly, it would be premature to grant the Defendants' motion to dismiss in this case before Plaintiffs have the ability conduct discovery regarding the clandestine activities of the Defendants.

## II.   Plaintiffs' claims are not barred by the statute of limitations.

Defendants do not contest Plaintiffs' allegations that Defendants engaged in a pattern and practice of police torture, or that Defendants agreed to conceal or cover up this crime. Instead, Defendants rely on procedural bars based on the statute of limitations. *See* Docket #101, at 5-6.

The Plaintiffs' claims are timely. With leave of the court (Docket #87), the Plaintiffs filed their SAC on January 15, 2013. Docket #96. The amended complaint relates back to the date of the original pleading, filed in June 2011. *See* Fed. R. Civ. P. 15(c). The claims contained in the SAC are not time-barred because they allege continuing violations. Furthermore, assuming arguendo that Plaintiffs' claims are time-barred, the statute of limitations should be equitably tolled for

10

public policy reasons. Alternatively, because of their own blameworthy conduct, Defendants are equitably estopped from claiming statute of limitations as an affirmative defense.

### A. Plaintiffs' claims allege continuing violations within the limitations period.

When a claim giving rise to a civil rights action is based not on a single, discrete incident, but on an ongoing policy, a continuing violation is present for limitations purposes. To establish a continuing violation, the plaintiff must establish that the unconstitutional or illegal act was part of standard operating procedure; that is, a fixed and continuing practice. *Pontarelli Limousine, Inc. v. City of Chicago*, 704 F. Supp. 1503, 1511 (N.D. Ill. 1989) (citing *Perez v. Laredo Junior Coll.*, 706 F.2d 731, 733 (5th Cir. 1983); *Sherer v. Balkema*, 840 F.2d 437 (7th Cir. 1988)).

In *Pontarelli*, the plaintiffs alleged an equal protection claim against the City of Chicago. *Id.* at 1510. In rejecting the City's argument that the statute of limitations barred the plaintiffs' claim, this court explained that the harm claimed by the plaintiffs (unlawful discrimination) "continues so long as the discriminatory policy remains in effect." *Id.* In so doing, this court distinguished between continuing violation cases in the equal protection context and other types of claims. *Id.* at 1510-11. In anti-trust refusal-to-deal cases, for example, the harm to a plaintiff occurs after the defendant commits a discrete, irrevocable, and final action. *Id.* at 1511. By contrast, an ongoing practice of unlawful discrimination continually subjects its victims to the whims of the actor. *Id.*

Here, the Plaintiffs likewise allege a continuous, ongoing violation of their equal protection and other constitutional rights—a conspiracy to conceal the torture of African American male suspects at Area 2, and later at Area 3. Just as the *Pontarelli* plaintiffs were injured so long as the exclusionary and discriminatory policy was enforced by the City of Chicago, here the Plaintiffs are injured by the Defendants' ongoing conspiratorial acts.

The unconstitutional and illegal acts that the Plaintiffs allege are part of a longstanding pattern and practice. *See Brown v. Walt Disney World Co.*, 805 F. Supp. 1554, 1560 (M.D. Fla. 1992) ("To revive a time-barred action under [the continuing violations doctrine], the claim must be part of a pattern or continuing practice out of which the timely filed incident arose. Further, there must be a violations within the limitations period"). The SAC alleges that the last two known overt acts in the Defendants' conspiracy to conceal police torture occurred in June 2010 and January 2011, within the limitations period. In June 2010, Defendant Burge took the stand in his own defense and denied, under oath, any involvement in the torture at Area 2. SAC ¶¶ 297-300. In January 2011, after Burge was convicted, his former attorney, Defendant Kunkle, wrote a letter to Burge's sentencing judge (U.S. District Court Judge Lefkow) arguing that, despite all the evidence to the contrary, Burge had not engaged in torture. SAC ¶¶ 282-83. Plaintiffs' conspiracy claims should be found to accrue, at the latest, after the last overt act of the conspiracy alleged in the SAC—in January 2011.

12

Application of the continuing violations doctrine serves an important purpose; it prevents cunning conspirators from escaping accountability. As the Seventh Circuit observed: "To permit the statute of limitations to bar consideration of allegations from which a jury could infer an agreement would prevent recovery for damages suffered within the limitations period merely because the defendants formed their agreement too early. Indeed, crafty conspirators could agree to injure and then wait out the statutory limitations period before inflicting the injury to avoid civil liability for their conduct. This is wrong." *Sherer*, 840 F.2d at 442.

There is likely more evidence supporting the Plaintiffs' claims about the conspiracy, still unknown to the Plaintiffs. And the very purpose of pre-trial discovery is to allow Plaintiffs to develop facts in support of their allegations. *Hickman v. Taylor*, 329 U.S. 495, 501 (1947) ("The various instruments of discovery now serve . . . as a device for ascertaining the facts, or information as to the existence or whereabouts of facts"); *Quinones v. Szorc*, 771 F.2d 289, 290-92 (7th Cir. 1985) ("the very nature of a conspiracy obscures most, if not all, information about the alleged agreement"). The ITIRC, for example, has begun to compile detailed torture allegation records on individual CPD officers. *See* SAC ¶ 124. These records and other discoverable information would help the Plaintiffs develop factual support for their claims.

To be clear, Plaintiffs are not alleging that the continuing ill effects of their victimization by Defendants justify the application of the continuing violations doctrine. *See also Evans v. City of Chicago*, 434 F.3d 916, 934 (7th Cir. 2006) ("The

doctrine of continuing violation . . . 'does not involve tolling the statute of limitations because of delayed or continuing injuries, but instead involves viewing the defendant's conduct as a continuous whole for prescriptive purposes'"). Rather, Plaintiffs allege that Defendants engaged in unlawful actions within the limitations period. These unlawful actions—lying to maintain the "Code of Silence" as late as June 2010 and January 2011—form a substantial nexus with the Defendants' discrete and individual acts of torture which would otherwise be time-barred.

### B. Even if one or more of the Plaintiffs' claims are untimely, equitable theories toll the statute of limitations.

Assuming arguendo that Plaintiffs' claims are time-barred, the statute of limitations should be equitably tolled in this case in order to promote fairness to the Plaintiffs and to deter the Defendants' misconduct.

Fairness to Plaintiffs requires that they receive their day in court. As the Supreme Court noted in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803): "The very essence of civil liberty certainly consists in the right of every individual to claim protection of the laws, whenever he receives an injury." The imposition of a time bar on an otherwise meritorious claim runs counter to the fundamental purpose of our legal system—redress under the law. Suzette M. Malveaux, *Statutes of Limitations: A Policy Analysis in the Context of Reparations Litigation*, 74 Geo. Wash. L. Rev. 68, 83 (2005) (quoting *Stringer v. Young's Lessee*, 28 U.S. (3 Pet.) 320, 330 (1830) ("for every wrong there is a remedy")).

In affirming Defendant Burge's conviction and sentence last week, the Seventh

Circuit recalled this litany of his crimes: "an interrogation regime where suspects were suffocated with plastic bags, electrocuted until they lost consciousness, held down against radiators, and had loaded guns pointed at their heads during rounds of Russian roulette. The use of this kind of torture was designed to inflict pain and instill fear while leaving minimal marks." *United States v. Burge*, 2013 WL 1285582, *1 (7th Cir. Apr. 1, 2013). Defendants do not dispute that Mssrs. Jones, Burton, Dungey, Freeman, and Tillis are five of an "estimated 135 victims of the systemic police torture regime that the Defendants participated in by torturing or otherwise abusing criminal suspects, or by condoning the torture program through a knowing refusal to acknowledge, prevent, or punish the Defendants' interrogation tactics." SAC ¶¶ 4-5.

In addition, Defendants engaged in a policy of affirmative misrepresentation, depriving Plaintiffs of the opportunity to prove their claims. When a plaintiff has been misled by the purposefully deceptive stratagem of the defendant, the court should toll the statute of limitations. *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 121 (E.D.N.Y. 2000). In *Bodner*, the plaintiffs (victims of the Nazi holocaust in occupied France during World War II) argued that the defendants (banks doing business in France during the occupation) engaged in a policy of "systematic and historical denial misrepresentation" and that such deception misled and deprived the plaintiffs from knowing or successfully proving their claims. *Id*. The *Bodner* court unequivocally accepted the plaintiffs' equitable tolling argument, concluding that the defendants' deception should not permit them to hide behind the statute of limitations. *Id*.

15

Researchers at the National Holocaust Museum recently concluded that Nazi Germany's concentration camp and killing center program was much more widespread than previously known, potentially opening new avenues of recovery for Holocaust survivors. *See* Eric Lichtblau, *The Holocaust Just Got More Shocking*, N.Y. Times, at SR3, Mar. 3, 2013. *See also Rosner v. United States*, 231 F. Supp. 2d 1202, 1207-09 (S.D. Fla. 2002) (equitably tolling the statute of limitations on the ground that the plaintiffs could not have known all of the facts giving rise to the lawsuit).

Defendants do not dispute the underlying facts giving rise to the Plaintiffs' claims that Defendants engaged in an unlawful conspiracy to commit and conceal police torture. The SAC alleges that Defendants engaged in numerous efforts to conceal the full scope of the police torture regime by, for example, fabricating and suppressing evidence, and falsely testifying at hearings and trials in order to conceal and continue the conspiracy. *See* SAC ¶¶ 76-80 (Burge and McGuire), 87-94 (Flood and McGuire), 96(e), 121 (Kill), 127 (Frenzer), 180-85 (Svilar), 267. Moreover, a Special State's Attorney investigation was commissioned in 2002, but the results were not publicly released until 2006. The 2006 report concluded that the statute of limitations barred criminal prosecutions, notwithstanding the fact that the Special State's Attorney said that he believed the abuse was an "ongoing" practice. *See* SAC ¶ 96(d).

As the substantive merits of Plaintiffs' conspiracy allegations are undisputed, allowing the Plaintiffs' SAC to proceed would also bolster the institutional legitimacy of the legal system. "If victims are selectively deprived the benefits of the laws, citizens

16

may come to view the legal system as ineffective, unfair, and illegitimate. As a result, they may resort to extrajudicial remedies and self-help—even violence." Malveaux, 74 Geo. Wash. L. Rev. at 83-84. This concern is echoed in the SAC, where Plaintiffs allege: "Because members of the Class distrust the police, they have been reluctant to seek aid, assistance, or protection from the police or other law enforcement." SAC ¶ 310. "This means that members of the Class are less likely to aid law enforcement in criminal investigations even when they have material information that can be used to bring criminal suspects to justice." SAC ¶ 311.

The concern for institutional integrity was raised during Burge's sentencing hearing in January 2011. Judge Lefkow noted then: "When a confession is coerced, the truth of the confession is called into question. When this becomes widespread, as one can infer from the accounts that have been presented here in this court, *the administration of justice is undermined irreparably*. How can one trust that justice will be served when the justice system has been so defiled?" (Emphasis added). *See also* SAC ¶¶ 312-13 ("The unlawful acts of and omissions by the Defendants are injurious not only to Mr. Jones and the Class, but to all residents of the City of Chicago"). It is for these significant public policy reasons that this court should toll the statute of limitations.

As the Supreme Court explained in another § 1983 case, exemptions from the statutes of limitations are useful because they ensure that the substantive law is being enforced and that misconduct is deterred. *See Hardin v. Straub*, 490 U.S. 536, 543

17

(1989). A fundamental goal of the U.S. legal system is to resolve disputes on their merits, not on procedural grounds. The Illinois Supreme Court acknowledged that limitations period should not be invoked to protect wrongdoer-defendants. "The purpose behind a statute of limitations is to prevent stale claims, not to preclude claims before they are ripe for adjudication, and certainly not to shield a wrongdoer." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 88 (Ill. 2003).

The specter of police torture continues to hang over the City of Chicago. At last count, the City has spent $60 million on defending and paying settlements in civil suits tied to Defendant Burge. And yet, as evidenced by Plaintiffs' claims and the recent Abbate trial verdict, police abuses continue unabated. *See* Hal Dardick & John Byrne, *Chicago City Council OKs Nearly $33M in Settlements for Cop Misconduct*, Chi. Trib., Jan. 17, 2013. Deterrence is therefore critical. The Seventh Circuit has acknowledged the importance of §1983 actions to deter police misconduct. *See Guzman v. City of Chicago*, 565 F.3d 393, 398 (7th Cir. 2009) ("in some ways it is easier to protect Fourth Amendment rights though civil actions"); *United States v. Watson*, 558 F.3d 702, 704 (7th Cir. 2009) (citing *Hudson v. Michigan*, 547 U.S. 586, 597 (2006)); *United States v. Harju*, 466 F.3d 602, 605 (7th Cir. 2006). The need for an effective deterrent through the civil justice system has become even more important as the Supreme Court has slowly begun to contract use of the Exclusionary Rule in Fourth Amendment cases. *See, e.g., Hudson*, 547 U.S. at 597 ("And what, other than civil suit, is the "effective deterrent" of [a] police violation[?]"); *Herring v. United States,* 555 U.S. 135, 140 (2009).

18

Chicago's well-documented history of police abuse and corruption requires that the statute be equitably tolled for victims of police torture. Plaintiffs were unable to bring their action earlier because of the deceptive efforts of the Defendants, who purposefully sought to conceal their participation in police torture, in order to avoid criminal and civil liability for their part in police torture. If Plaintiffs are unable to have their day in court, they would again be victimized by a legal system that has continuously let them down.

**C.    Equitable estoppel also bars Defendants from claiming a time-bar defense.**

Additionally, Defendants' own blameworthy conduct in preventing Plaintiffs from pursuing their claims estops them from claiming statute of limitations as a defense. *Cook v. City of Chicago*, 2008 WL 1883437, *1 (N.D. Ill. Apr. 25, 2008). In *Cook*, this court found that the unlawful conduct of CPD officers and an investigator was "sufficiently blameworthy" to allow the plaintiff to rely on equitable estoppel principles to avoid the time bar. *Id.* In *Cook*, members of the CPD exerted undue influence on the plaintiff by threatening him with police reprisals. *Id.* In *Cook*, this court looked beyond the plaintiff's awareness of the legally relevant facts for accrual purposes and denied the defendants' motion to dismiss because of their blameworthy actions. *Id.* Just as in *Cook*, here Defendants took additional affirmative steps "above and beyond" coercing Mr. Jones's confession; they engaged in a well-orchestrated plan to conceal their participation in his and the other Plaintiffs' torture. *See, e.g.*, SAC ¶ 96.

19

Because the Defendants purposefully concealed the conspiracy of police torture, Plaintiffs could not have been aware of the material facts giving rise to their claims. For example, it was not until 2010 when Burge's conviction was broadcast on major television media that Plaintiffs discovered the race-based animus that motivated the Defendants' use of torture against the members of the Class. That each of the Plaintiffs had experienced individual torture sessions with the police does not also mean that they should have known that their individual experiences were actually part of a systemic torture program targeting African American men. *See*, *e.g.*, *Quinones v. Szorc*, 771 F.2d 289, 290-92 (7th Cir. 1985) ("the very nature of a conspiracy obscures most, if not all, information about the alleged agreement").

**III.    Plaintiffs properly state their 5th Amendment coerced confession and due process claims claims.**

   **A.    Mr. Jones has properly stated his 5th Amendment coerced confession and due process claims and they are not time-barred.**

Defendants argue that Mr. Jones has "pleaded himself out of court with respect to a coerced confession claim" because he "never made a confession." Docket #110 at 5. Although Burge, Flood, McGuire, and McWeeny electrocuted Mr. Jones's genitals and put a gun to his head, all the while using racial epithets designed to terrorize him, Mr. Jones did not confess to any crime. SAC ¶¶ 59-74. Nonetheless, McGuire later fabricated a confession, telling Mr. Jones's trial judge that Mr. Jones had spontaneously confessed to a murder. SAC ¶ 87. This fabricated confession, an integral part of the Defendants' conspiracy (SAC ¶¶ 230-36), was the primary basis

20

upon which the trial court rested its guilty verdict against Mr. Jones. SAC ¶¶ 91-93.

Mr. Jones's claim that he did not actually confess does not preclude the argument that the confession used to convict him was coerced. In *People v. Wrice*, 962 N.E.2d 934, 946-47 (Ill. 2012), the Illinois Supreme Court allowed a post-conviction petition based on claim of police torture and coerced confession to proceed, despite the fact that the petitioner conceded that he never confessed to a crime. "The use in evidence of a defendant's coerced confession cannot be justified on the ground that the defendant has denied that he ever gave the confession." *Id.* (quoting *Ashcraft v. Tennessee*, 322 U.S. 143, 152 n. 7 (1944) (citing *White v. Texas*, 310 U.S. 530, 531-32 (1940) (although petitioner denied that he confessed, when the state used a fabricated confession to obtain a criminal conviction, petitioner is entitled to raise a coerced confession claim))).

Moreover, neither of the Plaintiffs' coerced confession claims are time-barred. Defendants argue that the Plaintiffs' coercive interrogation accrued at the time of each Plaintiff's motion to suppress the coerced confession. Docket #110 at 6 (citing *Caine v. Burge*, 2012 WL 2458640 (N.D. Ill. June 27, 2012)). Plaintiffs invoke the same equitable tolling arguments outlined above to support the allegations contained in Count V(A) and Count VI. Plaintiffs also note the unfairness of a rule that would require them to initiate a civil suit at the same time they were occupied with mounting defenses in criminal court. The manifest injustice of a rule that would require Plaintiffs to have initiated a civil suit during the pendency of their criminal trials is

compounded by the Defendants' misplaced reliance on *Heck* as a bar against Plaintiffs' 5th Amendment coerced confession claims.

### B. Plaintiffs' 5th Amendment coerced confession claims are properly stated and are not barred by *Heck*.

Defendants argue that Plaintiffs' due process claims "represent an improper collateral attack on their still-valid convictions." Docket #110 at 10. *Heck*'s favorable termination rule should not bar Plaintiffs' 5th Amendment claims. *See Heck v. Humphrey*, 512 U.S. 477, 487 (1994). As Defendants note: "The rule is intended to prevent a 'collateral attack on the conviction through the vehicle of a civil suit.'" Docket #110 at 9 (quoting *Heck*, 512 U.S. at 484). When, however, as here, Plaintiffs seek only monetary damages and not immediate or a more speedy release from prison, their "claims for damages do not reduce the certitude that the convicted criminal will serve the sentence that the state has imposed upon him." *Defining the Reach of* Heck v. Humphrey: *Should the Favorable Termination Rule Apply to Individuals Who Lack Access to Habeas Corpus?,* 121 Harv. L. Rev. 868, 886 (2008).

The rationale behind *Heck*'s favorable termination rule does not apply here. In adopting that rule, the *Heck* court was motivated by the desire to discourage parallel litigation in prisoner claims cases where both federal habeas corpus relief and §1983 claims could be made simultaneously. In an earlier case, *Prieser v. Rodriguez*, 411 U.S. 475 (1973), the Court had concluded that, when a prisoner sought immediate release from confinement because of some claimed constitutional violation, then habeas was the only appropriate form of relief.

22

The issue in *Heck* was slightly different. In that case, Roy Heck filed a §1983 suit alleging that police officers and prosecutors had violated his constitutional rights during the criminal prosecution against him for his wife's death. *Heck*, 512 U.S. at 478-79. Like the plaintiff in *Prieser*, Heck had not exhausted state remedies prior to filing the §1983 claim, but unlike the *Prieser* plaintiff, Heck sought only money damages, not release from prison. *Id.* The Supreme Court treated this as a distinction without a difference, held that Heck's claim necessarily implied the invalidity of his conviction, and imposed the favorable termination rule to discourage parallel litigation when §1983 claims and federal habeas claims could be pursued simultaneously. *Id.* at 487.

Concurring separately, Justice Souter argued that the favorable termination rule established by the majority was too broad. Concerned that the majority's favorable termination rule would "needlessly place at risk the rights of those outside the intersection" of those two avenues of relief, Justice Souter would have applied a bar to filing under §1983 only when habeas relief was also available. *Id.* at 500-01 (Souter, J., concurring). Otherwise, plaintiffs like Mr. Jones who are no longer in police custody would be shut out of the federal courts. "That would be an untoward result," Justice Souter concluded. *Id.* at 500.

Justice Souter's concurring opinion in *Heck* is significant because it garnered a majority of the Court's support in a subsequent case, *Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Ginsburg, J., concurring) (endorsing Justice Souter's view that *Heck* does not

23

bar an individual not "in custody" —or otherwise ineligible for habeas relief—from seeking damages under §1983). 121 Harv. L. Rev. at 874. While many lower courts continue to impose the favorable termination rule as a judicially-added element to a §1983 claim, a significant number permit "a prisoner without access to habeas to pursue relief within § 1983's broad scope." *Id.* at 875. *See also DeWalt v. Carter*, 224 F.3d 607, 616-17 (7th Cir. 2000) ("[W]e . . . are hesitant to apply the *Heck* rule in such a way that would contravene the pronouncement of five sitting Justices . . . [who now] hold the view that a §1983 action must be available to challenge constitutional wrongs were federal habeas is not available.")

Mr. Jones is not currently in prison; he is homeless. SAC ¶ 308-09. The *Heck* bar does not apply to his claim because habeas is unavailable to him. Habeas relief is also unavailable to Mr. Burton. Mr. Burton's habeas corpus petition was denied by the federal court in 2004. Docket #110, Exhibit B.

The SAC further alleges that the Defendants' conspiracy to commit and conceal police torture has thwarted Plaintiffs' efforts to challenge the validity of their convictions outside of the §1983 framework. Plaintiffs have acted with due diligence to pursue post-conviction relief, but courts have yet been unwilling to acknowledge their claims.

A 2012 Illinois case was the first that acknowledged the special problems of proof faced by currently incarcerated individuals like the Plaintiffs when challenging their convictions. In *Wrice*, the defendant filed a second successive post-conviction

24

petition in October 2007. *Wrice*, 962 N.E.2d at 944. The trial court denied defendant's request to file. *Id.* at 945. The appellate court reversed, reasoning that defendant "could not have argued that the Special State's Attorney's report corroborated his claims of police torture in his [prior] postconviction petitions filed in 1991 and 2000 because the report was not released until 2006." *Id.* The Illinois Supreme Court affirmed the appellate court, and granted defendant leave to file a successive post-conviction relief petition, directing the trial court to appoint post-conviction counsel. *Id.* at 955.

Mr. Dungey filed a successive petition for post-conviction relief on May 31, 2010. This petition was denied on September 16, 2012. SAC ¶ 162. Mr. Freeman filed a pro se petition for post-conviction relief on September 21, 2012. The circuit court has yet to rule on the petition. SAC ¶ 192. Mr. Tillis filed a petition for post-conviction relief on April 19, 2012. The court denied Mr. Tillis's petition on July 12, 2012. SAC ¶ 224. Mr. Burton filed a successive petition for post-conviction relief in 1995. SAC ¶ 136. Mr. Burton also filed a claim with the ITIRC in 2011, but that claim was suspended when the ITIRC lost state funding. SAC ¶ 137. Because these Plaintiffs basically have no other means of challenging their convictions, they also should not be required to prove favorable termination before their §1983 claims can proceed. Because of these reasons, *Heck* should not be applied to bar the Plaintiffs' claims in Counts V(A), V(B), and VI.

**IV. Plaintiffs have properly stated their conspiracy claims.**

Defendants argue that because "the underlying §1983 claims are untimely, the derivative conspiracy claims are also time-barred." Docket #110 at 13. As discussed above, Plaintiffs' §1983 claims are not barred by the statute of limitations. The conspiracy claims in Plaintiffs' SAC are properly stated for the reasons below.

Plaintiffs have alleged four conspiracy claims: (1) a claim under § 1985 for conspiracy to deprive Plaintiffs of the equal protection of the laws (Count II); (2) a derivative §1986 claim for failure to prevent the §1985 conspiracy claim (Count III); (3) a §1983 claim for conspiracy to commit the constitutional violations alleged in the SAC (Count I); and (4) a state law conspiracy claim (Count IX).

It is well-recognized that a plaintiff's complaint need not plead the details of a conspiracy. Instead, the Seventh Circuit merely requires the plaintiff to provide sufficient notice to allow a defendant to respond by alleging (1) the parties involved in the conspiracy; (2) the general purpose of the conspiracy; and (3) the approximate date of the conspiracy. *Tillman*, 2011 U.S. Dist. LEXIS 79320 at *71-72 (citing *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006)). Illinois state law is in accord with respect to conspiracies alleging violations of state law. *See, e.g.*, *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1995) (the nature of conspiracies, "shrouded in mystery," prohibits a plaintiff from pleading all the details of the conspiracy with particularity).

The lenient pleading requirements appropriately reflect the impossibility of knowing the particularities of an agreement others have reached to deprive a plaintiff

26

of his rights. *Quinones v. Szorc*, 771 F.2d 289, 290-92 (7th Cir. 1985) ("the very nature of a conspiracy obscures most, if not all, information about the alleged agreement"). Thus, a complaint need not include allegations as to precisely how and when the defendants formed the conspiracy. *See Loubser*, 440 F.3d at 443; *Quinones*, 771 F.2d at 291. A conspiracy complaint rarely alleges direct evidence and, instead, is sufficient if it pleads facts that circumstantially warrant the logical inference of conspiracy. *Patterson v. Burge*, 328 F. Supp. 2d 878, 903 (N.D. Ill. 2004).

Here, Plaintiffs have pleaded more than enough to satisfy the three requirements set forth in *Tillman* and *Loubser*. First, Plaintiffs have sufficiently alleged the parties involved in the conspiracy–i.e., all of the named defendants, as well as several named unsued co-conspirators. *See* SAC ¶¶ 21-44.

Second, the SAC sufficiently alleges that the purpose of the conspiracy was to deprive the Plaintiffs of their constitutional rights, which include: the right to be free from the excessive use of force; to be free from unreasonable search and seizure; to be free from wrongful confinement and imprisonment; the right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience"; the right of access to the courts and to a fair and impartial trial; the right to equal protection of the law; and the right to due process of law. *See, e.g.*, SAC ¶ 335. The more general purpose of the conspiracy as pleaded was, as a matter of pattern and practice, to torture false confessions from African American suspects at Area 2 and later at Area 3, in order to obtain wrongful convictions. *See, e.g.*, SAC ¶¶ 336-39.

27

Third, Plaintiffs also sufficiently allege the approximate dates of the conspiracy–from its earliest inception by Burge and other detectives in 1973 (SAC, ¶¶ 227, 267(a)); to 1982 when Daley joined the conspiracy (SAC ¶ 249); through to 1983, when McGuire gave false testimony during Mr. Jones's trial for murder (SAC ¶¶ 88-90); through 1991, when McWeeny and others tortured TyShaun Ross during an interrogation (SAC ¶ 326(r)); from 1997 through 2003, while Devine was State's Attorney and took numerous and repeated actions to cover up his own and Burge's role in the systematic torture regime (SAC ¶¶ 278-83); until (at least) June 2010, when, during his federal criminal trial for perjury and obstruction of justice, Burge testified under oath that he had not participated in the torture of any criminal suspect (SAC ¶¶ 297-300). During his trial, Burge also denied condoning the use of torture to extract confessions from criminal suspects and denied having knowledge of any CPD officer under his command having ever tortured any criminal suspects. SAC ¶¶ 297-300. These allegations are more than adequate to satisfy the pleading requirements.

The Seventh Circuit has interpreted *Iqbal* to mean that "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson*, 614 F.3d at 405 (emphases in original). *See also Tillman*, 2011 U.S. Dist. LEXIS 79320 at *77 (citing *Swanson*, 614 F.3d at 406-07).

There are ample allegations in the SAC regarding the nature, dates, and participants in a number of overt acts in furtherance of the conspiracy. For example,

28

the SAC alleges that: (a) from 1973 to 1991, Burge, Byrne, Bosco, Flood, McGuire, and McWeeny, individually and in concert, with Burge's direct supervision and knowledge, participated in numerous acts of torture on Class members in order to coerce false confessions as part of a pattern and practice at Area 2 (SAC ¶¶ 96, 107-10, 124-27, 169-70, 206, 226-29, 326(a)); (b) during a four-day-long detention, Burge, assisted by Flood and McWeeny, tortured Mr. Jones by electrocuting his foot, thigh, and penis with the "shock box" (SAC ¶¶ 61-73); (c) as part of the same scheme, the Defendant Officers fabricated and suppressed evidence, and testified falsely at hearings and trials in order to conceal and continue the conspiracy (SAC ¶ 267) ; and (d) although Burge directed and supervised the torture program at Area 2 and later, at Area 3, these illegal activities could not have continued without the acquiescence of Brzeczek, Daley, Devine, and Kunkle (SAC ¶ 237). A fair reading of the complaint defeats the Defendants' contention that the conspiracy allegations are vague or implausible.[1]

A §1985 conspiracy claim may be brought when "two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). To state a § 1985 conspiracy claim, a plaintiff must only allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Tillman*, 2011 U.S. Dist. LEXIS 79320 at *75 (quoting *Griffin v. Breckinridge*, 403 U.S. 83, 102 (1971)). Here, Plaintiffs allege that:

---

[1] Plaintiffs' demonstration above as to the sufficiency of his § 1983 conspiracy allegations applies equally to the state law conspiracy claim.

> Because the conspiracy or conspiracies and the overt action in
> furtherance thereof [were] done and continue to be done with the
> knowledge and purpose of depriving Plaintiffs, who are African American,
> and numerous other African American torture victims of the equal
> protection of the laws and/or of equal privilege and immunities under the
> law, and with racial animus toward Plaintiffs and other victims of this
> racially-motivated conspiracy, the Defendants also deprive Plaintiffs of
> their right to equal protection of the laws under the Fourteenth
> Amendment and 42 U.S.C. § 1985.

SAC ¶ 333.

Additionally, the SAC alleges at least seventeen separate occasions during which the Defendants and their unsued co-conspirators engaged in a pattern of torture and abuse directed exclusively against African Americans. *See* SAC ¶ 326. The SAC alleges that the class that Mr. Jones represents includes others out of an estimated 135 African American men who were arrestees, witnesses, or suspects at Area 2 or Area 3 and were victims of police torture; the failure of the Defendants to intervene in this torture; and the conspiratorial cover-up of the systematic torture regime. SAC ¶ 49. Thus, Plaintiffs allege a decades-long conspiracy that is premised on racial animus.

Plaintiffs have likewise satisfied the pleading requirements for a conspiracy under state law. For purposes of the state law conspiracy claim, Plaintiffs must allege that each defendant "knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). The SAC alleges that the Defendants participated in a common scheme to engage in torture or otherwise degrading treatment; these are unlawful acts. *See*, *e.g.*, SAC ¶ 326. Burge, Flood, and

30

McWeeny individually participated in the torture against Mr. Jones. SAC ¶¶ 59-74. These same defendants, along with Byrne, Bosco, and McGuire and others, participated in the torture of the Class. *See* SAC ¶ 326. Each of the Defendants suppressed evidence of the torture of which Mr. Jones and the members of the Class were victims. *See*, *e.g.*, SAC ¶ 267. Under quite similar facts in *Tillman*, the district court denied the motion to dismiss Mr. Tillman's conspiracy claims. *Tillman*, 2011 U.S. Dist. LEXIS 79320 at * 78.

## V. Defendants Daley, Devine, and Kunkle do not have immunity from the claims that Plaintiffs allege against them for misconduct as Cook County State's Attorneys.

Count V(A) and Count V(B) of the SAC allege Fifth and Fourteenth Amendment claims for coercive interrogation. Named defendants in Count V(A) include Bosco, Byrne, Flood, McGuire, and McWeeny, who acted under the direct supervision and acquiescence of Burge, and physically tortured Mr. Jones and other members of the Class. Former ASAs Devine and Kunkle are also included in Count V(B), who allegedly possessed personal knowledge of coercion by the police defendants and acted to conceal this coercion by making false statements to discredit evidence of torture, refusing to investigate allegations of torture despite personal knowledge that such allegations were truthful and accurate, suppressing evidence which would support the torture allegations against Burge and his subordinate officers, and orchestrating a series of legal decisions designed to shield Burge and other Officer Defendants from liability. SAC ¶¶ 274-78. Devine and Kunkle personally benefitted from their

involvement by way of $1 million in legal fees that the City of Chicago paid to Devine's firm for representing Burge in civil cases and Police Board proceedings. SAC ¶ 273. Burge, Daley, Devine, and Kunkle also benefitted from their involvement via career advancement. SAC ¶¶ 233-34.

Daley is also a defendant in Count V(B) for his repeated failure as a supervisor of the Cook County States' Attorney's Office to intervene, investigate, and appropriately discipline individuals employed by the City and County who were known to have been involved in the ongoing pattern of torture and abuse by Burge and detectives under his command and by Assistant State's Attorneys, all of whom were repeated accomplices in this conduct. Daley's failure to supervise, intervene, investigate, and discipline subordinates relating to the unconstitutional abuse of Plaintiffs, was a proximate cause of Plaintiffs' coercive interrogations and resulting wrongful convictions.

Counts III and IV allege proper interrelated supervisory liability and failure to intervene claims against Daley, Devine, and Kunkle. The fact that Daley, Devine, and Kunkle may not have participated directly in the physical abuse of the Plaintiffs is no defense to this claim. *See, e.g., Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (a defendant's direct participation in the deprivation of the plaintiff's constitutional rights is not necessary for there to be liability); *Al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009), *rev'd on other grounds*, *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074 (2011) (same). Rather, to be liable under § 1983 for failure to adequately supervise and discipline a

32

subordinate, which is a form of failure to intervene liability, a supervisor must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988); *see also Anderson v. Cornejo*, 355 F.3d 1021, 1022-23 (7th Cir. 2004). The Ninth Circuit has explained and clarified the propositions that are set out in *Jones*:

> Supervisors can be held liable for the actions of their subordinates (1) for setting in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that shows a "reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotation marks omitted). Any one of these bases will suffice to establish the personal involvement of the defendant in the constitutional violation.

*Al-Kidd*, 580 F.3d at 965.

The SAC adequately alleges all of these alternative requirements. It adequately alleges that Daley, Devine, and Kunkle were aware of facts relating to the pattern of abuse of African American suspects at Area 2 in order to obtain confessions that they facilitated, condoned, or at a bare minimum, ignored. The following facts support a reasonable inference of Daley, Devine, and Kunkle's deliberate indifference to the pattern of torture:

33

- "Daley knew about or was on notice of the activities at Area 2, and later Area 3, as a result of a February 1982 investigation involving the arrest of Andrew Wilson . . . . Wilson confessed [to murder], but not until after he was tortured by electrocution, suffocated with a plastic bag, burned on a radiator, and beaten . . . . Daley and Brzeczek monitored each development during the Wilson investigation." SAC ¶¶ 249-51.

- Andrew Wilson's arrest in February 1982 was contemporaneous with Mr. Jones's. SAC ¶ 250.

- "In February 1982, Brzeczek, Daley, Devine, and Kunkle received credible information from Dr. John Raba, the Director of Medical Services at Cook County Jail, that Andrew Wilson bore physical signs of torture after interrogation at Area 2. Dr. Raba wrote a letter to Brzeczek describing, in detail, his medical examination of Wilson and demanded a complete investigation. Brzeczek, in turn, forwarded Dr. Raba's letter to Daley explaining that there were allegations of torture at Area 2 and requested advice on whether he should investigate further. Daley, Devine, and Kunkle discussed the letter from Brzeczek with each other, but declined to investigate further." SAC ¶¶ 255-58.

- "[I] in May 1983, despite having received notice from Superintendent Brzeczek about the signs of police torture endured by Andrew Wilson during his 1982 interrogations, Daley publicly commended Burge and other Area 2 detectives for their fine work on the Wilson case." SAC ¶ 259. This is just one example of a plethora of statements by Daley designed to conceal the torture and abuse that had taken place at Areas 2 and 3.

- Because Daley, Devine, and Kunkle were on notice of the torture at least as early as 1982 due to the torture of Andrew Wilson and Brzeczek's subsequent letter, "Daley, Devine, and Kunkle also condoned the pattern and practice of torturing African American male arrestees, witnesses, and suspects at Area 2 and Area 3 by refusing to investigate the numerous complaints of torture or to intervene when Brzeczek refused to investigate." SAC ¶ 240.

- Beginning at least as early as 1988, Daley "was confronted with voluminous amounts of evidence that Burge was the central figure in a longstanding, well-organized program of the torture and cruel, inhuman, and otherwise degrading treatment of African American male arrestees, witnesses, and suspects at Area 2." SAC ¶ 284.

- Under Daley's direction, and later Devine and Kunkle's, the Cook County SAO continued to prosecute numerous African American homicide suspects who

34

allegedly confessed to homicide while in custody at Area 2. In many of these cases, the SAO decided to seek the death penalty against the criminal defendant. In Illinois, a decision to seek the death penalty requires the approval of the State's Attorney. Accordingly, Daley and Devine are required by law to have personally reviewed the facts and circumstances of many of these cases. It is reasonable to infer that from a review of these cases, Daley, Devine, and Kunkle noticed a pattern of African American homicide suspects who were claiming that they were tortured in order to extract confessions, and yet still decided to continue to prosecute, and in many cases even seek the ultimate penalty of death against, suspects who had allegedly made such confessions.

In sum, the SAC alleges that neither Daley, Devine, nor Kunkle took action to investigate any of these matters; never intervened; and never took any steps to ensure that, if their subordinates were complicit in the torture of suspects, they were disciplined for their misconduct. From this, it is reasonable to infer that Daley's failure to supervise his assistants was a proximate cause of Plaintiffs' torture.

Daley argues that a claim against him based upon the misconduct of Devine, Kunkle, and other subordinates in the Cook County SAO cannot stand because "[a]ny suggestion that Mr. Daley was somehow responsible for the alleged misconduct of other state's attorneys would be nothing more than a *respondeat superior* claim." Docket #105 at 11. This argument is faulty in its premise as it ignores the facts summarized in the preceding paragraphs. It also ignores the settled principle that while *respondeat superior* liability is concededly unavailable in the § 1983 context, a supervisor who knows about a risk of serious harm and "condones," "facilitates," or "turns a blind eye" to that risk *is* liable to the injured plaintiff. *See Jones*, 856 F.2d at 992-93. It also ignores the established rule that a defendant need not have personally participated in

35

the violation of a plaintiff's constitutional rights in order to have personal responsibility for the violation. *See Smith*, 761 F.2d at 369.

Indeed, it is well settled that, in an analogous situation, a municipality may be liable when a supervisor receives repeated complaints of constitutional violations and fails to take disciplinary or other action in response. *See, e.g., Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (deliberate indifference may be demonstrated by, among other things, "failure to act in response to repeated complaints of constitutional violations by . . . [police] officers"). Daley, Devine, and Kunkle's liability under Count IV turns on just such failures to act.[2] Over six and a half years, beginning at least as early as the torture of Andrew Wilson in February of 1982, Daley repeatedly learned of instances in which Burge and his detectives had extracted confessions by torture and Daley's own subordinates at the SAO either participated in the interrogations (as was the case in Wilson) or had taken the resulting statements. SAC ¶¶ 284-89. This policy of deliberate indifference continued under Devine and Kunkle's stewardship of the SAO after 1997. *See* SAC ¶¶ 278-79. Neither Daley, Devine, nor Kunkle took steps to exert control over their own employees. It is certainly reasonable to infer that, if Daley, Devine, and Kunkle had not been deliberately indifferent, Plaintiffs' torture would not have happened.

---

[2] Daley's liability as a supervisor is in his personal, individual capacity liability arising from his individual failures to act when he was repeatedly put on notice that his assistants were complicit in torture. *C.f., e.g., Dodds v. Richardson*, 614 F.3d 1185, 1195-97 (10th Cir. 2010) (holding that a supervisor who implements an unconstitutional policy can be held liable in his individual capacity for doing so).

36

Plaintiffs' claims are further supported by the allegations that Daley, from 1982 onward, also failed to intervene to prevent Burge and his fellow police defendants from continuing their pattern and practice of racially motivated torture designed to obtain coerced confessions. Although Burge and his officers were not ASAs under Daley's direct supervision and control when he was State's Attorney, Police Superintendent Brzeczek, in 1982, expressly gave Daley the opportunity to intervene to investigate, discipline and/or prosecute those responsible for the torture. *See* SAC ¶ 257. Moreover, Plaintiffs allege that Daley was acting pursuant to a conspiracy with Burge, Byrne, Brzeczek, and the other police defendants; and that Daley's subordinates, including Devine and Kunkle, worked with the police defendants in facilitating this pattern and practice. In these circumstances, Daley, and later Devine, as the chief law enforcement office of Cook County and the elected Cook County State's Attorney, had a duty to intervene to prevent further misconduct by Burge, Byrne, and their associates. Despite this duty, Daley, Devine, and Kunkle declined to take any action. This inaction also gives rise to a separate but interrelated claim of failure to intervene because of Daley, Devine, and Kunkle's "knowing[] refus[al] to terminate a series of acts by others, which [they] knew or reasonably should have known would cause others to inflict constitutional injury" and because their non-intervention constitutes "conduct that shows a 'reckless or callous indifference to the rights of others.'" *Al-Kidd*, 580 F.3d at 965.

37

In sum, Counts III, IV, V(A), and V(B) are legally sufficient as to Daley, Devine, and Kunkle. Plaintiffs should be permitted to proceed on these claims.

## A. Neither Daley, Devine, nor Kunkle are shielded by prosecutorial immunity from Plaintiffs' claims against them arising from their actions and inactions as Cook County State's Attorneys.

Daley, Devine, and Kunkle argue that they have immunity for failure to disclose exculpatory information to Plaintiffs during their tenure at the SAO. *See*, *e.g.*, Docket #111. However, Plaintiffs are not alleging that Daley, Devine, and Kunkle, in their role as State's Attorney (and Assistant State's Attorney), are liable for failure to disclose exculpatory material. Rather, Plaintiffs allege that they are liable under several counts in the SAC, including Count IV (failure to intervene) for their personal failure to supervise, intervene, investigate, and discipline.

In Count V(B), Plaintiffs assert that Daley, Devine, and Kunkle are liable for coercive interrogation. The basis of this liability is Daley, Devine, and Kunkle's failure to supervise, intervene, investigate, and discipline other Defendants and prosecutors, despite having the knowledge and opportunity to do so, and the fact that these inactions caused or continue to cause members of the Class to suffer injuries, including but not limited to wrongful charging, prosecution, conviction, and imprisonment. *See* SAC ¶¶ 360-61. Daley, Devine, and Kunkle's subordinates who collaborated with Burge, Byrne, and their co-conspirators to secure false confessions are not entitled to absolute immunity. Absolute prosecutorial immunity is available only for prosecutorial misconduct that is "intimately associated with the judicial phase of the

criminal process." *Imbler v. Pactman*, 424 U.S. 409, 430 (1976). Thus, a prosecutor is not shielded from liability simply based on his job title. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (instructing courts to "look[] to 'the nature of the function performed, not the identity of the actor who performed it'") (internal citations omitted). To determine whether prosecutorial immunity attaches to alleged conduct, courts first presume that qualified immunity is sufficient, and "apply absolute immunity only when the party seeking it meets his 'burden of showing that such immunity is justified for the function in question.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991). The Supreme Court has been "quite sparing" in affording absolute immunity, even where it had been afforded under common law. *Buckley*, 509 U.S. at 269.

Absolute immunity does not apply when a prosecutor is engaged in acts that serve an "investigative function [] normally performed by a detective or police officer." *Id.* at 273. *See also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (explaining that absolute immunity may not apply when a prosecutor is engaged in investigative or administrative tasks); *McGhee v. Pottawattamie*, 547 F.3d 922, 930 (8th Cir. 2009) (affirming a district court's ruling that "investigatory actions" taken before filing an information against defendants were not within the scope of absolute prosecutorial immunity). The Supreme Court has affirmed that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, makes statements to the press, or acts as a witness in support of a warrant application. *See Van de Kamp*, 555 U.S. at 342-43 (citing cases).

39

Applying these principles, numerous courts have held that Assistant State's Attorneys who participate in the interrogation process before the defendant has confessed to any crime or who participate in the manufacture of admissions that are known to be coerced are not protected by absolute immunity. *See, e.g., Orange v. Burge*, 2008 WL 4443280 (N.D. Ill. Sept. 29, 2008) (absolute immunity not available to ASA who was involved in plaintiff's interrogation and coached the plaintiff in regard to the false confession he was to give in exchange for the cessation of torture); *Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004) (holding that the plaintiff stated a claim and the ASA was not entitled to absolute immunity to the extent the complaint alleged the prosecutor had participated in the plaintiff's physically coercive interrogation prior to the confession); *Williams v. Valtierra*, 2001 WL 686782 (N.D. Ill. Jun. 18, 2001) (prosecutors who denied medical care to a suspect during the interrogation process are not entitled to absolute immunity); *Hill v. City of Chicago*, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) (denying absolute immunity to a prosecutor who fed details about the crime to a suspect prior to his confession).

Under these cases, Devine and Kunkle, who were both high-ranking ASAs under Daley, and who both are alleged to have been active participants in the events giving rise to Plaintiffs' SAC, are not entitled to absolute prosecutorial immunity. The supervisory claims against Daley are based on the misconduct of Devine, Kunkle, and other ASAs. Daley is no more entitled to absolute immunity for his failure to supervise his subordinates than are Devine and Kunkle. For the same reasons, neither Daley,

40

Devine, nor Kunkle are entitled to absolute prosecutorial immunity for their failure to intervene with Burge and the police officer defendants.

Daley, Devine, and Kunkle rely heavily on *Van de Kamp v. Goldstein*. The *Van de Kamp* court held that a supervisory prosecutor is entitled to the absolute immunity of his subordinate with respect to a claim based upon his failure to train, supervise and manage the disclosure of *Brady* material to the defendants. *See Van de Kamp*, 555 U.S. at 344. But the *Van de Kamp* holding with respect to the immunity of supervising prosecutors depended upon the functional analysis that has governed all prosecutorial immunity decisions since *Imbler*. *See id*. It is therefore clear, following *Van de Kamp*, that the Court will not sanction absolute immunity for supervisory prosecutors alleged to have failed to supervise subordinates who participated in coercing confessions by torture.[3]

Devine and Kunkle argue that as the state law claims against them are based on the same factual allegations as the §1983 claims and that they are entitled to absolute immunity on the state counts as well. Docket #111 at 11. However, for the same reasons that they have no basis to assert the absolute immunity defense in opposition to Counts III, IV, V(A), and V(B), they have no basis to assert the immunity defense in

---

[3] By the same reasoning, Daley, Devine, and Kunkle's personal actions as State's Attorney (or assistant State's Attorney) in furtherance of the conspiracy are not subject to absolute prosecutorial immunity. Under *Buckley v. Fitzsimmons*, Daley, Devine, and Kunkle's failure to intervene to prevent the torture that occurred during the 1982 manhunt and following Andrew Wilson's arrest, their squelching of any subsequent police or prosecutorial investigation of the abuses at that time, and their subsequent refusal to take any steps to halt the conspiratorial pattern and practice of police torture and coerced confessions are all investigative acts for which absolute prosecutorial immunity is not available.

41

opposition to Plaintiffs' state law claims. Similarly, they are not entitled to immunity on any other of the counts contained in the SAC.

**B.    Neither Daley, Devine, nor Kunkle are shielded by sovereign immunity from Plaintiffs' claims arising from their actions and inactions as Cook County State's Attorneys.**

Daley, Devine, and Kunkle further claim that the Eleventh Amendment protects them against Plaintiffs' claims based on their actions and inactions as State's Attorneys of Cook County. Their argument fails because it is based on the faulty assertion that they are being sued in their official capacity, not their individual capacities. Plaintiffs clearly state that Daley, Devine, and Kunkle are being sued in their individual capacities. SAC ¶¶ 32, 36, 41. The SAC further explains that the basis of their liability is their failure to personally supervise, personally intervene, personally investigate, and personally discipline their co-Defendants as well as other co-conspirators and employees of the Cook County SAO and City of Chicago after they had personal knowledge that torture was being used to obtain confessions. Additionally, Daley, Devine, and Kunkle personally benefitted from their failures to act by way of career advancement. Plaintiffs have stated individual capacity claims against Daley, Devine, and Kunkle that are sufficient to withstand a motion to dismiss. *Cf., e.g., Wilson v. Civil Town of Clayton*, 839 F.2d 375, 383-84 (7th Cir. 1988) (individual capacity liability turns upon a showing of direct responsibility for the constitutional violation). The Eleventh Amendment is not a defense to such claims. *See, e.g., Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991).

42

Daley makes the same argument in favor of dismissing Plaintiffs' claims against him as the Mayor. For the same reasons that the Eleventh Amendment does not bar a claim against Daley in his individual capacity as Cook County State's Attorney, the Eleventh Amendment does not bar a claim against Daley in his individual capacity as mayor. Accordingly, Daley is not entitled to sovereign immunity.[4]

## VI. The SAC states viable claims against Daley arising from his actions and inactions as Mayor.

Daley also appears to misinterpret Plaintiffs' claims against him arising from his actions and inactions as the Mayor. Docket # 105 at 2. Plaintiffs' SAC alleges a claim against Daley and all named Defendants based upon the doctrine that the suppression or concealment of exculpatory information can give rise to a due process claim for infringement of a plaintiff's right to a fair trial. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). The duty to disclose exculpatory information, and the potential for § 1983 liability for failure to disclose–does not terminate at conviction. To the contrary, law enforcement officials may be liable for concealing exculpatory information after the plaintiff's conviction and thereby prolonging the wrongful conviction and incarceration of Mr. Jones and other members of the class. *See, e.g.*, *Houston v. Partee*, 978 F.2d 362, 368 (7th Cir. 1992) (holding prosecutors who learned exculpatory information while the plaintiff's appeals were pending were not entitled to absolute immunity from suit seeking to recover for the prolongation of the plaintiff's

---

[4] Daley makes essentially the same argument to challenge Plaintiffs' claims against him based on his actions and inactions as Mayor of Chicago. For the same reasons that are stated in the text, this argument is not sufficient to dismiss the claims against Daley arising from his personal wrongdoing as Mayor.

incarceration while the information was being concealed); *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007) ("the duty to disclose [exculpatory information] extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *Patterson v. Burge*, 328 F. Supp. 2d 878, 888 (N.D. Ill. 2004) ("actions by government officials which influence a plaintiff's post-conviction proceedings are not immune from suit"); *Cooney v. Casady*, 652 F. Supp. 2d 948, 956 (N.D. Ill. 2009) (Bucklo, J.) (absolute immunity not available for DCFS attorney who committed alleged unconstitutional act during the administrative appeals process and after she ceased to have a role in Plaintiff's proceedings).

In this case, the concealment of exculpatory information from Plaintiffs began prior to the convictions of Mr. Jones and most other members of the Class. Defendants Burge, Byrne, and the Defendant Officers are all, *inter alia*, alleged to have concealed from Plaintiffs and their counsel their involvement in the torture and abuse of numerous other African American suspects. This pre-trial suppression of evidence caused the wrongful conviction of Jones and other members of the Class.

The cover-up and concealment of the Burge-connected torture continued for years following Mr. Jones's wrongful conviction. Plaintiffs allege that actions and inactions by Daley and others to prevent and deflect public scrutiny of the actions of Burge and his men, and to deprive Plaintiffs of information regarding the scope and nature of the Burge torture, prolonged the unjust convictions and incarcerations of Plaintiffs.

44

The SAC alleges that, as mayor, Daley acted in furtherance of a conspiracy, which he had joined in February of 1982 as the Cook County State's Attorney, that had among its purposes the torture of African American suspects to coerce false confessions and thereby obtain wrongful convictions, and, thereafter, the concealment of exculpatory information about the pattern and practice of torture. This conspiracy included among its members Burge, Byrne, and their associates who tortured Plaintiffs and others with Burge's approval and/or direct involvement; high-ranking police officials, including Brzeczek; and Assistant State's Attorneys under Daley's command, including Devine and Kunkle.

As a co-conspirator, it is axiomatic that Daley is responsible not only for his own misconduct, but also for the "acts and declarations of [the other] conspirators, made after the formation and in furtherance of the conspiracy," including those actions and declarations that *preceded* Daley's own involvement. *See United States v. Porter*, 542 F.3d 1088, 1093 n.3 (5th Cir. 2008) (citations and quotation marks omitted); *Jones v. City of Chicago*, 856 F.2d 985, 990 (7th Cir. 1988) (the function of a § 1983 conspiracy is to yoke particular individuals to the specific constitutional torts alleged in the complaint); *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir. 1981) ("Each conspirator is liable for overt acts of every other conspirator done in furtherance of the conspiracy, whether the acts occurred before or after he joined the conspiracy").[5]

---

[5] The criminal conspiracy cases cited above apply equally to a civil conspiracy matter. This is because it is a well-settled principle that "courts treat civil and criminal conspiracy alike…so that the abundant precedents on the meaning of criminal conspiracy are available for use in the civil context." *Hartford Acc. & Indem. Co. v. Sullivan*, 846 F.2d 377, 383 (7th Cir. 1988).

Daley's own actions as mayor, in furtherance of the conspiracy include:

• Daley was Mayor of Chicago from 1989 to 2011, and "as such was the chief policymaker for the City of Chicago, CPD, City Council, and Police Board." SAC ¶ 31. From 1988 to 1997, Kunkle and Devine, through Devine's private law practice, were counsel for Defendants Burge, Byrne, and other Area 2 police officers in several civil suits, defending them against claims of torture. As such, he and Devine were Special Assistant Corporation Counsel, paid by, and agents for, the City of Chicago, its Mayor, City Counsel, and Corporation Counsel's Office. SAC ¶ 34. In this role, which was sanctioned by Daley in his role as Mayor, Devine and Kunkle concealed torture and other violations committed by Burge, other named defendants, and officers under Burge's command. Devine's law practice received over $1 million in legal fees as a result of this appointment and representation. SAC ¶ 273.

• "From at least 1988 to 1996, Daley was confronted with voluminous amounts of evidence that Burge was the central figure in a longstanding, well-organized program of the torture and cruel, inhuman, and otherwise degrading treatment of African-American male arrestees, witnesses, and suspects at Area 2." SAC ¶ 284. Despite this knowledge, Daley took no action and as such failed to properly supervise, intervene, investigate, and discipline.

• When the 1990 OPS Report was made public in 1992, Daley "attempted to obscure the participation of Burge and other City employees by announcing that the reports contained 'only allegations.'" SAC ¶ 285. On separate occasions, Daley has also stated that the accusations of torture are not "substantiated cases," that the accusations are only "allegations, rumors, stories, things like that," and has denied that the torture at Area 2 was "systematic." SAC ¶¶ 286-87.

• "In 1996, despite his knowledge that Peter Dignan has been accused of substantial wrongdoing in more than a dozen police torture cases and was a key figure in the systematic torture regime, Daley promoted [Dignan] to lieutenant." SAC ¶ 288.

• "In October 2006, while Daley was mayor, the City of Chicago entered into a secret agreement with Madison Hobley, Stanley Howard, and Leroy Orange, conditioning the financial settlement on a promise not to name Daley as a defendant in any future civil rights, obstruction of justice, or racketeering conspiracy lawsuits." SAC ¶ 289.

• Until March 28, 1994, "the City had consistently maintained that Defendant Burge had been acting within the scope of his employment." SAC ¶ 290. As

chief policy-maker for the City between 1989 and March 28, 1994, the City could not consistently maintain this position without Daley's support and acquiescence. Similarly, Daley consistently overruled the recommendations of his senior staff by directing City attorneys continue to defend Burge (as opposed to suing him), even after Burge was indicted by federal authorities for crimes arising out of the torture.

The actions and inactions of Daley and his co-conspirators to conceal the torture regime at Areas 2 and 3 made it impossible for the Plaintiffs to be afforded relief until Burge was convicted of federal perjury charges in 2010. This is because, prior to Burge's conviction, and due in large part to the actions of Daley, Burge, and other co-conspirators, police brutality ran rampant in Chicago and the "code of silence" provided immunity for is perpetrators. *See, e.g.*, SAC ¶¶ 3-4. The belated conviction of Defendant Burge in 2010—not for torture, but for perjury and obstruction of justice— also illustrates that Daley's actions and inactions as mayor and chief policy-maker for the City substantially contributed to the concealment of the Burge torture well into the twenty-first century. Thus, it is reasonable to infer that, but for Daley's actions and inactions as mayor and *chief policy-maker* to continually conceal the torture, the culture that made it impossible for victims of the Burge torture to be taken seriously by the courts and receive compensation for injuries suffered would not have continued to thrive and flourish. The allegations in the SAC are sufficient to state a claim against Daley for his involvement in the conspiracy to cover up the Burge scandal and thereby conceal exculpatory information in violation of the principles laid down in *Newsome*, *Houston*, and others.

Other Burge torture victims have made claims against LeRoy Martin (former CPD superintendent), Terry Hilliard (also a former CPD superintendent), Gayle Shines (former OPS director) and Thomas Needham (former aid to the CPD superintendent) (none of whom are named as defendants in this matter), which closely track some of the claims that Plaintiffs make against Daley here. Repeatedly, those prior claims have been upheld. In *Orange v. Burge*, 2005 WL 742641, at *13 (N.D. Ill. Mar. 30, 2005), Judge Holderman held that because "Orange asserts that Martin, Shines, Hillard and Needham participated in covering up alleged torture, failing to investigate and suppressing of information," they may be "personally liable" under § 1983 for their "individual actions." Judge Gottschall found that the allegations of evidence suppression against those same defendants in *Patterson v. Burge* "support[ed] Patterson's claim that he suffered a deprivation of his constitutional right to a fair trial." 328 F. Supp. 2d 878, 888 (N.D. Ill. 2004). In *Cannon v. Burge*, 2006 WL 273544, *13, n.10 (N.D. Ill. Feb. 2, 2006), Judge St. Eve held that Martin, Shines, Hillard, and Needham had a duty under *Brady* "to disclosure exculpatory evidence regarding what transpired outside the interrogation room." And in *Howard v. City of Chicago*, 2004 WL 2397281, *14 (N.D. Ill. Oct. 25, 2004), Judge Anderson held that "both [the plaintiff's] due process claim and his § 1983 conspiracy claim state a cause of action against defendants Martin, Shines, Hillard and Needham." Plaintiffs' claim against Daley is indistinguishable from the claims against Martin, Shines, Hilliard, and Needham that were already upheld. *See also, Tillman*, 2011 U.S. Dist. LEXIS 79320

48

at *78 (denying the motion to dismiss a conspiracy claim alleging the "cover[] up and suppress[ion of] evidence of that pattern and practice of torture of which the [p]laintiff was a victim"). Thus, the overwhelming weight of authority supports the claim Plaintiffs allege against Daley as mayor.

In an attempt to avoid these holdings, Daley raises a variety of arguments, most of which are irrelevant because they depend on a misreading of Plaintiffs' complaint. For example, Daley argues that he cannot be liable for a negligent failure to investigate the Burge torture. He asserts that he should not be found liable for failure to intervene, and he contends that he is exonerated because he was not present at the times when Plaintiffs were tortured and/or because he was not personally involved in the denial of Plaintiffs' constitutional rights. All of these contentions miss the point of the SAC that asserts a claim against Daley as Mayor—not for failure to investigate or failure to intervene—but for the concealment of exculpatory evidence. Daley cannot prevail on the theory that he was not "personally involved" in the concealment of evidence because, to the contrary, the SAC details a series of overt acts that Daley personally took to cover up the Burge torture.

Daley is alleged to have a duty, as mayor, and as the direct supervisor of the Superintendent of Police, to disclose all that he know about police torture, as well as to take all necessary steps to ensure that the Department and its officers did likewise. However, Daley did the opposite—and his inaction caused the continuing violations of Plaintiffs' rights. Moreover, Daley is not alleged to have acted alone. Rather, he is alleged to have been a participant in a broad conspiracy to conceal a range of

49

information relating to the scope of the Burge-connected torture and relating to the credibility of allegations that a number of victims had made against Burge and others. In combination, the co-conspirators are alleged to have covered up, *inter alia*, evidence that would have established the truth of numerous allegations against Burge– information of a pattern and practice that would have supported Plaintiffs' torture claims, both individually and as a Class. It is therefore plausible to infer that, if the conspiracy had not existed, Plaintiffs would not have continued to suffer continuing violations of their civil and constitutional rights. At the pleading stage, the plausibility of that inference ends the inquiry. Accordingly, the SAC adequately alleges a claim against Daley as Mayor of Chicago for violation of Plaintiffs' due process rights by concealment of exculpatory evidence.

## VII. Plaintiffs' SAC states a claim for intentional infliction of emotional distress.

Defendants argue that Plaintiffs failed to state a viable intentional infliction of emotional distress (IIED) claim because Plaintiffs failed to plead facts supporting such a claim. Plaintiffs have alleged sufficient facts to state a viable claim for IIED. The elements of an IIED claim are:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct would cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress.

50

*Feltmeier*, 798 N.E.2d at 80.   To the first element "[a] pattern, course, and accumulation of acts can make an individuals' conduct sufficiently extreme to be actionable, whereas one instance of such behavior might not be." *Id.* at 83 (internal citations and quotation marks omitted).  The second and third elements both hinge on what constitutes emotional distress.   "Emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Id.* at 84 (citing Restatement (2d) of Torts, § 46).

The relationship between the plaintiff and the defendant also has significant bearing on the viability of an IIED claim:

> [T]he degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous.  The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment.  Threats, for example, are much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out than when made by someone in a comparatively weak position.

*McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).  The Restatement specifically mentions police officers as examples of these "positions of authority." *Id.* at 810 (citing Restatement (2d) of Torts, § 46, cmt. *e*).

Under Illinois law, Plaintiffs have alleged sufficient facts in support of their IIED claim to survive a motion to dismiss.  This case does not involve an isolated incident or allegation of torture or emotional distress.   Plaintiffs have alleged a

pattern of behavior by the Defendants that resulted in "severe emotional distress, including, but not limited to, constant fear and anxiety, nightmares, sleep disruption, depression, and a recurring fear of re-arrest, torture, and re-prosecution." SAC ¶ 398.

Although Daley, Devine, and Kunkle may not have participated directly in the torture, they were aware that suspects were being tortured by Burge and those under his command. Daley and Devine became aware of the torture at least as early as February of 1982. In February of 1982, Daley and Devine received credible information that Andrew Wilson had been tortured at Area 2 from Dr. John Raba. Despite this information, Daley and Devine declined to investigate and instead began a long campaign of public statements designed to conceal the torture. As the years progressed, Daley, Devine, and Kunkle continued to disregard evidence that torture had occurred, and continued to cover up the torture and the resulting conspiracy. As States' Attorney, Daley and Devine were responsible for personally reviewing the facts and circumstances in death penalty-eligible cases for the purposes of determining whether the death penalty should be sought against a particular defendant. Reviewing these cases would have put Daley and Devine on notice that the torture and coercion present in the Wilson case was not an isolated incident, but rather the result of a pattern of systematic abuse. Had Daley or Devine intervened or even investigated, they could have put a halt to this torture and other actions resulting in extreme emotional distress to the Plaintiffs, assuming they even wanted to, which apparently they did not. Additionally, it appears that after Daley decided to ignore the Raba letter, Raba did not attempt to take further action to make public officials or the public

52

aware of the torture. This should have reasonably lead Daley to believe that as the head of the SAO, and later chief policy-maker for the City, that if he did not take action to intervene in the torture and bring these allegations to light, it was unlikely that anyone else with the power or authority to do so would intervene.

Assuming, solely for the purposes of this argument, that the Defendants did not intend for Plaintiffs to suffer extreme emotional distress as a result of the torture and other violations of the Plaintiffs' rights, the Defendants reasonably *should have* known that the Plaintiffs would suffer extreme emotional distress as a result of the torture and the conspiracy to conceal the torture. The purpose of torture is to cause the victim to feel physical pain and emotional distress. *See* 18 U.S.C. § 2340(1). Thus, the Defendants reasonably *should have* known that the torture would have resulted in severe emotional distress to the Plaintiffs, which is enough to satisfy the second element and intent requirement of an IIED claim. Additionally, reviewing death penalty-eligible cases *should have* alerted Daley, Devine, and Kunkle to the fact that this was an ongoing pattern of abuse, and not an isolated incident. Based on his status both as the States' Attorney and the Mayor of Chicago, Daley also should have been aware that there was a causal connection between his refusal to intervene and the ongoing deprivation of Plaintiffs' rights. Plaintiffs, therefore, have stated a valid claim for intentional infliction of emotional distress against the Defendants.

53

**VIII.    Plaintiffs have adequately pleaded several interrelated *Monell* policy and practice claims, including, *inter alia*, a longstanding pattern and practice of racially-motivated torture of African American male arrestees, witnesses, suspects during interrogation, directed by Defendants Burge and Byrne, which was a direct cause of Plaintiffs' torture and wrongful convictions.**

Defendants assert that Plaintiffs' *Monell* claim, alleging a longstanding pattern and practice of racially-motivated torture of African American male arrestees, witnesses, and suspects during interrogations, directed by Burge and Byrne, are dependent upon the claims in Counts I through VI of the SAC and are likewise time-barred.  Docket #110 at 14.  Plaintiffs incorporate by reference their above arguments regarding the statute of limitations here.

A plaintiff cannot survive a motion to dismiss for failure to state a claim by merely listing previous instances of misconduct and extrapolating from them the existence of an "abstract [policy] of violating citizens' constitutional rights."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).  That said, it is well established that "plaintiffs in a § 1983 suit against a municipality need not meet any heightened pleading standards, but must only comply with conventional pleading standards."  *Knapp v. City of Markham*, 2011 WL 3489788, at *5 (N.D. Ill. 2011).

The allegations in the SAC are fundamentally different from the cases in which courts have granted motions to dismiss based upon mere allegations of an abstract policy.  In this case, Plaintiffs claim that the City engaged in a specific course of conduct–torture, abuse, and racial discrimination–against a discrete class of victims– African-American arrestees, witnesses, and suspects. This is certainly sufficient to

survive a motion to dismiss for failure to state a claim upon which relief can be granted. *See, e.g.*, *Knapp v. City of Markham*, 2011 WL 3489788 (N.D. Ill. 2011) (denying a motion to dismiss because the plaintiffs claimed that the City of Markham maintained a practice of treating African-American employees more favorably than Caucasian and other non-African-American employees); *Glover v. Village of Oak Lawn*, 2000 WL 1847599 (N.D. Ill. 2000) (denying a motion to dismiss because the plaintiffs claimed that the Village of Oak Lawn and its police department "stop, detain, search, and issue traffic tickets to individuals traveling on the streets and highways in Oak Lawn and adjacent communities on the basis of race without sufficient cause and justification for the express purpose of deterring African Americans and Hispanic Americans...from traveling through Oak Lawn"); *Jefferson v. City of Chicago*, 1999 WL 116223 (N.D. Ill. 1999) (denying a motion to dismiss because the plaintiffs claimed that the City of Chicago Bureau of Water Operations had a widespread practice of not promoting qualified African-American candidates to the Chief Engineer position).

It should also be noted that, under the Supreme Court's decision in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993), a *Monell* plaintiff need not state anything more than "a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *Leatherman*, 507 U.S. at 165 (quoting and adopting *Karim-Panahi v. L.A. Police Dept.*, 839 F.2d 621, 624 (9th Cir. 1988)). Of course, Plaintiffs allege much more–Plaintiffs provide a fact-specific description of a pattern and practice of racially-motivated torture

55

of African American male arrestees, witnesses, and suspects, spearheaded and implemented by the Defendants, which was initiated years before and continued years after Mr. Jones and the other Plaintiffs were tortured.

As in *Tillman*, where the motion to dismiss the plaintiff's *Monell* claim against the City of Chicago was rejected, here the Plaintiffs similarly allege there was a widespread, well-settled practice within Area 2 of systematic abuse of suspects; "that this practice was confirmed through OPS findings and other determinations that confirmed that this abuse was 'systemic'"; and "that the same instruments and methods were used at Area 2 on more than two dozen suspects in similar circumstances." SAC ¶¶ 96, 226-29, 243-53. *See also Tillman*, 2011 U.S. Dist. LEXIS 79320 at * 80. (citing *Kitchen v. Burge*, 781 F. Supp. 2d 721, 739 (N.D. Ill. 2011); *Andrews v. Burge*, 660 F. Supp. 2d 868, 882 (N.D. Ill. 2009)); *Cannon v. Burge*, 2006 WL 273544, *15 (N.D. Ill. Feb. 2, 2006) (decisions in this district allowing *Monell* claims alleging similar facts to proceed).

Furthermore, these OPS findings were supplemented by a determination that Burge was the prime mover in this pattern of abuse. *See* SAC ¶ 229. Indeed, in February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson. Additionally, Burge was tried and convicted for perjury and obstruction of justice for denying that he tortured African American males at Area 2. SAC ¶ 1.[6]

---

[6] This court can take judicial notice of the various courts that have found there to be a similar pattern and practice under Burge. *See, e.g., United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) ("[I]n the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract

Plaintiffs' allegations support the reasonable inference that there was a pattern and practice of torture that was closely and unmistakably linked to Mr. Jones's own torture and wrongful conviction. Plaintiffs also allege facts showing that this pattern and practice was known at the highest policy levels of the City–including by its Mayor, successive Police Superintendents, and members of the City Council–all of whom not only turned a blind eye, but also actively sought to cover up the gross misconduct. Thus, Defendants' motion to dismiss the Plaintiffs' *Monell* claim must be denied.

---

confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuses substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis"); *Hinton v. Uchtman*, 395 F.3d 810, 822 (7th Cir. 2005) ("[A] mountain of evidence indicates that torture was an ordinary occurrence at Area Two station of the Chicago Police Department during the exact time period pertinent to Hinton's case."); *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993) ("A rational jury could have inferred from the frequency of the abuse, the number of officers involved in the torture of Wilson, and the number of complaints from the black community, that Brzeczek knew that officers in Area 2 were prone to beat up suspected cop killers.").

Additionally, this court can also take notice of the official July 19, 2006 Report of the Cook County Special State's Attorney, which found that "Jon Burge, the commander of the Violent Crimes Section of Detective Areas 2 and 3," was "guilty [of] abus[ing] persons with impunity," and that it "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they." Report of the Special State's Attorney, at 16, *available at* http://www.chicagojustice.org/foi/report-of-the-special-states-attorney-critique-of-that-report/s_report_section_a.pdf (last visited Jan. 14, 2012). The Special State's Attorney also found that Police Superintendent (and co-defendant herein) Richard Brzeczek "received and believed evidence that [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that prisoner [Wilson] had confessed, that those subordinates had testified under oath on a motion to suppress and before a jury and, he had to believe, they testified perjuriously, *that the prisoner [Wilson] had been sentenced to death* and that the Superintendent still remained silent." *Id*. at 86 (emphasis in original). "At the very least," the Special Prosecutor further found, the Superintendent should have removed Burge from any investigative command and imposed "a complete shake-up at Detective Area 2." *Id*. at 88.

**Conclusion**

For the foregoing reasons, this court should enter an order denying the motions to dismiss submitted by the Defendants.

Respectfully submitted,

MELVIN JONES, ALNORAINDUS BURTON, AUBREE DUNGEY, JAMES FREEMAN, and SHERROD TILLIS, on behalf of themselves and all other similarly situated

By: /s/  Victor P. Henderson
        One of Plaintiffs' Attorney

Victor P. Henderson, Esq.
Samuel E. Adam, Esq.
Vivian Tarver-Varnado, Esq.
Henderson Adam, LLC
330 South Wells Street, Suite 1410
Chicago, Illinois  60606
(312) 262-2900
(312) 262-2901 (fax)

James D. Montgomery, Esq.
One North LaSalle Street, Suite 2450
Chicago, Illinois  60602
(312) 977-0200
(312) 977-0209 (fax)

58